## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | CASE NO. 21-32155 (MI) |
| BUCKINGHAM SENIOR LIVING | § | |
| COMMUNITY, INC.[1] | § | CHAPTER 11 |
| | § | |
| Debtor. | § | |
| | § | |

## FINAL ORDER (1) AUTHORIZING DEBTOR IN POSSESSION TO OBTAIN POST-PETITION FINANCING; (2) AUTHORIZING DEBTOR IN POSSESSION TO USE CASH COLLATERAL; (3) PROVIDING ADEQUATE PROTECTION; AND (4) GRANTING LIENS, SECURITY INTERESTS AND SUPERPRIORITY CLAIMS

This Final Order (1) Authorizing Debtor in Possession to Obtain Post-Petition Financing; (2) Authorizing Debtor in Possession to Use Cash Collateral; (3) Providing Adequate Protection; and (4) Granting Liens, Security Interests and Superpriority Claims (this "Final Order") is entered into by this Court after adequate notice and hearing upon the *Emergency Motion for Interim Order and Final Order (1) Authorizing Debtor in Possession to Obtain Post-Petition Financing; (2) Authorizing the Debtor in Possession to Use Cash Collateral; (3) Providing Adequate Protection; and (3) Granting Liens, Security Interests and Superpriority Claims* (the "Motion")[2], and upon the terms agreed to by and among Buckingham Senior Living Community, Inc. (the "Debtor"), UMB Bank, N.A., as the successor bond trustee (in such capacity, the "Bond Trustee") under the Bond Indentures (as defined below), and UMB Bank, N.A., as successor master trustee (the "Master Trustee" and together with the Bond Trustee, the "Trustee") with respect to the Master Indenture (as defined below). Upon the terms of the Motion, the

---

[1] The last four digits of the Debtor's federal tax identification number is: 7872. The location of the Debtor's principal place of business and the service address for the Debtor is: 8580 Woodway Drive Houston, Texas 77063.
[2] All defined terms not defined herein shall have the meaning ascribed in the Motion or in the DIP Credit Agreement, as applicable.

---

stipulations, acknowledgements and agreements of the Debtor, the DIP Lender and the Trustee (collectively, the "Parties"), the statements of the Parties and their counsel at the hearings on the Motion, and the record of the proceedings, the Court makes the following findings of fact and rulings of law:

## FINDINGS OF FACT

### The Debtor's Chapter 11 Case; Procedural Background; Jurisdiction and Notice

A.      On June 25, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and thereby commenced its case thereunder (the "Chapter 11 Case"). Since the Petition Date, the Debtor has been operating its business and managing its property as debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

B.      The Court held hearings to consider granting the relief requested in the Motion on an interim basis on June 28, 2021 and June 29, 2021.  Following such hearings, the Court entered an order granting the relief requested in the Motion on an interim basis, which order was entered by the Court on June 29, 2021 (the "Interim Order") [Docket No. 50].

C.      On July 12, 2021, the Official Committee of Unsecured Creditors (the "Committee") was appointed by the Office of the United States Trustee [Docket No. 97].

D.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. Venue of the Chapter 11 Case and the Motion in this district is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

E.      The Debtor has properly served notice of the Motion and the hearings thereon pursuant to sections 102, 105, 361, 362, 363 and 364 of the Bankruptcy Code and Federal Rules of Bankruptcy Procedure 2002 and 4001, 6004, 9006, and 9014 and the Bankruptcy Local Rules

which notice was sent to, among others (i) Daniel S. Bleck, Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., One Financial Center, Boston, Massachusetts 02111, counsel to the DIP Lender and the Trustee, (ii) the Debtor's 30 largest unsecured creditors, (iii) the Debtor's 30 largest unsecured vendors, (iv) the United States Trustee for the Southern District of Texas (the "U.S. Trustee"), (v) Robin Russell, Hunton Andrews Kurth LLP, 600 Travis Street, Suite 4200, counsel for the Committee, (vi) the Internal Revenue Service, (vii) persons listed on the proposed Master Service List, (viii) persons who have filed a request for notice pursuant to Bankruptcy Rule 2002, (ix) any party required to be served under the Bankruptcy Rules, (x) the Office of the Attorney General for the State of Texas, (xi) such other government agencies to the extent required by the Bankruptcy Rules and the Local Rules, and (xii) all other parties known to assert a lien on any of the Debtor's assets. Such notice is sufficient for all purposes under the Bankruptcy Code and the applicable Bankruptcy Rules in respect to the relief requested and no further notice of the relief sought in the Motion is necessary.

**The Debtor and the Community**

F.      The Debtor owns and operates a 495-unit continuing care retirement community ("CCRC") comprised of 465,000 square feet of developed property on approximately 23 acres of land which opened in 2005 (the "Community"). The Buckingham is a premiere senior living facility in the River Oaks neighborhood in Houston, Texas.

G.      The Debtor offers residential units for its residents (each a "Resident") in independent living, assisted living, memory care, or skilled nursing units and provides those Residents with necessary healthcare services, multiple entertainment outlets and other social benefits. As of the Petition Date, the Debtor provides accommodations for more than 280

Residents. To provide the quality of care and safety the Residents require, as of June 1, 2021, the Debtor employs 370 individuals to carry out the Debtor's daily operations.

**The Secured Bond Obligations**

H.      Pursuant to the Interim Order, as reaffirmed by this Final Order and subject to the limitations of Paragraph 34 herein, the Debtor acknowledged, stipulated, and agreed that: the Debtor is obligated to the Trustee for the benefit of the beneficial holders of the tax-exempt Bonds (as defined below), authorized and issued by the Tarrant County Cultural Education Facilities Finance Corporation (the "Issuer"), including (i) the Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (Buckingham Senior Living Community, Inc. Facility), Series 2007 (the "Series 2007 Bonds"), issued pursuant to that certain Indenture of Trust dated as of July 1, 2007 (the "2007 Original Indenture") between the Issuer and the Bond Trustee, (ii) the Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (Buckingham Senior Living Community, Inc. Facility), Series 2014 (the "Series 2014 Bonds"), issued pursuant to the 2007 Original Indenture, as supplemented by Supplement No. 1 to the Indenture of Trust, dated as of July 1, 2007 (the 2007 Original Indenture, as supplemented, the "2007 Indenture") between the Issuer and the Bond Trustee and (iii) the Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (Buckingham Senior Living Community, Inc. Facility), Series 2015A Fixed Rate, Series 2015B-1 Tax Exempt Mandatory Paydown Securities (TEMP-80) and Series 2015B-2 Tax Exempt Mandatory Paydown Securities (TEMP-50) (the "Series 2015 Bonds" and together with the Series 2007 Bonds and Series 2014 Bonds, the "Bonds"), issued pursuant to that certain Indenture of Trust, dated as of August 1, 2015 (the "2015

Indenture" and together with the 2007 Indenture, the "Bond Indentures") between the Issuer and the Bond Trustee.

I.      Pursuant to the Interim Order, as reaffirmed by this Final Order and subject to the limitations of Paragraph 34 herein, the Debtor acknowledged, stipulated, and agreed that: the Issuer loaned the proceeds of the Bonds to the Debtor pursuant to the Loan Agreement dated July 1, 2007 between the Debtor and the Issuer (as amended by the Amendment No. 1 to the Loan Agreement dated September 1, 2014 and the Loan Agreement dated August 1, 2015, collectively, the "Loan Agreements"). The Debtor used the proceeds of the Bonds primarily to (i) finance the construction, renovation and equipping of the Community, (ii) fund debt service reserve funds; (iii) pay a portion of the interest on the Bonds; and (iv) pay certain expenses incurred in connection with the issuance of the Bonds.

**The Bond Claim**

J.      Pursuant to the Interim Order, as reaffirmed by this Final Order and subject to the limitations of Paragraph 34 herein, the Debtor acknowledged, stipulated, and agreed that: as of the Petition Date, the amounts due and owing by the Debtor with respect to the Bonds and the obligations under the Bond Documents (as defined below) are as follows (collectively, the "Bond Claim"):

(a)      Unpaid principal on the Bonds in the amount of $140,340,000;

(b)      Accrued but unpaid interest on the Bonds in the amount of $16,276,745.83 as of June 25, 2021; and

(c)      unliquidated, accrued and unpaid fees and expenses of the Trustee and its professionals incurred through the Petition Date. Such amounts, when liquidated, shall be added to the aggregate amount of the Bond Claim.

**Security for the Bond Obligations**

K.     Pursuant to the Interim Order, as reaffirmed by this Final Order and subject to the limitations of Paragraph 34 herein, the Debtor acknowledged, stipulated, and agreed that: the rights of the Issuer under the Loan Agreements were assigned to the Trustee. In addition, as security for its obligations with respect to the Bonds, the Debtor entered into that certain Master Trust Indenture, Deed of Trust and Security Agreement dated as July 1, 2007, as supplemented by the Supplemental Indenture Number 1, dated as of July 1, 2007, the Supplemental Indenture Number 2, dated as of September 1, 2014 and the Supplemental Indenture Number 3, dated as of August 1, 2015 (as supplemented, the "Master Indenture") between the Debtor and the Master Trustee pursuant to which the Debtor granted the Master Trustee a security interest against substantially all of the Debtor's assets as described in the Master Indenture and that certain Deed of Trust and Security Agreement dated October 8, 2014, as modified by the Modification Agreement dated effective August 1, 2015 (as modified, the "Deed of Trust"), between the Debtor and the Master Trustee (all such collateral so granted under the Bond Documents, the "Pre-Petition Bond Collateral"). The Bond Indentures, the Loan Agreements, the Master Indenture, the Deed of Trust and any other document or agreement delivered as security for, or in respect of, the Bonds or the Debtor's obligations under any of such documents are collectively referred to herein as the "Bond Documents". Pursuant to these grants, the Trustee holds valid and perfected first priority liens and security interests in substantially all of the Debtor's real and personal property as security for the Bonds.

L.     Under the terms of the Bond Documents, certain accounts were established and are held by the Trustee, including, but not limited to the following funds, each as defined in the Bond Documents: a Bond Fund, including a separate Principal Account and Interest Account for

each of the four series of Bonds, a Reserve Fund with a Series 2007 Reserve Account, Series 2014 Reserve Account, Series 2015A Reserve Account and a Series 2015B Reserve Account therein (collectively, the funds in such accounts, the "Trustee-Held Funds"). As of the Petition Date, the Trustee-Held Funds totaled approximately $5,290,517. Subject to the limitations of the last sentence in Paragraph 29, and Paragraph 34, the Debtor acknowledges and agrees that (i) the Trustee-Held Funds are held in trust for the holders of the Bonds (the "Bondholders"); or (ii) in the alternative, that the Trustee holds a validly perfected possessory security interest in the Trustee-Held Funds and the Trustee is entitled to apply the Trustee-Held Funds in accordance with the terms of the Bond Documents. To the extent that the automatic stay applies to such Trustee-Held Funds pursuant to section 362(a) of the Bankruptcy Code, as adequate protection for the use of the Trustee's Cash Collateral (as defined below), the Debtor stipulates to relief from such stay for the purpose of allowing the Trustee to administer and apply the Trustee-Held Funds in accordance with the Bond Documents. Subject to the limitations of the last sentence in Paragraph 29, and Paragraph 34, the Trustee-Held Funds shall be administered and applied as set forth in the Bond Documents and for the express purposes set forth therein, and shall not be used or made available to Debtor as Cash Collateral or otherwise pursuant to this Final Order or any other order entered in this Chapter 11 Case, other than in connection with the DIP Facility (as defined below).  The Trustee-Held Funds are the source of the DIP Loans provided under the DIP Credit Agreement.  The Debtor stipulates that the use of the Trustee-Held Funds qualifies as a loan and not use of Cash Collateral.

**The Debtor's Need for Use of Cash Collateral**

M.    The Debtor has requested the use of the Cash Collateral of the Trustee in connection with the Chapter 11 Case. The Trustee does not consent to the use of its Cash Collateral, except upon the express terms of this Final Order.

N.    Without the use of Cash Collateral, the Debtor's continued operation as a going concern would be disrupted, the value of the underlying assets would significantly decline, the Debtor, its residents, its estate and its creditors would be immediately and irreparably harmed, and the Debtor will not have the funds necessary to maintain the Community, provide financial information, or pay employee compensation, payroll taxes, overhead and other expenses. The Debtor requires use of cash collateral as provided herein.

**The Debtor's Need for Debtor-in-Possession Financing**

O.    A critical need exists for the Debtor to obtain funds in order to fund the operational, capital and administrative needs of the Community, solely to the extent set forth under the Budget and under the DIP Facility (as each is defined below). The Debtor is unable to obtain postpetition financing on an unsecured basis under sections 364(c)(1) or 503(b)(1) of the Bankruptcy Code. Further, the Debtor asserts that it is also unable to obtain secured credit from sources other than the DIP Lender that would be allowable under sections 364(c)(2), 364(c)(3) and 364(d)(1) of the Bankruptcy Code for the purposes set forth in this Final Order. Further, the Trustee would not consent to any priming liens and would have argued that the Debtor could not have provided adequate protection for any such proposed financing.

P.    The DIP Lender has agreed to provide the requested DIP Loans (as defined below) under the DIP Facility and use of Cash Collateral in accordance with the terms contained in this Final Order, in the amounts, categories and times set forth in the Budget, which shall be

used for the necessary operational costs associated with the Community and other costs and expenses of administration of the Chapter 11 Case. In addition, the Trustee has agreed to the Debtor's use of Cash Collateral in accordance with the terms contained in this Final Order, in the amounts, categories and times set forth in the Budget, which shall be used for the necessary operational costs associated with the Community and other costs and expenses of administration of the Chapter 11 Case.

Q.     Without the DIP Loans, the Debtor will be unable to pay necessary payroll, costs, and operating expenses, and obtain goods and services needed to preserve the Community in a manner that will avoid irreparable harm to the Debtor's estate. At this time, the Debtor's ability to finance the ongoing operation and availability of sufficient liquidity through the incurrence of new indebtedness for borrowed money and other financial accommodations as provided herein are vital to the preservation of the Community and maintenance of the going concern value of the Debtor's estate and to otherwise provide the necessary services to the residents of the Community.

R.     The Debtor has requested that the DIP Lender provide advances (each a "DIP Loan") up to an aggregate amount of $5,000,000 (the "DIP Facility"), which funds shall be used by the Debtor solely to the extent provided in the Budget attached as **Exhibit B**.[3]

S.     The DIP Lender is willing to provide the DIP Loans, subject to the terms and conditions set forth herein and in the Interim Order, including the provisions of this Final Order providing that the Post-Petition Liens (as defined below), and the various claims, superpriority claims and other protections granted pursuant to this Final Order will not be affected by any

---

[3] As part of the DIP Facility, the DIP Loans may be used to fund a capital improvement account against which the Debtor may draw to pay capital expenses and storm damage claims, subject to the terms and conditions of the DIP Credit Agreement and in accordance with the Budget.

subsequent reversal or modification of this Final Order or any other order, as provided in section 364(e) of the Bankruptcy Code.

T.     The DIP Lender's lending of the DIP Loans is conditioned upon the grant of a lien that: (a) will prime and remain senior to the Trustee's Pre-Petition Liens; and (b) will otherwise constitute a first priority lien in all other Post-Petition Collateral (as defined below), subject only to (i) valid, binding, enforceable and perfected liens, having priority over the liens of the Trustee as of the Petition Date that are set forth on the attached **Exhibit C** (together, the "Permitted Liens")[4] and (ii) the Carve-Out.

U.     The terms of the DIP Loans have been negotiated in good faith and at arm's length among the Debtor and the DIP Lender. The terms of the DIP Loans are at least as favorable to the Debtor as those available from alternative sources, under all of the circumstances. Given the current market conditions and under the particular circumstances of the Chapter 11 Case, no other sources of funding are available. Given the exigencies of the case, the Debtor believes the DIP Loans are the best and only option. In connection with its consent to this Final Order, the Trustee exercised its rights and powers and used the same degree of care and skill in its exercise as a prudent person would exercise or use under the circumstances in the conduct of such person's own affairs, and the DIP Lender acted consistent with its duties and responsibilities under, and entry of the Final Order does not violate, the terms of any agreement relating to the Bonds.

V.     The terms of the DIP Loans are fair and commercially reasonable under the circumstances, reflect the Debtor's exercise of its prudent business judgment consistent with its

---

[4] The Debtor, the DIP Lender, the Trustee and other parties in interest reserve all rights to contest the amount, extent, priority and validity of any putative claim, security interest or lien identified on the attached **Exhibit C**. Nothing herein or otherwise shall be deemed a waiver of any such rights. To the extent that such claims and/or security interests or liens are deemed not to be valid senior liens, the DIP Loans shall not be subordinated to the claims of the estate under sections 544 or 545 of the Bankruptcy Code.

fiduciary duties, are supported by reasonably equivalent value and fair consideration, and are enforceable in accordance with applicable law. As such, the funds advanced shall be deemed to have been extended by the DIP Lender in "<u>good faith</u>" as that term is used in section 364(e) of the Bankruptcy Code and based upon the express reliance of the protections offered by section 364(e) of the Bankruptcy Code. The Post-Petition Liens and the Superpriority Claim (defined below) shall be entitled to the full protection of section 364(e) of the Bankruptcy Code, including in the event that this Final Order or any provision hereof is vacated, reversed or modified, on appeal or otherwise.

W.      The Debtor shall continue to segregate, remit, and deposit all Cash Collateral in the Debtor's accounts, possession, custody or control and which the Debtor may receive in the future, in accordance with applicable cash management orders entered by this Bankruptcy Court and as permitted by the DIP Credit Agreement.

**Need for Adequate Protection to Trustee**

X.      Pursuant to the Bankruptcy Code and in light of the foregoing, the Debtor is required to provide adequate protection to the Trustee in respect of its use of the Pre-Petition Collateral (including Cash Collateral) and granting of the priming Post-Petition Liens. The Debtor wishes to provide adequate protection of the security interests in and liens on the Pre-Petition Collateral pursuant to the terms set forth in this Final Order.

Y.      The Debtor and the DIP Lender have represented to the Bankruptcy Court that they have negotiated at arm's length and have acted in good faith in the negotiation and preparation of the DIP Credit Agreement and this Final Order, have been represented by counsel, and intend to be and are bound by their respective terms. The terms and conditions of this Final Order and the DIP Documents reflect the Debtor's exercise of prudent business judgment under

exigent circumstances and are consistent with its fiduciary duties and are supported by reasonably equivalent value and fair consideration.

Z.      Good cause has been shown for the entry of this Final Order. The terms of this Final Order, inclusive of the adequate protection provided to the Trustee relating to the Pre-Petition Liens, are fair and commercially reasonable, reflect the Debtor's prudent business judgment consistent with its fiduciary duties and constitute reasonable equivalent value and fair consideration. Entry of this Final Order is in the best interest of the Debtor, its creditors, including the holders of the Bonds, and its estate.

AA.     To the extent any portion of the foregoing constitute rulings of law, they shall constitute this Court's rulings with respect to the matters so-stated.

**NOW THEREFORE, THE COURT ORDERS AS FOLLOWS:**

**Motion Granted**

1.      The Motion is hereby **GRANTED** in accordance with the terms and conditions set forth in this Final Order. Any objections to the Motion with respect to the entry of this Final Order that have not been withdrawn, waived, or settled, and all reservation of rights included therein, are hereby denied and overruled.

**Approval of DIP Facility and DIP Loan Documents  (as amended hereby)**

2.      The terms of the DIP Facility, that certain Priming Superpriority Debtor-in-Possession Credit Agreement dated June 25, 2021 between the Debtor and the DIP Lender (the "DIP Credit Agreement"), attached as **Exhibit A**, and all documents executed in connection therewith (collectively with the DIP Credit Agreement, the "DIP Loan Documents") are fair and reasonable, reflect the exercise of the Debtor's prudent business judgment consistent with its fiduciary duties, and constitute reasonably equivalent value and fair consideration; *provided*,

*however*, that upon entry of this Final Order, the DIP Credit Agreement and DIP Loan Documents shall be and hereby are amended as follows:

(i)  the definition of "Restructuring" in the DIP Credit Agreement is hereby deleted and replaced with the following: ""Restructuring" means a restructuring of Debtor's financial obligations with respect to the Bonds and its other outstanding obligations on the terms and conditions acceptable to the DIP Lender, or a sale process subject to a form of bid procedures and sale milestones agreed to by the DIP Lender."

(ii)  the first sentence of Section 2.5(a) of the DIP Credit Agreement is hereby deleted and replaced with the following: "Interest shall accrue on each DIP Loan from the date such DIP Loan is drawn through the date on which such DIP Loan is repaid in full at a simple rate per annum equal to five and six hundred and twenty-five thousandths percent (5.625%)."

(iii)  the cumulative DIP Loan Commitment shall be increased from $3,400,000 to $5,000,000.

(iv)  the definition of "Maturity Date" in the DIP Credit Agreement is hereby deleted and replaced with the following: ""Maturity Date" means the earliest to occur of the date that is (a) November 30, 2021, (b) the closing date of any Restructuring, (c) the effective date of a plan of reorganization or liquidation for the Debtor in the Chapter 11 Case, and (d) the date on which the DIP Lender accelerates the DIP Obligations (or the DIP Obligations automatically and immediately accelerate) or the DIP Obligations otherwise become immediately due and payable, in each case pursuant to the terms of the DIP Credit Agreement."

(v) the Mortgage by the Debtor in favor of the DIP Lender and all other DIP Loan Documents are hereby amended to the extent necessary to effectuate the amendments described in clauses (i) – (iv) above.

3.      The Debtor shall be liable for the repayment in full of the DIP Loans and all DIP Obligations.

4.      The DIP Facility and DIP Loan Documents have been negotiated in good faith and at arm's length among the Debtor and the DIP Lender, and the DIP Loans shall be deemed to have been extended by the DIP Lender in good faith (as that term is used in section 364(e) of the Bankruptcy Code) and in express reliance upon, and with the full benefit of the protections afforded by, section 364(e) of the Bankruptcy Code, whether or not this Final Order or any provision hereof is vacated, reversed, or modified, on appeal or otherwise.

5.      Absent the relief granted by this Final Order, the Debtor's estate, residents and creditors would suffer immediate and irreparable harm. Accordingly, the entry of this Final Order and related authorization of Borrowings of the DIP Loans under the DIP Facility and DIP Loan Documents is in the best interests of the Debtor's estate, its residents, and creditors.

6.      The DIP Facility and DIP Loan Documents are hereby approved on a final basis, and the Debtor is hereby authorized to borrow the DIP Loans pursuant to the DIP Loan Documents, to be used in accordance with the Budget attached as **Exhibit B** and incorporated herein by reference, itemizing on a weekly basis all uses, and anticipated uses, revenues projected to be received and all expenditures proposed to be made during such period, which Budget may be amended at the request of the Debtor and with the written consent of the DIP Lender (as it may be amended, supplemented, replaced or otherwise modified from time to time with the consent of the DIP Lender, the "Budget"); the proceeds of the DIP Loans shall be used

for such purposes as are expressly permitted under the DIP Loan Documents, this Final Order and the Budget, including, without limitation, to pay the interest, fees, and expenses in accordance with this Final Order and to provide working capital for the Debtor. The Debtor may submit a modified Budget to the DIP Lender, in its sole discretion. In the event that the DIP Lender does not approve any such modified Budget, the current Budget shall remain in effect.

7. In furtherance of the foregoing and without further approval of this Court, the Debtor is authorized to perform all acts, to make, execute, and deliver all instruments and documents (including, without limitation, the execution or recordation of security agreements, mortgages, and financing statements), and to pay at the Maturity Date of the DIP Facility all fees, in each case that may be reasonably required or necessary for the Debtor's performance of the DIP Loans, including, without limitation:

(a) the execution, delivery, and performance of the DIP Loan Documents and any exhibits, schedules and other documents related thereto;

(b) the execution, delivery, and performance of one or more non-material amendments to the DIP Loan Documents, in each case in such form as the Debtor and the DIP Lender may agree (it being understood that no further approval of the Court shall be required for amendments to the DIP Loan Documents that do not shorten the maturity of the extensions of credit thereunder, increase or decrease the DIP Facility, increase the rate of interest payable thereunder, prejudice the rights of the Debtor or its estate or any other party in interest in any material respect, or provide the DIP Lender with additional protections, rights, economics, or other benefits);

(c) the non-refundable payment to the DIP Lender of the reasonable costs and expenses as may be due from time to time in connection with the DIP Loans in accordance with the terms of the DIP Loan Documents; and

(d) the performance of all other acts required under the DIP Loan Documents in connection with the DIP Loans.

Notice of any amendment, modification, or supplement must be filed with the Court within one (1) business day of the date of such amendment, modification, or supplement and served on the

Committee and the U.S. Trustee (which notice shall include the executed amendment, modification, or supplement).  Such amendment, modification, or supplement shall become final five (5) days after notice of such amendment, modification, or supplement is filed with the Court and served on the Committee and U.S. Trustee unless a motion is filed by a party in interest seeking a hearing regarding such proposed amendment, modification, or supplement.

**The DIP Loans**

8.      <u>DIP Loans</u>. Pursuant to sections 361 and 364 of the Bankruptcy Code and the terms and conditions hereof, until the occurrence of an Event of Default (as defined below), the Debtor is hereby authorized to borrow the DIP Loans pursuant to the terms, conditions and provisions of this Final Order in an amount up to an aggregate amount of $5,000,000 pursuant to the terms set forth herein and in the DIP Credit Agreement; <u>provided, however</u>, that the Debtor shall use the proceeds of the DIP Loans solely in compliance with the Budget and as expressly set forth herein.

9.      <u>Principal, Interest, Fees, Etc.</u>

(a)     Interest shall accrue on each DIP Loan from the date such DIP Loan is drawn through the date on which such DIP Loan is repaid in full at a simple rate per annum equal to five and six hundred and twenty-five thousandths percent (5.625%) (the "<u>Applicable Rate</u>").

(b)     The principal, accrued interest and any other obligations owed with respect to the DIP Loans (the "<u>DIP Obligations</u>") shall be due and payable upon the Maturity Date. The DIP Loans may be voluntarily paid at any time with no penalty or premium.

(c)     Upon the Maturity Date and subject to confirmation of the Plan of Reorganization, the DIP Obligations shall be satisfied in connection with the issuance of the Series 2021 B Bonds.

10.     <u>Conditions to the DIP Loans</u>. The funding of the DIP Loans is conditioned on, among other things, the satisfaction of the following:

(a)     entry of this Final Order;

(b)     evidence of insurance reasonably satisfactory to the DIP Lender (and receipt of additional insured and loss payee insurance certificates); and

(c)     execution of the DIP Loan Documents.

11.     <u>Disbursements of DIP Loans.</u> Disbursements of the DIP Loans shall be governed by the terms and conditions of the DIP Credit Agreement. In addition, disbursements of the DIP Loans shall be conditioned on the total available funds in the Debtor's operating account not exceeding $500,000 after accounting for the requested funding and payment of the proposed operating expenses of the Community set forth in the Budget for the following week.

12.     <u>Use of DIP Loan Proceeds.</u> The DIP Loans shall be used solely as set forth in the Budget for: (a) the necessary operation and maintenance costs associated with the Community in the amounts and categories and time set forth in the Budget; (b) with respect to the CapEx DIP Loans, the capital improvements or storm damage claims associated with the Community in the amounts and categories set forth in the Budget; and (c) the other costs and expenses of administration of the Chapter 11 Case as set forth in the Budget.

13.     <u>Effectiveness of DIP Loans.</u> From and after the entry of the Interim Order (the "<u>Effective Date</u>"), the terms and conditions of the Interim Order, as modified by this Final Order, constitute valid and binding obligations of the Debtor, enforceable against the Debtor in accordance with the terms of the Interim Order, as modified by this Final Order, for all purposes during the Chapter 11 Case, any subsequently converted cases of any of the Debtor under chapter 7 of the Bankruptcy Code or after the dismissal of the Chapter 11 Case. No obligation, payment, transfer or grant of security under the Interim Order or this Final Order shall be stayed, restrained, voidable, avoidable or recoverable under the Bankruptcy Code or under any applicable law (including without limitation, under sections 502(d), 548 or 549 of the

Bankruptcy Code or under any applicable state Uniform Fraudulent Transfer Act, Uniform Fraudulent Conveyance Act or similar statute or common law), or subject to any defense, reduction, setoff, recoupment or counterclaim.

14.     <u>Payments to the DIP Lender and/or the Trustee.</u> Any and all payments or proceeds remitted to the DIP Lender and/or the Trustee pursuant to the provisions of this Final Order or otherwise shall be received by the DIP Lender and/or the Trustee, free and clear of any claim, charge, assessment or other liability, including, without limitation, any such claim or charge arising out of or based on sections 506(c) and/or 552(b) of the Bankruptcy Code, whether directly or indirectly, all of which are hereby waived by the Debtor. In the event that it is determined by final order of the Court that the Trustee is not entitled under Bankruptcy Code section 506(b) to any payments or proceeds remitted to the Trustee on account of post-petition interest, fees and expenses relating to the Bond Claim, then any such payments or proceeds remitted to the Trustee shall reduce the Bond Claim held by the Trustee.

**Security for the DIP Loan**

15.     <u>Post-petition Liens.</u> Pursuant to the Interim Order, as reaffirmed by this Final Order, and pursuant to section 364(c)(2), (c)(3) and (d) of the Bankruptcy Code and as security for the repayment of the DIP Loans and the obligations under the DIP Loan Documents, the DIP Lender was and is granted valid, binding, enforceable and perfected first priority mortgages, pledges, liens and security interests (the "<u>Post-Petition Liens</u>") in all currently owned or hereafter acquired property and assets of the Debtor of any kind or nature, whether real or personal, tangible or intangible, wherever located, now owned or hereafter acquired or arising and all proceeds, products, rents and profits thereof, including, without limitation, accounts, inventory, equipment, capital stock in subsidiaries, investment property, instruments, chattel paper, real

estate, leasehold interests, contracts, patents, copyrights, trademarks, deposit accounts, intercompany claims, claims against affiliates, causes of action, tax refund claims, commercial tort claims, insurance proceeds and insurance premium refunds, and the proceeds, products, rents and profits of all of the foregoing (all of the foregoing, the "Post-Petition Collateral"); provided, however, that the Post-Petition Collateral does not include (a) any and all cash or other property received by Debtor in the form of gifts, charitable donations, bequests or grants that are by their terms, restricted in the manner in which they may be utilized by Debtor to the extent, and only to the extent, that such restrictions would prohibit the granting of any such gifts, donations, bequests or grants as collateral (collectively, the "Charitable Assets"); or (b) actions for preferences, fraudulent conveyances or other avoidance power claims and any recoveries under sections 542, 544, 545, 547, 548 (exclusive of transferees under section 549), 550 and 553 and the Bankruptcy Code (collectively, the "Avoidance Actions") or the proceeds thereof.

16.     The Post-Petition Liens are in addition to the superpriority administrative expense claim set forth in Paragraph 17 hereof, and pursuant to sections 364(c) and 364(d), shall be valid, binding, continuing, enforceable, fully-perfected, senior and priming on all Post-Petition Collateral that (a) will be and remain senior to the Pre-Petition Liens, Rollover Liens and Supplemental Liens granted to the Trustee as adequate protection for its Pre-Petition Liens; and (b) will otherwise constitute a first priority lien on all other assets of the Debtor, subject only to (i) Permitted Liens, if any, and (ii) the Carve-Out.

17.     Superpriority Administrative Expense Claim. Pursuant to the Interim Order, as reaffirmed by this Final Order, the DIP Loans were and are granted the status of a superpriority administrative expense claim (the "Superpriority Claim") pursuant to section 364(c)(1) of the Bankruptcy Code, including, without limitation, having priority over all other unpaid

---

administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code (subject only to the Carve-Out), and shall at all times be senior to the rights of the Debtor, any successor trustee or any creditor in the Chapter 11 Case or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment. The Superpriority Claim granted to the DIP Lender by this Paragraph 17 shall be payable from and have recourse to all pre-and postpetition property of the Debtor and all proceeds thereof.

**Debtor's Use of Cash Collateral**

18.     Pursuant to the Interim Order, as reaffirmed by this Final Order, the Debtor was and is authorized to use cash collateral (as defined in section 363(a) of the Bankruptcy Code) constituting proceeds of accounts and revenues from operations of the Community (collectively, the "Cash Collateral"). Cash Collateral shall include, without limitation, the advances under the DIP Facility, but shall not include any other funds received by the Debtor during this proceeding.

19.     The Debtor's use of Cash Collateral shall be solely as set forth in the Budget and as otherwise provided in this Final Order for: (a) the necessary ordinary course operation and maintenance costs associated with the Community in the amounts and categories and time set forth in the Budget; and (b) other costs and expenses of administration of the Chapter 11 Case as set forth in the Budget. Except on the term and conditions of this Final Order, the Debtor is prohibited from using Cash Collateral at any time absent consent of the DIP Lender or further order of the Bankruptcy Court.

**Adequate Protection to Trustee for the Pre-Petition Liens and Pre-Petition Collateral Securing the Bond Claim**

20.    As provided in the Interim Order and reaffirmed by this Final Order, as adequate protection of the Trustee's interests in the Pre-Petition Collateral, including Cash Collateral, pursuant to sections 361, 363 and 552(b) of the Bankruptcy Code, and the Trustee's consent to the priming of its liens and claims pursuant to the Post-Petition Liens and the Superpriority Claim provided to the DIP Lender, the Trustee was and is provided the following adequate protection in the Interim Order, as reaffirmed by this Final Order:

(a)    Rollover Liens. As adequate protection for any diminution in the value of the Pre-Petition Collateral, including based upon the priming by the DIP Lender ("Diminution"), the Trustee shall continue to have valid, binding, enforceable and perfected additional and replacement mortgages, pledges, liens and security interests in all Post-Petition Collateral and the proceeds, rents, products and profits therefrom, whether acquired or arising before or after the Petition Date, to the same extent, priority and validity that existed as of the Petition Date (such liens, the "Rollover Liens"), solely to the extent of any such Diminution; provided, however, the Rollover Liens shall be subject to the (i) Post-Petition Liens, (ii) Permitted Liens, and (iii) the Carve-Out;

(b)    Supplemental Liens. As additional adequate protection for any Diminution, the Trustee shall have a valid, perfected and enforceable continuing supplemental lien on, and security interest in, all of the assets of the Debtor of any kind or nature whatsoever within the meaning of section 541 of the Bankruptcy Code, whether acquired or arising before or after the Petition Date, and the proceeds, rents, products and profits therefrom, exclusive of the Charitable Assets, the Avoidance Actions and any proceeds therefrom (collectively, the "Supplemental Liens"), solely to the extent of any such Diminution; provided, however, the Supplemental Liens shall be subject to the (i) Post-Petition Liens, (ii) Permitted Liens, and (iii) the Carve-Out;

(c)    Pre-Petition Superpriority Claim. As additional adequate protection for any Diminution, the Trustee shall receive a superpriority expense claim, solely to the extent of any such Diminution, allowed under section 507(b) of the Bankruptcy Code (the "Pre-Petition Superpriority Claim") against all assets of the Debtor's estate. The Pre-Petition Superpriority Claim shall have priority over any and all other unpaid administrative expenses now existing or hereafter arising, of any kind whatsoever, of the kind specified in sections

503(b) and 507(b) of the Bankruptcy Code, and over any and all administrative expenses or other claims arising under sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546, 726, 1113 or 1114 of the Bankruptcy Code, and shall at all times be senior to the rights of the Debtor, any successor trustee or any creditor in the Chapter 11 Case or any subsequent proceedings under the Bankruptcy Code, whether or not such expenses or claims may become secured by a judgment lien or other nonconsensual lien, levy or attachment; provided, however, the Pre-Petition Superpriority Claim shall be subject to the (i) Post-Petition Liens, (ii) Superpriority Claim, (iii) Permitted Liens, and (iv) the Carve-Out; and

(d)     Financial Reports. The Debtor shall provide the Trustee with all reports, documents and other materials, including financial reports, as may be required in this Final Order and such other and further access to the Debtor's books and records, advisors and professionals as may be reasonably requested by the Trustee from time to time.

## PROVISIONS COMMON TO THE DIP LOANS AND TRUSTEE AS HOLDER OF THE BOND CLAIM

### Covenants

21.     Covenants. The Debtor shall observe all covenants in this Final Order at all times prior to and after the Termination Date (as defined below). The Debtor agrees as follows, and the Parties acknowledge that failure to comply with such covenants shall constitute an Event of Default under this Final Order:

### Budget and Reporting Covenants:

(a)     The Debtor shall be in Compliance with the Budget. Compliance with the Budget ("Compliance") means a weekly report (the "Weekly Budget Report") certified by a responsible person for the Debtor, in the same form as the Budget indicating all receipts received and disbursements made by the Debtor during the applicable measuring period compared to the Budget for such period (each, a "Measuring Period"), with (a) aggregate disbursements during such period not exceeding 110% of the total budgeted disbursement for such period; (b) any single disbursement line item not exceeding 115% of the such budgeted line item for such period; (c) total receipts not less than 90% of such budgeted receipts for such period, and (d) expenditures for estate professional fees shall not exceed 100% of the amount allocated for such expenditures in the Budget for such period (both in the aggregate and with respect to each professional's respective line on the Budget). Each "Variance" shall be measured on a

rolling four week basis and may include weeks prior to entry of this Final Order. For purposes of this paragraph and solely with respect to revenues, "Variance" shall mean up to 10% of the budgeted receipts for any particular staggered month, with such staggered month being measured from the 6th business day of a particular month to the 5th business day of the following month. Any single disbursement line item not paid in a particular week may be paid during subsequent weeks and for the purpose of calculating the Variance, such single disbursement line item will be deemed to be budgeted for later periods.

(b)     The Debtor shall provide the following reports to the DIP Lender:

i.      no later than 12:00 p.m. (prevailing Central time) on Thursday of each week or if such Thursday is not a business day, then the immediate succeeding business day, the Weekly Report, providing for a comparison of the items in the Budget for the preceding week to the Debtor's actual performance that includes (1) a narrative summary of any Variances from the Budget for the preceding week and on a cumulative basis, and (2) a detailed bank account and loan balance reconciliation and report summarizing, for the previous week, actual daily cash activity, including expenditures (i.e., checks issued and wire transfers sent) by line item as set forth in the Budget;

ii.     at any time and from time to time that the Debtor receives any material written notice from any Governmental Body, the Debtor shall promptly provide a copy of such notice to the DIP Lender, and the Debtor shall provide to the DIP Lender copies of all material reports, certificates and notices that the Debtor may provide to any Governmental Body;

iii.    a monthly reporting package, no later than 30 days after the end of each calendar month, including cash flow, income statement and balance sheet for such month, accounts payable and receivable reports with aging information; and

iv.     as promptly as reasonably practicable from time to time following the DIP Lender's reasonable request therefor, such other information (including historical information) regarding the operations, business affairs and financial condition of the Debtor, the progress of the Chapter 11 Case or compliance with the terms of any DIP Loan Document.

All reports provided under this Final Order shall be provided simultaneously to the Committee.

**DIP Loan Document Covenants**

      (a)    The Debtor agrees, and agrees to instruct its advisors, employees, managers and professionals, to comply with all of the terms and conditions of the DIP Loan Documents.

**Bankruptcy Milestones**

22.    The Debtor, the Trustee and the DIP Lender agree that the Bankruptcy Milestones set forth in the Interim Order shall be replaced in their entirety by the following Bankruptcy Milestones and that failure to materially comply with the following Bankruptcy Milestones shall constitute an Event of Default, unless waived or modified by the DIP Lender and/or the Trustee in their sole discretion:

      (a)    On Tuesday of each week (or such other day as may be agreed upon by the Parties), the Debtor shall make available representatives reasonably acceptable to the DIP Lender and the Trustee for a telephone conference call with the DIP Lender and the Trustee, holders of the Bonds, and their respective agents, advisors and/or representatives to discuss the cash flows and operations of the Community, and such other matters as are relevant or are reasonably requested by the DIP Lender and the Trustee; and

      (b)    By September 3, 2021, (i) the Debtor, the Trustee, the DIP Lender and the Committee shall reach agreement with respect to the proposed Chapter 11 Plan of Reorganization [Dkt. No. 21] (the "Plan"), or (ii) the Debtor shall pivot to a sale process subject to a form of bid procedures and sale milestones agreed to by the Trustee and the DIP Lender in consultation with the Committee.

23.    The Debtor covenants and agrees that it will use its best efforts to comply with the Bankruptcy Milestones.

24.    No Liens or Encumbrances. Prior to payment in full of the DIP Loans, the Debtor shall not sell, pledge, hypothecate, or otherwise encumber any Post-Petition Collateral (any such sale, pledge, hypothecation, or other transfer shall be void *ab initio*). Further, there shall be no other claim or expense having priority or being *pari passu* to the priority granted to the DIP

Lender and the Trustee in this Final Order while any portion of the DIP Loans remain outstanding, except with respect to the Carve-Out.

25.     <u>No Modification.</u> Nothing contained herein shall alter or modify, or be deemed to alter or modify, the Bond Documents (or any other agreement to which the Trustee is party).

26.     <u>No Waiver.</u> No consent by the DIP Lender or the Trustee to any administrative claims, including fees and expenses of professionals, sought to be assessed against or attributed to the Trustee, as applicable, in the Pre-Petition Collateral, or the Post-Petition Collateral pursuant to the provisions of sections 506(c) and/or 552(b) of the Bankruptcy Code or otherwise by, through or on behalf of the Debtor, shall be implied from any action, inaction or acquiescence. Except as expressly set forth herein, the Effective Date is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, (a) any of the rights of the DIP Lender and Trustee under the Bankruptcy Code or under non-bankruptcy law, including, without limitation, the right of the DIP Lender and the Trustee to request additional adequate protection of their interests in the Pre-Petition Collateral or Post-Petition Collateral or relief from or modification of the automatic stay under section 362 of the Bankruptcy Code (or the Debtor's right to object thereto); or (b) any other rights, claims or privileges (whether legal, equitable or otherwise) of the DIP Lender and the Trustee (or the Debtor's right to object thereto).

27.     <u>No Challenge.</u> As provided in the Interim Order and reaffirmed by this Final Order, notwithstanding anything else herein, subject to the proviso at the end of this Paragraph, no amounts under the Carve-Out, the proceeds of the DIP Loans and the proceeds of Pre-Petition Collateral (including Cash Collateral) and Post-Petition Collateral shall be used for the purpose of: (a) objecting to or contesting in any manner, or in raising any defenses to, the validity, extent,

perfection, priority, or enforceability of (i) the Bond Claim or the Pre-Petition Liens (including the Trustee-Held Funds), (ii) the DIP Loans or the Post-Petition Collateral with respect thereto, or (iii) any other rights or interests of the DIP Lender or the Trustee, (b) asserting any claims or causes of action, including, without limitation, any actions under chapter 5 of the Bankruptcy Code against the DIP Lender and/or the Trustee or the holders of the Bonds or invoking the equitable doctrine of "marshalling" or any other similar doctrine with respect to any of the Pre-Petition Collateral, the Post-Petition Collateral or otherwise; (c) preventing, hindering, or delaying the enforcement or realization by the Trustee, as applicable, upon any of the Pre-Petition Collateral or Post-Petition Collateral; (d) incurring indebtedness except as permitted by the Interim Order and this Final Order; (e) funding acquisitions, capital expenditures, capital leases or other transactions not in the ordinary course of the Debtor's business other than as set forth in the Budget; (f) modifying the rights of the holders of the Bonds, except as otherwise contemplated by the Parties; (g) modifying any adequate protection granted the DIP Lender and/or the Trustee; or (h) commencing or prosecuting any motion, proceeding or cause of action against the DIP Lender and/or the Trustee, or their respective agents, attorneys, advisors or representatives. Notwithstanding the foregoing, not more than $35,000 of Cash Collateral may be made available to reimburse the Committee, upon appropriate application therefor, for the Committee's fees and expenses in investigating the validity, priority, perfection, and enforceability of the Bond Trustee's liens in the Pre-Petition Collateral.

**Events of Default**

28.     Each of the following shall be considered an Event of Default ("Event of Default") under the DIP Facility and this Final Order:

            (a)      the failure to make payments on the DIP Loans as and when due;

(b)     the failure of the Debtor to pay all of its administrative expenses in full in accordance with and subject to the terms as provided for in the Budget;

(c)     this Final Order becomes stayed, reversed, vacated, amended or otherwise modified in any respect without the prior written consent of the DIP Lender and the Trustee;

(d)     failure to meet any of the Bankruptcy Milestones or other covenants set forth in this Final Order;

(e)     the dismissal of the Chapter 11 Case, conversion of the Chapter 11 Case to a chapter 7 case, or suspension of the Chapter 11 Case under section 305 of the Bankruptcy Code;

(f)     the appointment of a chapter 11 trustee or an examiner with enlarged powers (beyond those set forth in section 1104(c) and 1106(a)(3) and (4) of the Bankruptcy Code);

(g)     the granting of relief from the automatic stay to permit foreclosure with respect to a material asset of the Debtor, by any entity other than the DIP Lender or Trustee on any Post-Petition Collateral;

(h)     the entry of an order granting any superpriority claim which is senior or *pari passu* with the DIP Lender and/or the Trustee pursuant to this Final Order;

(i)     the payment of or granting adequate protection with respect to prepetition indebtedness of the Debtor other than as set forth in the Budget or as provided for in this Final Order;

(j)     the cessation of Post-Petition Liens, Rollover Liens, Adequate Protection Payments, Supplemental Liens, Superpriority Claims, or Pre-Petition Superpriority Claim granted pursuant to this Final Order to be valid, perfected and enforceable in all respects;

(k)     the filing of any Challenge (as defined below) to the Pre-Petition Liens or Pre-Petition Collateral by the Debtor, or the Bankruptcy Court grants standing to the Committee or another third party to pursue such Challenge;

(l)     the payment of estate professional fees by the Debtor other than to the extent set forth in the Budget;

(m)     the occurrence of an Event of Default under the DIP Credit Agreement; or

(n)     failure to pay the amounts due under this Final Order by the Maturity Date.

**Termination and Maturity**

29.     Notwithstanding anything herein, and except as provided in Paragraph 32, the Debtor shall no longer, pursuant to the Interim Order, this Final Order or otherwise, be authorized to borrow funds and/or use Cash Collateral for any purpose hereunder upon the earliest of (a) the occurrence of an Event of Default or (b) the Maturity Date (such earlier date, the "Termination Date"), provided, however, that the DIP Lender and/or Trustee shall provide five (5) Business Days (the "Default Notice Period") written notice via email to counsel to the Debtor, the U.S. Trustee, and counsel to the Committee of any Event of Default (the "Default Notice") and the Debtor may continue to use Cash Collateral pursuant to the Budget for five (5) Business Days after receipt of such Default Notice while the Debtor or the Committee seeks an expedited hearing to contest whether an Event of Default has occurred (including the failure to meet a Bankruptcy Milestone), and the DIP Lender and the Trustee consent to the holding of such an expedited hearing within five (5) Business Days of such a filing (collectively, the "Debtor Default Period Rights").  Notwithstanding anything to the contrary in this Final Order and until the expiration of the Investigation Period (as defined below), the Committee reserves its rights to challenge the categorization and use of the Trustee-Held Funds, including whether they are property of the Debtor's estate, whether they constitute Cash Collateral and whether the DIP Lender was entitled to interest and fees on the DIP Loans and the Trustee and DIP Lender reserve all rights to contest any such claims by the Committee.

30.     Notwithstanding the occurrence of an Event of Default, the DIP Lender and/or Trustee may elect in writing not to terminate the Debtor's authority to borrow funds and/or use Cash Collateral hereunder, as applicable, to waive defaults hereunder, to forbear from the exercise of rights and remedies hereunder and, subject to Court approval and the approval of the

DIP Lender, to modify the Maturity Date and any Event of Default. Any such continued extension of financial accommodations shall be without prejudice to the DIP Lender's ability to terminate funding.

31.     Notwithstanding the occurrence of an Event of Default or anything herein to the contrary, but subject to the provisions of Paragraph 29 herein (i) all of the rights, remedies, benefits and protections provided to the DIP Lender and the Trustee shall survive the Termination Date; and (ii) upon the Termination Date, the principal of and accrued interest and all other amounts owed to the DIP Lender under the DIP Loans shall be immediately due and payable.

**Exercise of Rights**

32.     (a) Subject to the Debtor Default Period Rights, without further order from the Bankruptcy Court, the automatic stay provisions of section 362 of the Bankruptcy Code are vacated and modified to the extent necessary to permit, upon the occurrence of any Event of Default, the DIP Lender to cease making any advances under the DIP Facility, including the DIP Loans.

(b)     The DIP Lender and Trustee shall be entitled to apply the payments or proceeds of the Post-Petition Collateral or the Pre-Petition Collateral as they deem appropriate, subject to the Permitted Liens, and the Carve-Out, and in no event shall the DIP Lender or the Trustee be subject to the equitable doctrine of "marshalling" or any other similar doctrine with respect to any of the Post-Petition Collateral or otherwise.

(c)     Prior to exercising foreclosure, setoff, or any other remedies with respect to the Post-Petition Collateral, the DIP Lender shall obtain an Order authorizing such actions following

notice and a hearing. Notice shall be shortened such that a hearing can be held on an expedited

basis on five (5) days' notice, subject to Court availability.

**Release**

33.     Subject to Paragraph 34, as provided in the Interim Order and reaffirmed by this

Final Order, the Debtor hereby reaffirms its releases of the DIP Lender and the Trustee, all

holders of the Bonds, and their respective affiliates, agents, attorneys, officers, directors and

employees with respect to all claims and/or causes of action by, and liabilities owing to, the

Debtor arising out of or based upon or related to, in whole or in part, the Bonds, and any aspect

of the prepetition relationship between the Trustee and the Debtor and any other acts or

omissions by the Trustee in connection with either the Bond Documents or its prepetition

relationship with the Debtor. Further, the Debtor and its estate reaffirm their waiver of any and

all rights to object to or contest the amount of the Bond Claim or the Trustee's security interests

in the Pre-Petition Collateral and agree that all such claims and security interests have been duly

perfected and are in all respects valid and enforceable first priority security interests and liens,

subject and subordinate only to (a) Post-Petition Liens to the extent set forth herein, (b)

Permitted Liens; and (c) the Carve-Out.

34.     <u>Investigation Period.</u> Notwithstanding the provisions in this Final Order, any party

in interest, other than the Debtor, including, without limitation, the Committee and any other

person or entity acting or seeking to act on behalf of the Debtor's estate in all circumstances and

for all purposes may file an adversary proceeding or contested matter (a "<u>Challenge</u>") (a)

challenging the amount, validity, extent, enforceability, perfection or priority of the Bond Claim

or the Pre-Petition Liens in respect thereof, or (b) otherwise asserting any claims or causes of

action against the Trustee and/or holders of the Bonds on behalf of the Debtor's estate so long as

any Challenge is made on or before September 7, 2021 (such period of time, the "Investigation Period"). Any Challenge brought after the conclusion of the Investigation Period shall be barred. If no Challenge is commenced by a party during the Investigation Period against the Trustee, and/or the holders of the Bonds, then as to such party, (a) any repayment of the Bond Claim shall be deemed final and indefeasible, not subject to subordination or recharacterization and otherwise unavoidable, (b) the Bond Claim shall constitute an allowed claim, not subject to subordination or recharacterization and otherwise unavoidable, for all purposes in the Chapter 11 Case and any subsequent chapter 7 case or cases, (c) the Pre-Petition Liens on the Pre-Petition Collateral shall be deemed legal, valid, binding, perfected, not subject to defense, counterclaim, offset of any kind, subordination and otherwise unavoidable, (d) the Trustee, the Bond Claim and the Pre-Petition Liens of the Trustee on the Pre-Petition Collateral shall not be subject to any other or further claims, causes of action or challenges by any party in interest including, without limitation, any successor thereto; and (e) the Trustee, all holders of the Bonds and their respective affiliates, agents, attorneys, officers, directors and employees, shall be deemed released of all claims and/or causes of action by the Debtor, the Committee, the Debtor's estate, all parties in interest, and any subsequently appointed trustee arising out of or based on any facts or circumstances occurring prior to the date hereof; provided further that if one or more claims are timely under this Paragraph 34 and properly filed, then except for such claims, all other potential claims and causes of action are hereby deemed forever waived and barred. Notwithstanding the foregoing, no claims or cause of actions of any kind or nature may be asserted against the DIP Lender or the liens and claims granted to the DIP Lender under and/or related to the DIP Facility, other than in connection with a Challenge by the Committee with respect to the stipulations set forth in Paragraph L regarding the Trustee-Held Funds as detailed in Paragraph 29. Nothing in this

Final Order shall be deemed to confer standing on the Committee or any other non-Debtor party-in-interest to commence a Challenge, and the Committee or other non-Debtor party in interest shall be required to move for standing and satisfy the applicable standard for obtaining standing to pursue estate causes of action.

35.    <u>Section 364(e); Section 506(c); Section 552(b).</u> The DIP Lender shall be entitled to all of the benefits of section 364(e) of the Bankruptcy Code for all DIP Loans. Except to the extent of the Carve-Out, no expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the Post-Petition Collateral, the Pre-Petition Collateral or collateral subject to Rollover Liens and Supplemental Liens, pursuant to section 506(c) or 552(b) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender and the Trustee and no such consent shall be implied from any other action, inaction, or acquiescence by the DIP Lender and/or the Trustee.

**<u>Carve-Out</u>**

36.    In partial consideration of the Debtor's acknowledgement of the debt due and owing and the Debtor's waiver of any claims under sections 506(c) and 552(b) of the Bankruptcy Code, the DIP Lender and Trustee consent to the payment of certain expenses and professional fees incurred during the pendency of these Chapter 11 Case that shall be superior in all instances to the liens and claims of the DIP Lender and Trustee and all other parties (the "<u>Carve Out</u>"). For purposes hereof, the "<u>Carve Out</u>" means the sum of (a) the fees and expenses of professionals retained by the Debtor pursuant to section 327, 328, or 363 of the Bankruptcy Code (the "<u>Debtor Professionals</u>"), exclusive of ordinary course, non-restructuring professionals of Debtor, if any,

and the Debtor's Claims and Noticing Agent, in an aggregate amount not to exceed the sum of: the dollar amount of such fees and expenses to the extent (i) incurred or accrued and remaining unpaid, (ii) provided for under the Budget (as accrued and regardless of whether approved and unpaid or pending approval by the Bankruptcy Court), and (iii) previously or subsequently allowed by Court order, plus (b) the statutory fees of the U.S. Trustee pursuant to 28 U.S.C. § 1930 and the fees of the Clerk of this Court, together with interest, if any, at the statutory rate, plus (c) the reasonable fees and expenses incurred by a trustee under section 727(b) of the Bankruptcy Code, in an amount not to exceed $50,000, plus (d) the allowed fees and expenses of the patient care ombudsman appointed pursuant to section 333 of the Bankruptcy Code to the extent (i) incurred or accrued prior to the occurrence of an Event of Default and remaining unpaid, and (ii) provided for under the Budget, plus (e) the fees and expenses of professionals retained by the Committee, in an aggregate amount not to exceed the sum of the dollar amount of such fees and expenses to the extent (i) incurred or accrued and remaining unpaid, (ii) provided for under the Budget (as accrued and regardless of whether approved and unpaid or pending approval by the Bankruptcy Court), and (iii) previously or subsequently allowed by Court order ((a) through (e), collectively, the "Carve-Out Expenses"); provided, however, that the aggregate amount of such Carve Out Expenses incurred after an Event of Default shall not exceed $200,000. In the event of a disposition of any of the Pre-Petition Bond Collateral or any other collateral for the obligations owed by the Debtor to the Trustee, the Carve-Out will apply with equal force and effect to the proceeds of such disposition.  Prior to the payment of such fees and expenses from the amount available under the Carve Out, such professionals shall first apply any retainers held by such professional to their allowed fees and expenses. Nothing herein shall constitute a waiver of any right of the DIP Lender or Trustee to object to fees and expenses of

any professionals or to challenge any assertion that any amount of the fees and expenses remain unpaid (or the Debtor's right to respond thereto). Except to the extent of and in consideration of the Carve Out, (a) no expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Lender, the Trustee, the Pre-Petition Collateral, or the Post-Petition Collateral pursuant to section 506(c) of the Bankruptcy Code or a similar principal of law; and (b) the "equities of the case" exception under section 552(b) of the Bankruptcy Code is waived as to the DIP Lender, the Trustee, the Pre-Petition Collateral, and the Post-Petition Collateral.

37.     Any payment or reimbursement made in respect of any Carve-Out Expenses incurred by any Debtor Professional prior to an Event of Default shall not reduce the Carve-Out.

38.     Any payment or reimbursement made in respect of any Carve-Out Expenses incurred by any Debtor Professional on or after an Event of Default shall permanently reduce the Carve-Out on a dollar for dollar basis.

**Credit Bid**

39.     The DIP Lender and the Trustee have an absolute right to credit bid their respective obligations in any sale or other disposition of their respective collateral under the Bankruptcy Code, provided that the Trustee's right to credit bid shall be limited to the secured portion of the Bond Claim following any successful Challenge.

**Miscellaneous**

40.     The Debtor shall execute and deliver to the DIP Lender and the Trustee as applicable, any and all such agreements, financing statements, instruments and other documents as such parties may reasonably request to evidence, confirm, validate or perfect the liens granted

pursuant hereto. The Debtor is authorized to do and perform all acts, to make, execute and deliver all instruments and documents, including the DIP Loan Documents; provided, however, that this Final Order shall be sufficient and conclusive evidence of the validity, perfection, and priority of the Post-Petition Liens, Pre-Petition Liens, Rollover Liens and Supplemental Liens to the DIP Lender and Trustee, as applicable, without the necessity of filing or recording any financing statement, mortgage, notice, or other instrument or document which may otherwise be required under the law or regulation of any jurisdiction or the taking of any other action to validate or perfect the Post-Petition Liens, Pre-Petition Liens, Rollover Liens and Supplemental Liens or to entitle those liens to the priorities granted herein.

41.     Based on the findings herein set forth, and in accordance with section 364(e) of the Bankruptcy Code, in the event any or all of the provisions of this Final Order are hereafter modified, amended or vacated by a subsequent order of this or any other Court, no such modification, amendment or vacation shall affect the validity and enforceability of any lien or priority authorized or created hereby. Notwithstanding any such modification, amendment or vacation, any claim granted to the DIP Lender and the Trustee hereunder arising prior to the effective date of such modification, amendment or vacation shall be governed in all respects by the original provisions of this Final Order and the DIP Lender and the Trustee shall be entitled to all of the rights, remedies, privileges and benefits, including the liens and priorities granted herein, with respect to any such claim.

42.     Deemed Request for Stay Relief. This Final Order shall be deemed to constitute a request by the Trustee for relief from the automatic stay with respect to the Pre-Petition Collateral and for adequate protection as of the Petition Date and shall suffice for all purposes of section 507(b) of the Bankruptcy Code.

43.   <u>No Control.</u> None of the DIP Lender, the Trustee or the holders of the Bonds shall be deemed to be in control of the operations of the Debtor or to be acting as a "<u>responsible person,</u>" "<u>managing agent</u>" or "<u>owner or operator</u>" (as such terms or any similar terms are used in the United States Comprehensive Environmental Response, Compensation and Liability Act, as amended, or any similar Federal or state statute) with respect to the operation or management of the Debtor, notwithstanding any consent to this Final Order and extending financial accommodations of any type, kind or nature under this Final Order.

44.   To the extent obligations remain due and owing under the DIP Loans, such obligations of the Debtor in respect of the DIP Loans shall not be discharged by the entry of an order confirming a plan of reorganization or a plan of liquidation in the Chapter 11 Case, but rather shall be required to be paid in full on the effective date of such plan, and, pursuant to section 1141(d)(4) of the Bankruptcy Code, the Debtor has waived such discharge with respect to the payment of the DIP Loans unless such obligations have been indefeasibly paid in full and all commitments have been terminated or the DIP Lender shall have otherwise agreed in writing.

45.   <u>No Third Party Beneficiaries.</u> The provisions of this Final Order shall be binding upon and inure to the benefit of the DIP Lender, the Trustee, the Debtor and their respective successors and assigns (including any trustee or other fiduciary hereafter appointed as a legal representative of the Debtor or with respect to the property of the estate of the Debtor). No rights are created hereunder for the benefit of any third party, any creditor, or any direct, indirect or incidental beneficiary.

46.   <u>Modification of Stay</u>. The automatic stay imposed by virtue of section 362 of the Bankruptcy Code is hereby vacated and modified insofar as necessary to permit (a) the Debtor to grant the Post-Petition Liens, the Rollover Liens and the Supplemental Liens to the DIP Lender

and the Trustee, as applicable, (b) the Trustee to accept and receive disbursements and/or payments and to apply moneys pursuant to the Bond Documents (including, without limitation, the Trustee-Held Funds), (c) the Parties to take any action specifically authorized or contemplated by this Final Order and implement the DIP Facility, and (d) all acts, actions, and transfers contemplated herein, including without limitation, transfers or application of cash collateral and other funds to the DIP Lender as provided herein;

47.     <u>Effectiveness.</u> The findings of fact and conclusions of law contained in this Final Order shall take effect immediately upon entry of this Final Order. The liens and claims granted to the DIP Lender and the Trustee under the Interim Order and this Final Order, and the priority thereof, and any payments made pursuant to the Interim Order and this Final Order, shall be binding on the Debtor, any successor trustee or examiner, and all creditors of the Debtor, as provided in section 364(e) of the Bankruptcy Code.

48.     Any notice required hereunder shall be served on:

(a)     *counsel to the Debtor:*

Demetra Liggins
McGuireWoods LLP
600 Travis Street, Suite 7500
Houston, TX 77002
Dliggins@mcguirewoods.com

(b)     *counsel to the Trustee:*

Daniel S. Bleck
Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C.
One Financial Center
Boston, MA 02111
DSBleck@mintz.com

(c)     *the Office of the U.S. Trustee:*

J. Casey Roy
903 San Jacinto Blvd., Room 230

Austin, Texas 78701
Casey.Roy@usdoj.gov

Jayson B. Ruff
515 Rusk Street, Suite 3516
Houston, TX 77002
Jayson.B.Ruff@usdoj.gov

(d)     *counsel to the Committee:*

Robin Russell
Hunton Andrews Kurth LLP
600 Travis Street, Suite 4200
Houston, TX 77002
RRussell@andrewskurth.com

49.     To the extent there exists any conflict between the Motion, any other motion, pleading, document, agreement or term sheet, any DIP Loan Document and the terms of this Final Order, this Final Order shall govern and control.

**SIGNED this _____ day of _____ 2021.**

_____
**UNITED STATES BANKRUPTCY JUDGE**

## Exhibit A

**PRIMING SUPERPRIORITY**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**


**BY AND BETWEEN**

**BUCKINGHAM SENIOR LIVING COMMUNITY, INC.,**

**AS DEBTOR,**

**AND**

**UMB BANK, N.A.,**

**IN ITS CAPACITY AS BOND TRUSTEE,**

**AS DIP LENDER**


**DATED AS OF JUNE 25, 2021**

## TABLE OF CONTENTS

**Page(s)**

ARTICLE I      DEFINED TERMS ..........................................................................2

     Section 1.1      Definitions..............................................................................2

ARTICLE II      LOANS ....................................................................................15

     Section 2.1      DIP Loans .............................................................................15
     Section 2.2      Borrowing Mechanics ..........................................................15
     Section 2.3      Use of Proceeds....................................................................16
     Section 2.4      Evidence of Debt..................................................................16
     Section 2.5      Interest on Loans..................................................................16
     Section 2.6      Repayment ............................................................................16
     Section 2.7      Mandatory Prepayments.......................................................16
     Section 2.8      Application of Payments and Proceeds.................................17
     Section 2.9      General Provisions Regarding Payments...............................17
     Section 2.10      Termination of DIP Loan Commitments ...............................17

ARTICLE III      CONDITIONS PRECEDENT; CONDITIONS SUBSEQUENT ..................18

     Section 3.1      Conditions Precedent; Closing Date ....................................18
     Section 3.2      Conditions to Each Borrowing..............................................20
     Section 3.3      Conditions Subsequent..........................................................21

ARTICLE IV      REPRESENTATIONS AND WARRANTIES.............................................21

     Section 4.1      Representations and Warranties.............................................21

ARTICLE V      AFFIRMATIVE COVENANTS ..................................................................25

     Section 5.1      Affirmative Covenants ..........................................................25

ARTICLE VI      NEGATIVE COVENANTS/BUDGET COMPLIANCE...............................29

     Section 6.1      Negative Covenants ..............................................................29
     Section 6.2      Budget Compliance...............................................................32

ARTICLE VII      INCREASED COSTS; TAXES; SET OFF; ETC. ......................................32

     Section 7.1      Taxes; Withholding, Etc ......................................................32
     Section 7.2      Right of Set Off....................................................................33

ARTICLE VIII      EVENTS OF DEFAULT ............................................................................34

     Section 8.1      Events of Default ..................................................................34
     Section 8.2      Remedies...............................................................................36
     Section 8.3      Remedies Cumulative ...........................................................37
     Section 8.4      Application of Proceeds........................................................37

ARTICLE IX      MISCELLANEOUS ...................................................................................37

     Section 9.1      Amendments and Waivers; Release of DIP Collateral ...........37
     Section 9.2      Notices..................................................................................37
     Section 9.3      Expenses...............................................................................38
     Section 9.4      Enforceability; Successors and Assigns.................................40

Section 9.5      Integration ................................................................................................40
Section 9.6      No Waiver; Remedies ..................................................................................40
Section 9.7      Setoff ...........................................................................................................40
Section 9.8      Execution in Counterparts............................................................................41
Section 9.9      Governing Law; Submission To Jurisdiction; Venue....................................42
Section 9.10     Waiver of Jury Trial.....................................................................................43
Section 9.11     Severability ..................................................................................................43
Section 9.12     Survival ........................................................................................................43
Section 9.13     Maximum Lawful Interest ...........................................................................43
Section 9.14     Interpretation................................................................................................44
Section 9.15     Ambiguities..................................................................................................44
Section 9.16     The PATRIOT Act.......................................................................................44
Section 9.17     Conflicting Provisions in Security Documents.............................................44
Section 9.18     Conflicting Provisions in the Financing Orders............................................44
Section 9.19     Modifications ...............................................................................................44
Section 9.20     Release .........................................................................................................45


SCHEDULE 2.1      DIP Loan Commitment

EXHIBIT A         Budget

EXHIBIT B         Form of Borrowing Certificate

THIS PRIMING SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT is made as of June 25, 2021 by and between Buckingham Senior Living Community, Inc. (the "Debtor") and UMB Bank, N.A., in its capacity as Bond Trustee (the "DIP Lender").

## RECITALS

WHEREAS, on June 25, 2021 (the "Petition Date"), the Debtor filed a voluntary petition for relief (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas (the "Bankruptcy Court");

WHEREAS, the Debtor is the owner and operator of a continuing care retirement community known as The Buckingham (the "Facility");

WHEREAS, the Tarrant County Cultural Education Facilities Finance Corporation (the "Bond Issuer") issued its (i) Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (Buckingham Senior Living Community, Inc. Project), Series 2007 (the "Series 2007 Bonds"), pursuant to that certain Indenture of Trust dated as of July 1, 2007 (the "2007 Original Indenture") between the  Bond Issuer and UMB Bank, N.A., in its capacity as successor trustee thereunder (in such capacity, the "Bond Trustee"), (ii) Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (Buckingham Senior Living Community, Inc. Project), Series 2014 (the "Series 2014 Bonds"), pursuant to the 2007 Indenture, as supplemented by Supplement No. 1 to the Indenture of Trust, dated as of September 1, 2014 (the 2007 Original Indenture, as supplemented, the "2014 Indenture") between the Bond Issuer and the Bond Trustee and (iii) the Tarrant County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds (Buckingham Senior Living Community, Inc. Project), Series 2015A Fixed Rate, Series 2015B-1 Tax Exempt Mandatory Paydown Securities (TEMP- 80) and Series 2015B-2 Tax Exempt Mandatory Paydown Securities (TEMP- 50) (the "Series 2015 Bonds" and together with the Series 2007 Bonds and Series 2014 Bonds, the "Bonds"), pursuant to that certain Indenture of Trust, dated as of August 1, 2015 between the Bond Issuer and the Bond Trustee (the "2015 Indenture" and together with the 2007 Original Indenture and the 2014 Indenture, the "Bond Indentures");

WHEREAS, the Bond Issuer loaned the proceeds of the Bonds to the Debtor pursuant to the Loan Agreement dated July 1, 2007 between the Debtor and the Bond Issuer (as amended by the Amendment No. 1 to the Loan Agreement dated September 1, 2014) and the Loan Agreement dated August 1, 2015, collectively, the "Loan Agreements");

WHEREAS, the Debtor used the proceeds of the Bonds primarily to: (i) finance the construction, renovation and equipping of the Facility, (ii) fund debt service reserve funds; (iii) pay a portion of the interest on the Bonds; and (iv) pay certain expenses incurred in connection with the issuance of the Bonds;

WHEREAS, the rights of the Bond Issuer under the Loan Agreements were assigned to the Bond Trustee. In addition, as security for its obligations with respect to the Bonds, the Debtor entered into that certain Master Trust Indenture, Deed of Trust and Security Agreement dated as

July 1, 2007, as supplemented by the Supplemental Indenture Number 1, dated as of July 1, 2007, the Supplemental Indenture Number 2, dated as of September 1, 2014 and the Supplemental Indenture Number 3, dated as of August 1, 2015 (as supplemented, the "<u>Master Indenture</u>") between the Debtor and UMB Bank, N.A., as successor master trustee (the "<u>Master Trustee</u>" and together with the Bond Trustee, the "<u>Trustee</u>") pursuant to which the Debtor granted the Master Trustee a security interest against substantially all of the Debtor's assets as described in the Master Indenture and that certain Deed of Trust and Security Agreement dated October 8, 2014, as modified by the Modification Agreement dated effective August 1, 2015 (as modified, the "<u>Deed of Trust</u>"), between the Debtor and the Master Trustee (all such collateral so granted under the Prepetition Credit Agreements (as defined below), the "<u>Prepetition Collateral</u>");

WHEREAS, the Bond Indentures, the Loan Agreements, the Master Indenture, the Deed of Trust and any other document or agreement delivered as security for, or in respect to, the Bonds or the Debtor's obligations under any of such documents are collectively referred to herein as the "<u>Prepetition Credit Agreements</u>."

WHEREAS, the Debtor has requested, and the DIP Lender has agreed, to provide a working capital facility to support the Debtor's working capital needs during the Chapter 11 Case, pursuant to the terms and conditions hereof; and

WHEREAS, the DIP Lender is only willing to provide the DIP Loans hereunder if the Debtor grants to the DIP Lender a priming, first priority lien and superpriority administrative claim on the DIP Collateral, subject only to the Carve-Out and other Permitted Liens and the Financing Orders.

NOW THEREFORE, in consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

ARTICLE I<br>DEFINED TERMS

Section 1.1     <u>Definitions</u>.

(a)     As used in this Agreement, including, without limitation, the preamble, recitals, exhibits and schedules hereto, the following terms have the meanings stated:

"<u>Account</u>" has the meaning set forth in the UCC.

"<u>Action</u>" against a Person means an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination or other proceeding threatened or pending against or affecting such Person or its property, whether civil, criminal, administrative, investigative or appellate, in law or equity, before any arbitrator or Governmental Body.

"<u>Affiliate</u>" means, with respect to a Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (i) any Person which beneficially owns or holds ten (10%) percent or more of any class of the Capital Stock of such Person or other equity interests in such Person, (ii) any Person of which such Person beneficially owns or holds ten (10%) percent or more of any class of the Capital Stock or in which such Person beneficially owns or holds ten (10%) percent or more of the equity interests, (iii) any director or executive officer of such Person.  For the purposes of this definition, the term "<u>control</u>" (including with correlative meanings, the terms "<u>controlled by</u>" and "<u>under common control with</u>"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Capital Stock, by agreement or otherwise.

"<u>Agreement</u>" means this Priming Superpriority Debtor-in-Possession Credit Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Asset Sale</u>" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person, in one or more transactions or a series of related transactions, of all or any part of the businesses of the Debtor, and/or of all or any part of the assets or properties of any kind of the Debtor, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, other than (a) inventory (or other assets) sold or leased in the ordinary course of business, (b) sales or dispositions of obsolete, worn-out or excess furniture, fixtures, equipment or other property in the ordinary course of business and (c) the actual or constructive loss of any property or the use thereof.

"<u>Assignee</u>" means has the meaning set forth in Section 9.4(b).

"<u>Assignment</u>" has the meaning set forth in Section 9.4(b).

"<u>Authorized Officer</u>" means, as applied to any Person, any individual holding the position of chairman of the board, executive director (or the equivalent thereof), chief executive officer, chief financial officer, any vice president or treasurer or the Person or entity acting in that capacity.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Bankruptcy Milestones</u>" has the meaning set forth in the Financing Orders.

"<u>Bond Indentures</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Bond Issuer</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Bond Trustee</u>" has the meaning set forth in the recitals to this Agreement.

"Bonds" has the meaning set forth in the recitals to this Agreement.

"Borrowing" means an advance of a DIP Loan made hereunder on the Interim Order Entry Date or thereafter.

"Borrowing Certificate" has the meaning set forth in Section 2.2(b).

"Borrowing Date" means the date of a Borrowing.

"Budget" means the budget attached as Exhibit A itemizing on a weekly basis all uses, and anticipated uses, of the DIP Loans, revenues projected to be received and all expenditures proposed to be made during such period, which Budget may be amended with the written consent of the DIP Lender.

"Business Day" means a day other than Saturday or Sunday or other day on which commercial banks in Houston, Texas or New York City, New York are authorized or required by law or other governmental action to close.

"CapEx DIP Loan Commitment" means a subset of the DIP Loan Commitment in the amount set forth in Schedule 2.1 or such lesser amount as determined in accordance with the Financing Orders and the Budget.

"CapEx DIP Loans" mean DIP Loans, in an amount not to exceed the CapEx DIP Loan Commitment, to be used to pay capital expenses and storm damage claims as provided herein.

"Capital Improvement Account" means a deposit account held by the Debtor into which the proceeds of the CapEx DIP Loans shall be deposited.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"Carve-Out" has the meaning set forth in the Interim Order (before the entry of the Final Order) and, after the entry of the Final Order, the Final Order.

"Cash" means a credit balance in any Deposit Account, money or currency.

"Change of Control" means any one or more of the following events: (i) the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of the Debtor to any Person or group; (ii) the liquidation or dissolution of the Debtor or the adoption of a plan by the Board of Directors of the Debtor relating to the dissolution or

liquidation of the Debtor; (iii) the conversion of the Debtor from a Texas non-profit corporation to a "for profit" corporation or other entity; (iv) any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Debtor or control the election of members of the board of directors or equivalent governing body of the Debtor; or (v) any change in the composition or membership of the Debtor's board of directors, or day to day management of the Debtor, from that in effect on the date hereof, except for any changes approved in advance by the DIP Lender.

"Chapter 11 Case" has the meaning set forth in the recitals to this Agreement.

"Closing Date" means the date hereof.

"Committee" means any committee of unsecured creditors appointed in the Chapter 11 Case.

"Controlled Account" has the meaning set forth in Section 5.1(f).

"Controlled Account Agreement" has the meaning set forth in Section 5.1(f).

"Consents" means any approval, consent, authorization or order of, notice to or registration or filing with, or any other action by, any Governmental Body or other Person.

"Credit Bid" means the submission by the DIP Lender of a bid at a public or private sale to purchase all or any portion of the DIP Collateral in which any of the DIP Obligations are used and applied as a credit against the purchase price.

"Debtor" has the meaning set forth in the Preamble to this Agreement; provided that "Debtor" shall include any of the Debtor's successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of the Debtor, whether under chapter 11 of the Bankruptcy Code or any subsequent chapter 7 case and the Debtor's successor upon conclusion of the Chapter 11 Case).

"Debtor Relief Laws" shall mean the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, examinership, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"Deposit Account" means any deposit account (as such term is defined in the UCC), including, without limitation, a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"<u>DIP Collateral</u>" means any and all "Property" as defined in the Mortgage and/or the Financing Orders, together with any other collateral granted by the Debtor to the DIP Lender pursuant to any other DIP Collateral Document, as applicable.

"<u>DIP Collateral Documents</u>" means the Mortgage, the Controlled Account Agreements and all other instruments, documents and agreements delivered by the Debtor pursuant to this Agreement or any of the other DIP Loan Documents pursuant to which the Debtor grants a DIP Lien, or any other Lien, mortgage, or encumbrance, to the DIP Lender, as any of the foregoing may be amended, restated, supplemented, modified, or replaced from time to time.  For the avoidance of doubt, the DIP Collateral Documents do not include the Financing Orders.

"<u>DIP Commitment Period</u>" means (a) with respect to Initial DIP Loans, the period commencing on Interim Order Entry Date and ending on the Maturity Date and (b) with respect to remaining DIP Loans (exclusive of the Initial DIP Loans), the period commencing on the Final Order Entry Date and ending on the Maturity Date.

"<u>DIP Lender</u>" has the meaning set forth in the Preamble to this Agreement.

"<u>DIP Lien</u>" means any Lien granted under or pursuant to any DIP Collateral Document or the Financing Orders.

"<u>DIP Loan</u>" has the meaning set forth in Section 2.1(a).

"<u>DIP Loan Commitment</u>" means the amount set forth in <u>Schedule 2.1</u> or such lesser amount as determined in accordance with the Financing Orders and the Budget.

"<u>DIP Loan Document</u>" means any of this Agreement, the DIP Collateral Documents and all other documents, instruments or agreements executed and delivered by the Debtor for the benefit of the DIP Lender in connection herewith.

"<u>DIP Obligations</u>" means all indebtedness, obligations, covenants, duties of payment or performance of every kind and all other liabilities of the Debtor from time to time owed to DIP Lender, whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, owing, arising, due or incurred under this Agreement, the Financing Orders or any DIP Loan Document or in respect of any of the DIP Loans, or any other instruments at any time evidencing any of the foregoing or otherwise, including, without limitation, all obligations to repay principal of and interest on the DIP Loans, and to pay interest, costs, charges, expenses, professional fees, and all sums chargeable to the Debtor under the DIP Loan Documents and the Financing Orders and Debtor's obligation to provide the DIP Lender with adequate protection of its interests in the DIP Collateral and other property to be used, sold, leased or otherwise disposed of by the Debtor under the terms of the Financing Orders.

"<u>Dollars</u>" and the sign "<u>$</u>" mean the lawful money of the United States of America.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is sponsored, maintained or contributed to by, or required to be contributed to by, the Debtor.

"Environmental Laws" means all federal, state, local and foreign laws (including without limitation common law), treaties, statutes, regulations and rules whether now or hereinafter in effect relating in any way to the environment, the preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or health and safety matters, including, without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act, in each case as amended, and all rules, regulations, judgments, decrees, orders and licenses arising under all such laws.

"Environmental Liability" means any actual, alleged or contingent liability or obligations of the Debtor directly or indirectly resulting from or based on (i) violations or alleged violations of any Environmental Law, (ii) the generation, use, handling, transportation, management, storage, treatment or disposal of any Hazardous Material, (iii) exposure to any Hazardous Material, (iv) the release or threatened release of any Hazardous Material into the environment or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with any of the foregoing.

"Environmental Permits" means all permits, licenses, authorizations, registrations and other governmental consents required by applicable Environmental Laws for the use, storage, treatment, transportation, release, emission and disposal of raw materials, by-products, wastes and other substances used or produced by or otherwise relating to the operations of the Debtor.

"Equipment" means, as to the Debtor, all of the Debtor's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"ERISA Affiliate" means, as applied to any Person, (i) any corporation that is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member, (ii) any trade or business (whether or not incorporated) that is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member, and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii)

7

above is a member.  Any former ERISA Affiliate of the Debtor, shall continue to be considered an ERISA Affiliate of the Debtor within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Debtor and with respect to liabilities arising after such period for which the Debtor could be liable under the Internal Revenue Code or ERISA.

"Event of Default" means each of the conditions or events set forth in Section 8.1.

"Excluded Property" means the Avoidance Actions (as defined in the Financing Orders).

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the DIP Lender or required to be withheld or deducted from a payment to the DIP Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the DIP Lender being organized under the laws of, or having its principal office or, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are imposed as a result of a present or former connection between the DIP Lender and the jurisdiction imposing such Tax (other than connections arising from the DIP Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement, or sold or assigned an interest in any DIP Loan or any DIP Loan Document), (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of the DIP Lender with respect to an applicable interest in a DIP Loan pursuant to a law in effect on the date on which the DIP Lender acquires such interest in the DIP Loan, (c) Taxes attributable to the DIP Lender's failure to comply with Section 7.1(c) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Facility" has the meaning set forth in the recitals to this Agreement.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

 "Final Order" means a final order (which must be acceptable in form and substance to the DIP Lender in its sole discretion) entered or to be entered by the Bankruptcy Court authorizing the secured financing under the DIP Loan Documents.

"Final Order Entry Date" means the date on which the Bankruptcy Court enters the Final Order.

"Financing Orders" means, collectively, the Interim Order, the Final Order and such other orders relating thereto or authorizing the granting of credit by DIP Lender to the Debtor on an emergency, interim or permanent basis, pursuant to section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.

"Governmental Body" means any agency, bureau, commission, court, department, official, political subdivision, tribunal or other instrumentality of any administrative, judicial, legislative, executive, regulatory, police or taxing authority of any government, whether supranational, national, federal, state, regional, provincial, local, domestic or foreign, and includes, without limitation, the European Union and its agencies and instrumentalities.

"Hazardous Materials" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including, without limitation, radioactive materials, oil, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law, including, without limitation, any substance, waste or material which is (i) designated a "pollutant", "hazardous substance", "extremely hazardous substance" or "toxic chemical" under any Environmental Law, or (ii) regulated in any way under the Regulations of any state or other jurisdiction where the Debtor conducts its business or owns any real property or has any leasehold or in which any Relevant Property is located.

"Indebtedness" means, with respect to any Person, without duplication, the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person for the deferred purchase price of property or services (other than accounts payable and accrued liabilities that would be classified as current liabilities under GAAP if and only for so long as such item of such accounts payable and accrued liabilities is no more than 90 days past due), (iii) all obligations of such Person evidenced by notes, bonds, debentures or similar borrowing or securities instruments, (iv) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (v) all obligations of such Person as lessee under Capital Leases, (vi) all obligations of such Person in respect of banker's acceptances and letters of credit, (vii) all obligations of such Person secured by Liens on the assets and property of such Person, (viii) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock or other ownership or profit interest in such Person or any other Person or any warrants, rights or options to acquire such Capital Stock, (ix) net liabilities in respect of such Person's hedge agreements as determined in accordance with GAAP, (x) all obligations of such Person in respect of any guaranty by such Person of any obligation of another Person of the type described in clauses (i) through (ix) of this definition and (xi) all obligations of another Person of the type described in clauses (i) through (x) secured by a Lien on the property or assets of such Person (whether or not such Person is otherwise liable for such obligations of such other Person).

"Indemnified Taxes" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Debtor under any DIP Loan Document.

"Initial DIP Loans" means the amount set forth on Schedule 2.1 or such lesser amount as set forth in the Interim Order and the Budget.

"Intellectual Property" means, collectively, all copyrights, all patents and all trademarks, together with: (i) all inventions, processes, production methods, proprietary information, know-how and trade secrets; (ii) all licenses or user or other agreements granted to the Debtor with respect to any of the foregoing, in each case whether now or hereafter owned or used including the licenses or other agreements with respect to any DIP Collateral; (iii) all customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs; (iv) all sales data and other information relating to sales or service of products now or hereafter manufactured; (v) all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and (vi) all causes of action, claims and warranties, in each case, now or hereafter owned or acquired by the Debtor in respect of any of the items listed above.

"Interim Order" means an interim order (which must be acceptable in form and substance to the DIP Lender in its sole discretion) entered or to be entered by the Bankruptcy Court authorizing the secured financing (including the Initial DIP Loans) under the DIP Loan Documents.

"Interim Order Entry Date" means the date on which the Bankruptcy Court issues the Interim Order.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"Investment" means (i) any direct or indirect purchase or other acquisition by the Debtor of, or of a beneficial interest in, any of any Capital Stock of any other Person, (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by the Debtor from any Person, of any Capital Stock of such Person, and (iii) any direct or indirect loan, advance or capital contribution by the Debtor to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales of inventory to that other Person in the ordinary course of business and/or constitute ordinary annual trade credit extended in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additional Investments, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Knowledge" means, with respect to the Debtor, the actual knowledge of the Debtor's Authorized Officers.

10

"Leasehold Property" means any leasehold interest of the Debtor as lessee under any lease of real or personal property, other than any such leasehold interest designated from time to time by the DIP Lender in its sole discretion as not being required to be included in the DIP Collateral or with respect to which the applicable lease includes an enforceable prohibition on the grant of a security interest therein.

"Loan Agreements" has the meaning set forth in the recitals to this Agreement.

"Lien" means any mortgage, deed of trust, security interest, charge, pledge, hypothecation, assignment, attachment, deposit arrangement, encumbrance, lien (statutory, judgment or otherwise, but excluding any right of set off arising by operation of law or pursuant to agreements entered into in the ordinary course of business), or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any Capital Lease, any Synthetic Lease, any financing lease involving substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC or comparable law of any jurisdiction in respect of the foregoing).

"Margin Stock" means "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"Material Adverse Effect" means any material adverse effect on or change in (i) the business or assets of the Debtor, (ii) the ability of the Debtor to perform its obligations hereunder or under of any of the DIP Loan Documents, (iii) the legality, validity or enforceability of any DIP Loan Document, or (iv) the DIP Collateral or the perfection or priority of any DIP Liens granted to the DIP Lender under any of the DIP Collateral Documents.

"Maturity Date" means the earliest to occur of the date that is (a) November 8, 2021, (b) the closing date of any Restructuring, (c) the confirmation of a plan of reorganization or liquidation for the Debtor in the Chapter 11 Case, and (d) the date on which the DIP Lender accelerates the DIP Obligations (or the DIP Obligations automatically and immediately accelerate) or the DIP Obligations otherwise become immediately due and payable, in each case pursuant to the terms hereof.

"Mortgage" means the Mortgage, dated on even date herewith, by the Debtor in favor of the DIP Lender.

"Multiemployer Plan" means any Employee Benefit Plan that is a "multi-employer plan" as defined in Section 3(37) of ERISA.

"Net Asset Sale Proceeds" means, for the Debtor, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Debtor from such Asset Sale, minus (ii) the sum of (a) reasonable, customary and documented brokerage, consultant and other reasonable customary and documented fees and expenses actually incurred in connection with such

Asset Sale and (b) Taxes paid or reasonably estimated to be payable as a result of such Asset Sale.

"<u>Net Indebtedness Proceeds</u>" means the proceeds of any Indebtedness incurred by the Debtor after the Petition Date (other than pursuant to this Agreement) <u>minus</u> if, at the time of payment thereof and after giving thereto, (i) the Debtor is in pro forma compliance with the provisions of Section 6.2, (ii) any such payment is permitted to be made at such time in accordance with the Budget and (iii) no Default or Event of Default shall have occurred and be continuing or would result therefrom, reasonable, customary and documented out-of-pocket attorneys' fees, accountants' fees, and other reasonable customary and documented fees and expenses actually incurred in connection with the issuance of such Indebtedness.

"<u>Net Insurance/Condemnation Proceeds</u>" means, for the Debtor, an amount equal to: (i) any Cash payments or proceeds received by or owed to the Debtor (A) under any casualty insurance policy in respect of a covered loss thereunder or (B) as a result of the taking of any assets of the Debtor by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking <u>minus</u> (ii) the sum of (A) any actual and reasonable documented costs and expenses (including reasonable out-of-pocket attorney's fees) incurred by the Debtor in connection with the adjustment or settlement of any claims of the Debtor in respect thereof, and (B) any bona fide, reasonable, customary and documented costs actually incurred in connection with any sale of such assets as referred to in clause (i)(B) of this definition, including Taxes paid or reasonably estimated to be payable as a result of any gain recognized in connection therewith.

"<u>Net Proceeds</u>" means, as of any time, the aggregate of Net Asset Sale Proceeds, Net Insurance/Condemnation Proceeds and Net Indebtedness Proceeds.

"<u>Notices</u>" has the meaning set forth in Section 9.2.

"<u>Operating Account</u>" means the Debtor's deposit account at Bank of America, N.A., currently used as its operating account, which deposit account may be changed with the written consent of the DIP Lender.

"<u>PATRIOT Act</u>" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56).

"<u>PBGC</u>" means the Pension Benefit Guaranty Corporation or any successor thereto.

"<u>Pension Plan</u>" means any Employee Benefit Plan, other than a Multiemployer Plan, that is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"<u>Permit</u>" means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance or other authorization issued, granted, given or otherwise made available by or under the

12

authority of any Governmental Body or pursuant to any federal, state, local or foreign Regulation.

"<u>Permitted Indebtedness</u>" means the Indebtedness permitted pursuant to Section 6.1(a).

"<u>Permitted Investment</u>" has the meaning set forth in Section 6.1(c).

"<u>Permitted Liens</u>" has the meaning set forth in Section 6.1(b).

"<u>Person</u>" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, other legal entities and Governmental Bodies.

"<u>Petition Date</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Post-Petition</u>" means following the Petition Date.

"<u>Prepetition Collateral</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Prepetition Credit Agreements</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Prepetition Bond Indebtedness</u>" means the Indebtedness issued or loaned and outstanding under a Prepetition Credit Agreement.

"<u>Prepetition Obligations</u>" means all obligations of the Debtor arising prior to the Petition Date.

"<u>Prepetition Payment</u>" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of Prepetition Obligations or other prepetition claims against the Debtor.

"<u>Prepetition Secured Parties</u>" means each of the Bond Trustee and any other agent, trustee, bondholder, noteholder, lender or other secured party under any Prepetition Credit Agreement.

"<u>Regulation</u>" means each applicable law, rule, regulation, or  order, by any Governmental Body, central bank or comparable agency and any request or directive (if having the force of law) of any of those Persons and each judgment, injunction, order, writ, decree or award of any Governmental Body, arbitrator or other Person.

"<u>Released Parties</u>" shall have the meaning given such term in Section 9.19.

"<u>Relevant Property</u>" means, for the Debtor, all sites, facilities, locations, real property and leaseholds (i) presently or formerly owned, leased, used or operated by the Debtor (whether or not such properties are currently owned, leased, used or operated by the

Debtor) or (ii) at which any Hazardous Material has been transported, disposed, treated, stored or released by the Debtor.

"Restructuring" means a restructuring of Debtor's financial obligations with respect to the Bonds and its other outstanding obligations on the terms and conditions acceptable to the DIP Lender.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Synthetic Lease" means any lease of goods or other property, whether real or personal, which is treated as an operating lease under GAAP and as a loan or financing for U.S. income tax purposes.

"Tax" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in the State of New York; provided that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of the DIP Liens is governed by the Uniform Commercial Code as in effect in a United States jurisdiction other than New York, "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States Trustee" means the United States Trustee for the Southern District of Texas.

"Weekly Budget Report" means, a weekly report certified by an Authorized Officer for the Debtor, substantially in the same form as the Budget indicating (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Budget, and the percentage variance thereof, for (A) the weekly period ended on (and including) the immediately preceding Sunday and (B) the cumulative period to date; and (ii) a written explanation of such variances.

(b)     Capitalized terms used but not defined above or elsewhere herein shall have the meanings given to such terms in the Financing Orders, as applicable.

ARTICLE II
LOANS

Section 2.1     DIP Loans.

(a)     Subject to the terms and conditions set forth herein and in the Financing Orders, upon Debtor's request for a DIP Loan in accordance with Section 2.2(b), the DIP Lender agrees to make term loans pursuant to this Section 2.1(a) (collectively, the "DIP Loans") during the DIP Commitment Period in an amount equal to such requested DIP Loan.  Each such DIP Loan shall be for purposes consistent with the Budget and otherwise consistent with this Agreement; provided that both before and after giving effect to any DIP Loan, the aggregate amount of all DIP Loans, including the CapEx DIP Loans, made shall not exceed the DIP Loan Commitment.  Once repaid, DIP Loans borrowed hereunder may not be reborrowed.

(b)     Any amount borrowed under this Section 2.1 shall, along with all other DIP Obligations (including accrued and unpaid costs, and expenses), be entitled to the DIP Liens on the DIP Collateral and the other rights and benefits provided pursuant to the Financing Orders, this Agreement and the other DIP Loan Documents.

Section 2.2     Borrowing Mechanics.

(a)     The DIP Loans, other than the CapEx DIP Loans, shall be funded by the DIP Lender into the Debtor's Operating Account, and anything herein to the contrary notwithstanding, shall be disbursed solely in accordance with the Budget and the Financing Orders (both as to timing and amount of any such requests), subject to Sections 3.1 and 3.2.  The CapEx DIP Loans shall be funded by the DIP Lender into the Debtor's Capital Improvement Account, and shall be disbursed solely in accordance with the Budget and Financing Orders (both as to timing and amount of any such requests), subject to Sections 3.1 and 3.2.

(b)     Not less than two Business Days prior to any Borrowing Date, the Debtor shall deliver to the DIP Lender a fully executed Borrowing Certificate no later than 10:00 a.m. (New York City time) on such date.  Such Borrowing Certificate, a form of which is attached hereto as Exhibit B (each a "Borrowing Certificate"), shall, except with respect to the CapEx DIP Loans, specify the amount of the proposed DIP Loan and the Borrowing Date thereof, and shall certify that the amount of the proposed DIP Loan, after accounting for other available funds held by the Debtor less five hundred thousand dollars ($500,000), is reasonably expected to be needed to pay amounts coming due in the 15 days immediately following such Borrowing Date, as set forth in the Budget.  With respect to the CapEx DIP Loans, the Debtor may request a CapEx DIP Loan by indicating its request for such CapEx DIP Loan in a Borrowing Certificate, specifying the amount of the proposed CapEx DIP Loan and the Borrowing Date thereof, and certifying that the amount of the proposed CapEx DIP Loan is needed to pay amounts having come due and otherwise incurred with respect to capital improvements or storm damage claims at the Facility as set forth in the Budget.  On the Borrowing Date specified in any Borrowing Certificate, the DIP Lender shall disburse such funds to the Operating Account (or the Capital Improvement Account with respect to the CapEx DIP Loans) and shall use reasonable efforts to make the funds available to the Debtor no later than 2:00 p.m. (New York City time) on the requested Borrowing Date.

15

Section 2.3     Use of Proceeds.  The proceeds of the DIP Loans, other than the CapEx DIP Loans, shall be used by the Debtor, subject to and in accordance with the Budget and the Financing Orders, solely for (i) working capital and general corporate purposes of the Debtor and (ii) bankruptcy-related costs and expenses.  The proceeds of the CapEx DIP Loans shall be used by the Debtor, subject to and in accordance with the Budget and the Financing Orders, solely for payment of capital expenses and storm damage claims.  None of the proceeds of the DIP Loans shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lender (whether in its capacity as DIP Lender, Prepetition Secured Party, Bond Trustee or in any other capacity), the beneficial owners of the Bonds, or any of their respective advisors, agents and sub-agents, including in connection with the validity of the DIP Liens granted to the DIP Lender, or the Liens granted to the Prepetition Secured Parties in the Prepetition Collateral arising under the Prepetition Credit Agreements.

Section 2.4     Evidence of Debt.  The DIP Lender shall maintain in its internal records an account or accounts evidencing the DIP Obligations owed to the DIP Lender, including the amounts of the DIP Loans owed to it and each repayment and prepayment in respect thereof. Any such recordation shall be conclusive and binding on the Debtor, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect the DIP Loan Commitment, the DIP Loans or any of the DIP Obligations.

Section 2.5     Interest on Loans.

(a)     Applicable Rate; Payment of Interest.  Interest shall accrue on the full amount of the DIP Loan Commitment from the Interim Order Entry Date through the Maturity Date at a simple rate per annum equal to five and six hundred and twenty-five thousandths percent (5.625%).  Accrued interest shall be due and payable on the Maturity Date.

(b)     Calculation of Interest Rates.  Interest payable pursuant to this Section 2.5 shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.

Section 2.6     Repayment.  Subject to Sections 2.8 and 2.9, the DIP Loans shall be due and payable, and the Debtor shall be required to repay all of the DIP Obligations (including, without limitation, all accrued and unpaid principal, interest, fees, costs, and expenses on the DIP Loans) on the Maturity Date.

Section 2.7     Mandatory Prepayments.

(a)     Net Proceeds.  No later than the first Business Day following the date of receipt by the Debtor of any Net Proceeds, the Debtor shall prepay the DIP Loans (including the applicable portion of the accrued costs and expenses) as set forth in Section 2.9 in an aggregate amount equal to such Net Proceeds.

(b)     Prepayment Certificate.  Concurrently with any prepayment of the DIP Loans pursuant to Section 2.7(a), the Debtor shall deliver to the DIP Lender a certificate of an Authorized Officer demonstrating the calculation in reasonable detail of the amount of the applicable Net Proceeds.  In the event that the Debtor shall subsequently determine that the

actual amount received exceeded the amount set forth in such certificate, the Debtor shall promptly make an additional prepayment of the DIP Loans in accordance with Section 2.9 in an amount equal to such excess, and the Debtor shall concurrently therewith deliver to the DIP Lender a certificate of an Authorized Officer demonstrating the derivation of such excess.

Section 2.8    Application of Payments and Proceeds.  Any amount required to be paid pursuant to Section 2.7(a) or any other provision of this Agreement, and all proceeds of the DIP Collateral (whether before or after an Event of Default) shall be applied (a) first, to pay any amounts (including reasonable and documented attorneys' fees) payable to the DIP Lender under Section 9.3 hereof, (b) second, to pay accrued and unpaid interest, costs, expenses and other outstanding DIP Obligations, and (c) third, to repay any principal amounts outstanding in respect of the DIP Loans.

Section 2.9    General Provisions Regarding Payments.

(a)    Payments.  All payments by the Debtor of principal, interest and other DIP Obligations shall be made by the Debtor to the DIP Lender in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the DIP Lender not later than 4:00 p.m. (New York City time) on the date due at the DIP Lender's office for receipt of notices hereunder (or as otherwise instructed by the DIP Lender to the Debtor) without presentment, demand, protest or notice of any kind, all of which are expressly waived by the Debtor.

(b)    Late Payments.  The DIP Lender shall be permitted to consider any payment made by or on behalf of the Debtor that is not made in same day funds prior to 4:00 p.m. (New York City time) as a late payment, and any such late payment shall be deemed received on the next Business Day.  The DIP Lender shall give prompt telephonic notice to the Debtor (confirmed in writing) if any payment is considered late hereunder. To the extent any late payment is received, the DIP Lender shall be permitted to declare by notice to the Debtor (confirmed in writing) a Default or Event of Default to the extent so provided under the terms of Section 8.1.  Interest shall continue to accrue on any late payment until the Business Day following receipt thereof.

(c)    Payments to Include Accrued Interest.  All payments in respect of the principal amount of any DIP Loan shall include payment of accrued interest on the principal amount being repaid or prepaid calculated in accordance with Section 2.5, and all such payments shall be applied to the payment of interest before application to principal.

(d)    Business Days.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

Section 2.10   Termination of DIP Loan Commitments.  Unless previously terminated, the DIP Loan Commitment shall automatically terminate at the end of the DIP Commitment Period.  Upon the making of any DIP Loan, the DIP Loan Commitment shall be permanently reduced by an amount equal to the principal amount of such DIP Loan.

ARTICLE III
CONDITIONS PRECEDENT; CONDITIONS SUBSEQUENT

Section 3.1    Conditions Precedent; Closing Date.  The obligation of the DIP Lender to make any DIP Loan on any date on which the Debtor requests a Borrowing is subject to the satisfaction, or waiver in accordance with Section 9.1, of the following conditions on or before the Closing Date:

(a)    Certificate.  The DIP Lender shall have received a certificate of an Authorized Officer of the Debtor with respect to (i) the articles of incorporation of the Debtor, (ii) the bylaws of the Debtor, (iii) the resolutions of the board of directors of the Debtor approving each DIP Loan Document and such other agreements, instruments, certificates or other documents required to be delivered by the Debtor under the DIP Loan Documents and the performance of the obligations of the Debtor thereunder, and (iv) the names and true signatures of any officers of the Debtor who the Borrower desires to sign DIP Loan Documents from time to time (all of whom shall be Authorized Officers).

(b)    Good Standing Certificate.  The DIP Lender shall have received a good standing certificate from the applicable Governmental Body of the jurisdiction of incorporation of the Debtor and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated within 30 days prior to the Closing Date.

(c)    Financing Orders.  The Financing Orders, and all motions relating thereto, approving and authorizing the DIP Loans, all provisions thereof and the priorities and DIP Liens granted under Bankruptcy Code section 364(c) and (d), as applicable, shall be in form and substance satisfactory to the DIP Lender and its counsel, the Interim Order shall have been entered by the Bankruptcy Court on or before the date hereof and the Final Order shall be scheduled to be issued no later than September 2, 2021, and shall include, without limitation, provisions (a) modifying the automatic stay to permit the creation and perfection of the DIP Liens, (b) providing for the vacation of such stay to permit the enforcement of the DIP Lender's rights and remedies under the DIP Loan Documents upon further Court order, (c) upon entry of the Final Order, prohibiting the assertion of claims arising under sections 506(c) or 552(b) of the Bankruptcy Code against the DIP Lender or, except as expressly permitted therein, the commencement of other actions adverse to the DIP Lender or its respective rights and remedies under the DIP Loan Documents, the Financing Orders, or any other order, (d) prohibiting the incurrence of Indebtedness by Debtor, other than Permitted Indebtedness, with priority equal to or greater than the DIP Loans, (e) prohibiting any granting or imposition of Liens other than DIP Liens and Permitted Liens, and (f) authorizing and approving the Debtor to execute and deliver the DIP Loan Documents to which each shall be a party and the transactions contemplated therein, including, without limitation, the granting of the super priority status, the first-priority and priming security interests and DIP Liens upon the DIP Collateral and the payment of all fees and expenses due to the DIP Lender.  As of the Final Order Entry Date, the Final Order shall further state, among other things, that, upon entry of the Final Order, (a) the DIP Lender, the Prepetition Secured Parties, and all of their respective counsel, advisors and consultants, shall each be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code, and (b) permit the DIP Lender the right to Credit Bid (pursuant to section

18

363(k) of the Bankruptcy Code and/or applicable law) the DIP Loans, in whole or in part, in connection with any sale or disposition of assets in the Chapter 11 Case.

(d)   Compliance with Financing Orders.  No Financing Order shall have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the DIP Lender.  The Debtor shall be in compliance in all material respects with the Financing Orders and all other orders of the Bankruptcy Court binding on it.

(e)   Debtor-in-Possession.  No trustee or examiner shall have been appointed with respect to the Debtor or its properties.

(f)   First Day Motions.  All "first day" motions and related orders entered by the Bankruptcy Court in the Chapter 11 Case shall be in form and substance satisfactory to the DIP Lender and its counsel.

(g)   Use of Proceeds and Information.  The proceeds of the DIP Loans shall be used by the Debtor solely in accordance with the Budget and the DIP Lender shall receive such information (financial or otherwise) as may be reasonably requested by the DIP Lender.

(h)   Litigation, etc.  There shall not exist any material action, suit, investigation, litigation or proceeding pending (other than the Chapter 11 Case) or threatened in any court or before any Governmental Body that, in the reasonable opinion of the DIP Lender, materially and adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a Material Adverse Effect.

(i)   Cash Management.  Cash management arrangements satisfactory to the DIP Lender in form and substance shall be in place.  The DIP Lender or its advisors shall have completed a review of the Debtor's cash management systems and determined that all material amounts of cash and cash equivalents of the Debtor are subject to a DIP Lien in favor of the DIP Lender.

(j)   Consents.  Holders of a majority in principal amount of the Bonds outstanding shall have consented to the DIP Lender's entry into the DIP Loan Documents.

(k)   No Default.  No Default or Event of Default shall exist at the time of, or after giving effect to, the transactions contemplated on the Closing Date, including the advancing of any DIP Loans.

(l)   Representations and Warranties.  All representations and warranties in the DIP Loan Documents shall be true and correct as of the Closing Date.

(m)   UCC Financing Statements.  The DIP Lender shall have received UCC financing statements duly authorized by the Debtor with respect to all personal property DIP Collateral of the Debtor, for filing in all jurisdictions as may be necessary or, in the opinion of the DIP Lender, desirable, to perfect the security interests created in such DIP Collateral pursuant to the DIP Collateral Documents.

(n)     DIP Loan Documents.  The DIP Lender shall have received duly executed copies of each DIP Loan Document (other than any DIP Loan Document which the DIP Lender has allowed to be executed at a later date), with originals to promptly follow.  The Mortgage, financing statements and other DIP Loan Documents related to perfection of the security interest and Liens of the DIP Lender in the DIP Collateral shall, at the DIP Lender's option, have been filed in all appropriate jurisdictions (or arrangements for such filings acceptable to the DIP Lender shall have been made).

(o)     Other Actions to Perfect Security Interests.  The DIP Lender shall have received evidence that Debtor shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument, and made or caused to be made any other filing and recording (other than as set forth herein), reasonably required by the DIP Lender to perfect, and to ensure the perfection of, its security interests in the DIP Collateral with the priority required by the DIP Loan Documents.

(p)     Other Information.  The DIP Lender shall have received any other financial or non-financial information regarding the Debtor that the DIP Lender reasonably requested at least five Business Days prior to the Closing Date.

(q)     DIP Lender's Professional Fees and Costs.  The Financing Orders shall require the Debtor pay, on the Maturity Date, all reasonable out-of-pocket fees and expenses of the DIP Lender incurred in connection with this Agreement and the other DIP Loan Documents, including the fees, costs and expenses of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC., as counsel to the DIP Lender, and any other attorneys' fees, costs and expenses of local counsel to the DIP Lender.  The DIP Lender shall be satisfied, in its sole discretion, that all such fees and expenses constitute DIP Obligations under the Financing Orders and are secured by the DIP Liens on the DIP Collateral.

(r)     No Material Adverse Change.  The Debtor, as debtor-in-possession, shall have continued to operate its business in the ordinary course through the Closing Date, and since the Petition Date there shall have been no Material Adverse Effect.

Section 3.2     Conditions to Each Borrowing.  The obligations of the DIP Lender to make any DIP Loan on any Borrowing Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 9.1, of the following conditions precedent:

(a)     Borrowing Certificate.  The DIP Lender shall have received a fully executed and delivered Borrowing Certificate, in accordance with Section 2.2.  Each Borrowing Certificate shall be executed by an Authorized Officer of the Debtor and delivered to the DIP Lender on a Business Day.

(b)     Representations and Warranties.  As of such Borrowing Date (both before and after giving effect to the advance of the DIP Loans and application of its proceeds), the representations and warranties of the Debtor contained in the DIP Loan Documents shall be true and correct in all material respects on and as of that Borrowing Date, as if made on and as of that Borrowing Date (except to the extent such representations and warranties specifically relate to an

earlier date, such representations and warranties were true and correct on and as of such earlier date).

        (c)    <u>No Event of Default</u>.  As of such Borrowing Date, no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the applicable Borrowing (or the application of its proceeds).

        (d)    <u>Consents</u>.  The DIP Lender shall have received such Consents and other information, approvals, opinions or documents reasonably requested by the DIP Lender in connection with such Borrowing.

        (e)    <u>Available Commitments</u>.  After making the DIP Loans requested on such Borrowing Date, the aggregate outstanding principal amount of the DIP Loans shall not exceed the amount of the DIP Loan Commitment.

        (f)    <u>No Material Adverse Effect</u>.  Since the Interim Order Entry Date, no Material Adverse Effect shall have occurred after giving effect to the making of the DIP Loans.

        (g)    <u>Other Information</u>.  The DIP Lender shall have received any other financial or non-financial information regarding the Debtor that the DIP Lender reasonably requested.

        Section 3.3    <u>Conditions Subsequent</u>.  The Debtor shall timely perform all obligations and commitments in any post-closing agreement between the DIP Lender and the Debtor with respect to any requirement of Sections 3.1 or 3.2 hereof that the DIP Lender has, in the exercise of its sole and absolute discretion, agreed to be satisfied at a later date.

ARTICLE IV<br><u>REPRESENTATIONS AND WARRANTIES</u>

        Section 4.1    <u>Representations and Warranties</u>.  In order to induce the DIP Lender to enter into this Agreement and to make each DIP Loan to be made hereby, Debtor hereby represents and warrants to the DIP Lender, on the Closing Date and on each Borrowing Date as follows:

        (a)    <u>Status; Authorization</u>.  Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and is duly qualified and in good standing in every other jurisdiction where it is doing business except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect, and, subject to the entry by the Bankruptcy Court of the Financing Orders, the execution, delivery and performance by the Debtor of the DIP Loan Documents (i) are within its respective authority, (ii) have been duly authorized, and (iii) do not conflict with or contravene its constitutive documents.  Subject to the entry by the Bankruptcy Court of the Financing Orders, the execution, delivery, performance of its obligations, and exercise of its rights under the DIP Loan Documents by the Debtor, including, without limitation, the making of the DIP Loans under this Agreement, (y) do not require any Consents that have not been obtained or notices to third parties that have not been provided except to the extent such failure would not result in a Material Adverse Effect and (z) are not and will not be in conflict with or be prohibited or prevented by (A) any Regulation,

(B) any corporate governance document, corporate minute or resolution of the Debtor or (C) any instrument, agreement or provision thereof, in each case binding on it or affecting any of its property.

        (b)    <u>Execution and Binding Effect</u>.  Subject to the entry by the Bankruptcy Court of the Financing Orders, upon execution and delivery thereof, each DIP Loan Document shall constitute the legal, valid and binding obligation of the Debtor, enforceable in accordance with its terms.

        (c)    <u>Properties</u>.

        (i)    Debtor has good and marketable title to all real property owned or purported to be owned by it, in each case free of all Liens other than the Permitted Liens.

        (ii)    Debtor enjoys, and will enjoy, peaceful and undisturbed possession of, or a lease or license to use, all property (subject only to the Permitted Liens) that is necessary for the conduct of its business.

        (d)    <u>Litigation</u>.  Except for the Chapter 11 Case, there are no material legal or other proceedings or investigations pending or, to the Knowledge of the Debtor, threatened against the Debtor before any court, tribunal or regulatory authority which could, if adversely determined, alone or together, reasonably be expected to have a Material Adverse Effect.

        (e)    <u>Governmental Approvals and Filings</u>.  Other than the Bankruptcy Court's entry of the Financing Orders and the filings and recordings contemplated by the DIP Collateral Documents, no approval, order, consent, authorization, certificate, license, permit or validation of, or exemption or other action by, or filing, recording or registration with, or notice to, any Governmental Body is or will be necessary in connection with the execution and delivery of this Agreement or any other DIP Loan Document, consummation by the Debtor of the transactions herein or therein contemplated, or performance of or compliance with the terms and conditions hereof or thereof.  The Debtor is not an "investment company" or a company "controlled" by an "investment company," with the meaning of the Investment Company Act of 1940, as amended.

        (f)    <u>Absence of Conflicts</u>.  Subject to the Bankruptcy Court's entry of the Financing Orders, the execution and delivery by the Debtor of this Agreement and each other DIP Loan Document to which it is a party and performance by it hereunder and thereunder will not violate any law (including, without limitation, Regulations T, U and X of the Federal Reserve Board) and will not conflict with or result in a breach of any order, writ, injunction, resolution, decree or other similar document or instrument of any court or Governmental Body or its certificate of incorporation or by-laws or similar constituent documents or create (with or without the giving of notice or lapse of time, or both) a default under or breach of any material agreement, bond, note or indenture, in each case to which it is a party (by successor in interest or otherwise), or by which it is bound or any material portion of its properties or assets is affected, in each case, the effect of which could reasonably be expected to be, have or reflect in a Material Adverse Effect or, except under the DIP Collateral Documents, result in the imposition of any

Lien (other than Permitted Liens) of any nature whatsoever upon any of the properties or assets owned by or used in connection with the business of the Debtor.

(g)     DIP Collateral.  From and after the Interim Order Entry Date, the DIP Lender shall have first-priority perfected security interests and DIP Liens in and to all of the DIP Collateral, free and clear of any Liens other than the Permitted Liens, and entitled to priority under applicable law, with no financing statements, hypothecations, chattel mortgages, real estate mortgages or similar filings on record with respect to the Debtor or the DIP Collateral anywhere other than such filings in connection with this Agreement, the DIP Collateral Documents or the Permitted Liens.  Each of the representations and warranties made by the Debtor in each DIP Collateral Document to which it is a party is true and correct in all material respects as of each date made or deemed made.

(h)     Subsidiaries.  The Debtor does not own any Subsidiaries.

(i)     Material Misstatements and Omissions.  Any projections and pro forma financial information contained in or delivered pursuant to any DIP Loan Document (including the Budget and each Weekly Budget Report) or any other document, certificate or written statement furnished to the DIP Lender pursuant to any DIP Loan Document are based upon good faith estimates and assumptions believed by the Debtor to be reasonable at the time made.

(j)     Budgets.  All facts in the Budget and each Weekly Budget Report (when delivered) are accurate in all material respects and the Debtor has disclosed to the DIP Lender all material assumptions in the Budget and each Weekly Budget Report.  After giving effect to the DIP Loans projected to be made under the Budget, the Debtor believes, in good faith and in the exercise of its commercially reasonable judgment, that it has or will have sufficient capital and funds to pay and satisfy the expenses, obligations and liabilities of the Debtor as set forth, as and when provided to be paid or satisfied, in the Budget.

(k)     Labor Practices.  To the Knowledge of the Debtor, the Debtor is not engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.

(l)     Employee Benefits.  Each of the Employee Benefit Plans intended to qualify under Section 401 of the Internal Revenue Code so qualifies, and nothing has occurred with respect to the operation of such plan which would cause the loss of such qualification or the imposition of any material liability, penalty or tax under ERISA or the Internal Revenue Code.  All contributions and premiums required by law or by the terms of each Employee Benefit Plan have been timely made.  Neither Debtor nor its ERISA Affiliates bear any liability for any Pension Plan or Multiemployer Plan and have not had any liability under any Pension Plan or Multiemployer Plan for the last 6 years

(m)     Environmental Matters.

(i)     There are no Environmental Liabilities at any Relevant Property, which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

23

(ii)      The Debtor: (A) has operated its business in compliance with all applicable Environmental Laws; (B) has obtained all Environmental Permits required by applicable Environmental Laws for the ownership and operation of its properties, and all such Environmental Permits are in full force and effect or such Person has made all appropriate filings for issuance or renewal of such Environmental Permits; (C) to its Knowledge, is not aware of any acts, omissions, events or circumstances that may interfere with or prevent continued compliance with the Environmental Laws and Environmental Permits referred to in the preceding clauses (A) and (B); (D) has not received written notice of any asserted or threatened claim, action, suit, proceeding, hearing, investigation or request for information relating to any environmental matter; and (E) has not received notice from any Governmental Body that the Debtor is a potentially responsible party under any Environmental Law at any disposal site containing Hazardous Materials, nor has the Debtor received any notice that any lien under any Environmental Law against any property of the Debtor exists, except for matters in each case of (A) through (E) above, which individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(n)      Insurance.  The policies, binders or self-insurance programs for fire, liability, product liability, workmen's compensation, vehicular and other insurance currently held by or on behalf of the Debtor insure its material properties and business activities against such losses and risks as are reasonably believed to be adequate to protect its properties in accordance with customary industry practice.  As of the date hereof, all such policies, binders and self-insurance programs are in full force and effect.  As of the date hereof, the Debtor has not received notice from any insurer or agent of such insurer that substantial capital improvements or other expenditures are required.  As of the date hereof, the Debtor has not received notice of cancellation of any material insurance policy or binder.

(o)      Absence of Events of Default and Material Adverse Effect.  Since the Interim Order Entry Date, no Default or Event of Default has occurred.  Since the Interim Order Entry Date, no Material Adverse Effect has occurred.

(p)      Compliance with Laws.  Except as otherwise excused by the Bankruptcy Code, the Debtor has complied, and is in compliance in all respects, with all laws, except for such instances of non-compliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(q)      Margin Regulations.  No part of the proceeds of the DIP Loans issued hereunder will be used for the purpose of buying or carrying any Margin Stock or to extend credit to others for the purpose of buying or carrying any Margin Stock, in either case in a manner which would violate or conflict with Regulations T, U or X of the Board Governors of the Federal Reserve System.  The Debtor is not engaged in the business of extending credit to others for the purpose of buying or carrying Margin Stock.  Neither the making of the DIP Loans nor any use of proceeds of any such Loans will violate or conflict with the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System, as amended from time to time.

24

(r)     Taxes.  The Debtor has filed all federal and other material Post-Petition Tax returns required to be filed by it and has not failed to pay any material Post-Petition Taxes, or interest and penalties relating thereto, except for Post-Petition Taxes not yet due and except for those the amount or validity of which is currently being contested in good faith by appropriate proceedings diligently pursued and available to the Debtor and with respect to which adequate reserves have been set aside on its books in accordance with GAAP.

ARTICLE V
AFFIRMATIVE COVENANTS

Section 5.1     Affirmative Covenants.  The Debtor covenants and agrees that until payment in full of all DIP Obligations (other than indemnification obligations for which no claim has been made as of the applicable date of determination), the Debtor shall perform all the covenants in this Article V applicable to it:

(a)     Basic Reporting Requirements.  The Debtor shall furnish to the DIP Lender:

(i)     no later than 12:00 p.m. (prevailing Central time) on Thursday of each week or if such Thursday is not a business day, then the immediate succeeding business day, the Weekly Budget Report;

(ii)     at any time and from time to time that the Debtor receives any material written notice from any Governmental Body, the Debtor shall promptly provide a copy of such notice to the DIP Lender, and the Debtor shall provide to the DIP Lender copies of all material reports, certificates and notices that the Debtor may provide to any Governmental Body;

(iii)     a monthly reporting package, no later than 30 days after the end of each calendar month, including cash flow, income statement and balance sheet for such month, accounts payable and receivable reports with aging information; and

(iv)     as promptly as reasonably practicable from time to time following the DIP Lender's reasonable request therefor, such other information (including historical information) regarding the operations, business affairs and financial condition of the Debtor, the progress of the Chapter 11 Case or compliance with the terms of any DIP Loan Document.

(b)     Verification.  The Debtor shall keep true and accurate (in all material respects) books of account in accordance with past practices and shall permit the DIP Lender, or any of its designated representatives, upon reasonable notice and at the expense of the Debtor, during normal business hours to examine the books of account of the Debtor (and to make copies and/or extracts therefrom) and to discuss the affairs, finances and accounts of the Debtor with, and to be advised as to the same by, the managers, executives and officers of the Debtor and to be advised as to such or other business records upon the reasonable request of the DIP Lender. Management, advisors, consultants and senior personnel of the Debtor shall be available upon reasonable advance notice from the DIP Lender (or its agents or representatives) for meetings

with the DIP Lender and its agents or representatives during normal business hours with reasonable prior notice and at such reasonable locations.

(c)     <u>Existence; Maintenance of Properties; Compliance with Regulations</u>.  The Debtor shall maintain its corporate/legal existence and business, maintain its assets in good operating conditions and repair (subject to ordinary wear and tear and casualty damage and to all provisions of this Agreement permitting sales of certain of the Debtor's assets), keep its business and assets insured in accordance herewith, maintain its chief executive office in the United States, continue to engage in the same or substantially similar lines of business as of the Petition Date, and comply in all respects with all Regulations, including without limitation, ERISA and Environmental Laws, except where a failure to do so could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

(d)     <u>Notice of Material Events</u>.  The Debtor shall notify the DIP Lender promptly in writing upon an Authorized Officer becoming aware of any of the following: (i) the occurrence of any Default or Event of Default, (ii) any noncompliance with any Environmental Law or proceeding in respect thereof which could reasonably be expected to have a Material Adverse Effect, (iii) any change of chief executive office address of the Debtor, (iv) any pending or, to the Knowledge of the Debtor, threatened litigation or similar proceeding affecting the Debtor involving claims in excess of $100,000 in the aggregate or any material change in any such litigation or proceeding previously reported, (v) claims in excess of $100,000 in the aggregate against any assets or properties of the Debtor encumbered in favor of the DIP Lender, and (vi) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(e)     <u>Further Assurances</u>.

(i)     The Debtor shall cooperate with the DIP Lender, take such action, execute such documents, and provide such information as the DIP Lender may from time to time reasonably request in order to effect the transactions contemplated by and the purposes and intent of the DIP Loan Documents.

(ii)     The Debtor shall promptly, upon request by the DIP Lender, correct, and cause each of the other parties to the DIP Loan Documents to promptly correct, any defect or error that may be discovered in any DIP Loan Document or in the execution, acknowledgment or recordation of the DIP Loan Document.  Promptly upon request by the DIP Lender, the Debtor shall execute, authorize, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, documents, security agreements, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments as the DIP Lender may require from time to time in order to carry out more effectively the purposes and intent of each DIP Loan Document.  Without limiting the foregoing, the Debtor shall (A) authorize the filing by the DIP Lender of UCC-1 financing statements for all jurisdictions deemed necessary or desirable by the DIP Lender, and (B) take such action from time to time (including, without limitation, authorizing, filing, executing and/or delivering such assignments,

security agreements and other instruments) as shall be reasonably requested by the DIP Lender to create, in favor of the DIP Lender, to the extent required under the respective DIP Collateral Documents and to the maximum extent permitted under applicable law, a first-priority perfected Lien in all of the DIP Collateral, subject only to Permitted Liens.

(f)     Controlled Account Agreements.

(i)     The Debtor shall use its commercially reasonable efforts to enter into an account control agreement in form and substance acceptable to the DIP Lender (each, a "Controlled Account Agreement") as necessary to provide the DIP Lender, to the extent not prohibited by applicable law, with "control" over, except as set forth below, each Deposit Account of the Debtor (each, a "Controlled Account") as provided for under Section 9-104 of Article 9 of the UCC (or other applicable law) for the purpose of perfecting the security interest which the DIP Lender has in such Deposit Account pursuant to the DIP Collateral Documents.  The Debtor further agrees to promptly enter into Controlled Account Agreements for any new Deposit Accounts opened during the DIP Commitment Period, which new Deposit Accounts shall only be opened following notice to, and written consent from, the DIP Lender.  No arrangement contemplated hereby or by any Controlled Account Agreement in respect of any such Deposit Account of the Debtor, shall be modified by the Debtor without the prior written consent of the DIP Lender. Deposit Accounts excluded from the requirements of this section are as follows:

| Bank Name | Last Four Digits of Account # | Description |
|---|---|---|
| Bank of America, N.A. | xxx0610 | Utility Adequate Assurance Account |
| Bank of America, N.A. | xxx7564 | Scholarship Account |
| Bank of America, N.A. | xxx6160 | Operating Account |
| Bank of America, N.A. | xxx3732 | Capital Expenditure Account |
| Bank of America, N.A. | xxx4705 | Community/Collateral Account (Credit Card) |
| UMB Bank, N.A. | xxx933.3 | Trustee Restricted Accounts |
| UMB Bank, N.A. | xxx933.1 | |
| UMB Bank, N.A. | xxx933.2 | |
| UMB Bank, N.A. | xxx935.3 | |
| UMB Bank, N.A. | xxx935.1 | |
| UMB Bank, N.A. | xxx935.2 | |
| UMB Bank, N.A. | xxx939.3 | |
| UMB Bank, N.A. | xxx939.4 | |
| UMB Bank, N.A. | xxx939.6 | |
| UMB Bank, N.A. | xxx939.5 | |
| UMB Bank, N.A. | xxx939.12 | |
| UMB Bank, N.A. | xxx939.1 | |
| UMB Bank, N.A. | xxx939.2 | |

27

| UMB Bank, N.A. | xxx939.8 | |
| UMB Bank, N.A. | xxx939.10 | |
| UMB Bank, N.A. | xxx939.13 | |
| UMB Bank, N.A. | xxx939.7 | |
| Regions Bank | xxx0407 | Escrow Account (Reservation Deposits) |
| Regions Bank | Pending | Escrow Account (Entrance Fee) |

(ii)      Upon the occurrence and during the continuance of an Event of Default, any disbursements of proceeds in any Controlled Account will only be made at the direction of the DIP Lender; prior to the occurrence of an Event of Default, the Debtor will have access to any funds on deposit in the Controlled Accounts for use solely in accordance with this Agreement and the other DIP Loan Documents.  The DIP Lender assumes no responsibility for the Controlled Accounts, including, without limitation, any claim of accord and satisfaction or release with respect to deposits which any banks accept thereunder.  Upon the occurrence and during the continuance of an Event of Default, all remittances which the Debtor receives in payment of any Accounts, and the proceeds of any other DIP Collateral, shall be (A) kept separate and apart from the Debtor's own funds so that they are capable of identification as the DIP Lender's property; (B) held by the Debtor as trustee of an express trust for the DIP Lender's benefit; and (C) immediately deposited in such accounts designated by the DIP Lender.  Upon the occurrence and during the continuance of an Event of Default, all proceeds received or collected by the DIP Lender with respect to the Controlled Accounts, and reserves and other property of the Debtor in possession of the DIP Lender at any time or times hereafter, may be held by the DIP Lender, as the case may be, without interest to the Debtor until all DIP Obligations are paid in full or applied by the DIP Lender on account of the DIP Obligations.  The DIP Lender may release to the Debtor such portions of such reserves and proceeds as the DIP Lender may determine.  The DIP lender shall not have any duty to protect, insure, collect or realize upon the Controlled Accounts or to preserve rights in them.

(g)      Insurance.  The Debtor shall maintain, at its expense, and keep in effect with responsible insurance companies, such liability insurance for bodily injury and third-party property damage as is customary in the case of companies engaged in the same or similar business or having similar properties, similarly situated.  The Debtor shall keep and maintain, at its expense, its material real and personal property insured against loss or damage by fire, theft, explosion, spoilage and all other risks ordinarily insured against by other owners or users of such properties in similar businesses in an amount equal to the full replacement or cash value thereof, subject to deductible amounts which the Debtor, in its reasonable judgment, deems prudent.

(h)      Information Regarding DIP Collateral.  The Debtor will furnish to the DIP Lender prompt written notice of any change in (i) any the Debtor's corporate name or any trade name used to identify it in the conduct of its business or the Debtor's chief executive office, its principal place of business or its jurisdiction of organization or (ii) the Debtor's federal Taxpayer

Identification Number.  The Debtor will not affect or permit any change referred to in the preceding sentence unless arrangements satisfactory to the DIP Lender have been made to ensure that all filings will be (or have been) made under the UCC and all other actions have been taken that are required so that such change will not at any time adversely affect the validity, perfection or priority of any Lien established under any DIP Loan Document on the DIP Collateral.

(i)    Existence; Conduct of Business.  The Debtor will do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits (including, without limitation, Environmental Permits) privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except to the extent that failure to so act, which either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  The Debtor shall maintain its credit and risk policies substantially as in effect on the Petition Date.

(j)    Payment of Obligations.  Proceeds of the DIP Loans shall be used solely as provided in Section 2.3

(k)    Compliance with Laws.  Except as otherwise excused by the Bankruptcy Code, the Debtor will comply with all laws (including, without limitation, all Environmental Laws), rules, licenses, permits, Regulations and orders of any Governmental Body applicable to it or its property, except where failures to do so, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(l)    Subsidiaries.  Without limitation of the prohibition against forming Subsidiaries under Section 6.1(f) or waiving any Event of Default arising therefrom, if any Subsidiary is nonetheless formed or acquired by the Debtor after the Closing Date, the Debtor will, prior to the date upon which such Subsidiary is formed or acquired, notify the DIP Lender thereof and promptly following such formation or acquisition, cause any equity interest in, assets owned or leased by, or Indebtedness owned by or on behalf, of such Subsidiary to be added to the DIP Collateral.  The DIP Lender may require that any such Subsidiary be joined to this Agreement or the DIP Collateral Documents as a borrower or debtor hereunder or thereunder pursuant to joinder agreements in form and substance reasonably satisfactory to the DIP Lender.

(m)    Restructuring.  The Debtor shall, in good faith, continue to pursue the Restructuring and take all commercially reasonable steps to obtain approvals for the Restructuring as expeditiously as is reasonably practicable under applicable law.  Any agreements, arrangements, pleadings or other documents relating to a Restructuring which Debtor shall enter into must be acceptable to the DIP Lender.

(n)    Bankruptcy Milestones.  The Debtor shall comply with the Bankruptcy Milestones.

## ARTICLE VI
## NEGATIVE COVENANTS/BUDGET COMPLIANCE

Section 6.1    Negative Covenants.  The Debtor covenants and agrees that until all of the DIP Obligations (other than indemnification obligations for which no claim has been made as of

the applicable date of determination) have been paid or satisfied in full, the Debtor shall perform all covenants in this Section 6.1 applicable to it:

(a)    Indebtedness.  The Debtor shall not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), any Indebtedness, performance, obligations or dividends of any other Person, except:

(i)    the DIP Obligations;

(ii)    the Prepetition Bond Indebtedness; and

(iii)    Indebtedness, including post-petition administrative expenses, incurred in the ordinary course of the Debtor's operations and in compliance with the Budget; provided that such Indebtedness remains at all times unsecured except as provided in Section 6.1(b).

(b)    Liens.  The Debtor shall not create or incur any Liens on any of the property or assets of the Debtor, except (the Liens described in the following clauses, the "Permitted Liens"):

(i)    the Liens of the DIP Lender securing the DIP Obligations;

(ii)    Liens of the Prepetition Secured Parties securing the Prepetition Bond Indebtedness, including the Liens granted pursuant to the Financing Orders and other Liens existing on the date hereof;

(iii)    Liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to the Debtor and with respect to which adequate reserves have been set aside on its books;

(iv)    non-consensual statutory Liens (other than Liens securing the payment of taxes) arising in the ordinary course of the Debtor's business to the extent:  (A) such Liens secure Indebtedness which is not overdue or (B) such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued by the Debtor, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on its books;

(v)    zoning and land use restrictions, easements, encumbrances, licenses, covenants and other restrictions affecting the use of real property which do not interfere in any material respect with the use of such real property or ordinary conduct of the business of the Debtor as presently conducted thereon or materially impair the value of the real property which may be subject thereto;

(vi)    purchase money security interests in Equipment (including Capital Leases) to secure Indebtedness permitted under Section 6.1(a)(ii) hereof;

(vii)    pledges and deposits of cash by the Debtor after the date hereof in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of the Debtor as of the date hereof;

(viii)    pledges and deposits of cash by the Debtor after the date hereof to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of the Debtor as of the date hereof; provided, that, in connection with any performance bonds issued by a surety or other person, the issuer of such bond shall have waived in writing any rights in or to, or other interest in, any of the DIP Collateral in an agreement, in form and substance satisfactory to the DIP Lender;

(ix)    Liens arising from (A) operating leases and the precautionary UCC financing statement filings in respect thereof and (B) Equipment or other materials which are not owned by the Debtor located on the premises of the Debtor (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of the Debtor and the precautionary UCC financing statement filings in respect thereof; and

(x)    judgments and other similar Liens arising in connection with court proceedings that do not constitute an Event of Default; provided, that, (A) the enforcement of such judgments and Liens remain at all times subject to the automatic stay provisions of the Bankruptcy Code, (B) except as otherwise consented to in writing by the DIP Lender, such Liens are being contested in good faith and by appropriate proceedings diligently pursued by the Debtor, as the case may be, and (C) adequate reserves or other appropriate provision, if any, as are required by GAAP have been made therefor.

(c)    Investments.  The Debtor shall not make any Investments other than Investments in: (i) marketable obligations of the United States maturing within one (1) year; (ii) certificates of deposit, bankers' acceptances and time and demand deposits of United States banks having total assets in excess of $1,000,000,000 or other similar cash equivalents; and (iii) existing Investments on the Closing Date shown on the Budget or financial statements (each of (i) through (iii) above, a "Permitted Investment").

(d)    Mergers; Asset Sales.  Other than any disposals of obsolete, worn out or surplus property and the license or sublicense of intellectual property, the Debtor shall not, without the written consent of the DIP Lender, (i) consummate a merger, amalgamation or consolidation, (ii) enter into any Asset Sale or otherwise effect the disposition of any assets, (iii) purchase, sell, lease or otherwise dispose of assets other than inventory in the ordinary course, (iv) make any changes in the corporate structure or identity of the Debtor which could

31

reasonably be expected to have a Material Adverse Effect or (v) enter into any binding agreement to do any of the foregoing.

(e)     Restricted Payments.  The Debtor shall not directly or indirectly, declare, order, pay, make or set apart any sum for any Indebtedness other than the DIP Loans or the Prepetition Bond Indebtedness or any other payments permitted by the Bankruptcy Court subject to the Budget.

(f)     Subsidiaries.  The Debtor shall not form, or cause to be formed, any Subsidiary without the written consent of the DIP Lender.

(g)     Chapter 11 Claims.  Except as provided in the Financing Orders, the Debtor will not incur, create, assume, suffer to exist or permit any other superpriority expense claim under section 364 of the Bankruptcy Code or any or Lien which is senior to or *pari passu* with, the Liens securing the DIP Obligations.

Section 6.2     Budget Compliance.  The Debtor shall comply with the Budget (subject to the permitted variances provided in the next immediate sentence), and shall not make any payments, or incur any obligations or liabilities, that are not projected and provided for in the Budget.  As of the last day of each Measuring Period (as defined in the Financing Orders), (a) aggregate disbursements during such period shall not exceed 110% of the total budgeted disbursement for such period; (b) any single disbursement line item shall not exceed 115% of the such budgeted line item for such period; (c) total receipts shall not be less than 90% of such budgeted receipts for any particular staggered month, with such staggered month being measured from the 6th Business Day of a particular month to the 5th Business Day of the following month, and (d) expenditures for estate professional fees shall not exceed 100% of the amount allocated for such expenditures in the Budget for such period (both in the aggregate and with respect to each professional's respective line on the Budget).  Subject to the prior consent of the DIP Lender, the Variance shall exclude emergency repairs involving manifest danger to the life or safety of the Residents or immediately necessary for the preservation or safety of the Community. Each "Variance" shall be measured on a rolling four week basis, other than as set forth in (c) of this Section, and may include weeks prior to the Petition Date.

ARTICLE VII
INCREASED COSTS; TAXES; SET OFF; ETC.

Section 7.1     Taxes; Withholding, Etc.

(a)     Payments to be Free and Clear.  Except as otherwise required under this Section 7.1, all sums payable by the Debtor hereunder and under the other DIP Loan Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than an Excluded Tax) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of the Debtor or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b)    Withholding of Taxes.  If the Debtor is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by the Debtor to the DIP Lender in the ordinary or general conduct of business: (i) the Debtor shall notify the DIP Lender of any such requirement or any change in any such requirement as soon as the Debtor becomes aware of it, (ii) the Debtor shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on Debtor) for its own account or (if that liability is imposed on the DIP Lender) on behalf of and in the name of the DIP Lender, (iii) if such Tax is an Indemnified Tax, the sum payable by the Debtor in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, the DIP Lender, as the case may be, receives an amount equal to what it would have received had no such deduction, withholding or payment been required or made, and (iv) within 30 days after paying any sum from which it is required by law to make any deduction or withholding, and within 30 days after the due date of payment of any Tax which it is required by clause (ii) above to pay, the Debtor shall deliver to the DIP Lender evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority.

(c)    Taxpayer Identification.  Upon the reasonable request of the Debtor, the DIP Lender shall deliver to the Debtor two (2) properly completed and duly executed copies of United States Internal Revenue Service Form W-9 (certifying that the DIP Lender is entitled to an exemption from U.S. backup withholding tax) or any successor form on or before the date the DIP Lender becomes a party hereto.  Upon the reasonable request of the Debtor, the DIP Lender also agrees to deliver to the Debtor two (2) further copies of said Form W-9, properly completed and duly executed, on or before the date that any such form expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Debtor, and such extensions or renewals thereof as may reasonably be requested by the Debtor, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required that renders all such forms inapplicable or that would prevent the DIP Lender from duly completing and delivering any such form with respect to it and the DIP Lender so advises the Debtor.

Section 7.2    Right of Set Off.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, the DIP Lender is hereby authorized by the Debtor at any time or from time to time, without notice to the Debtor or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held by or owing by the DIP Lender to or for the credit or the account of the Debtor against and on account of the DIP Obligations of the Debtor to the DIP Lender hereunder, irrespective of whether or not (a) the DIP Lender shall have made any demand hereunder or (b) the principal of or the interest on the DIP Loans or any other amounts due hereunder or the other DIP Loan Documents shall have become due and payable and although such obligations and liabilities, or any of them, may be contingent or unmatured; provided that the DIP Lender shall notify the Debtor promptly upon the exercise of any set-off and the appropriation and application made by

33

the DIP Lender, but the failure to give such notice shall not affect the validity of such set-off and application.

ARTICLE VIII
EVENTS OF DEFAULT

Section 8.1    Events of Default.  Any one or more of the following events which shall occur and be continuing shall constitute an "Event of Default":

(a)    Failure to Make Payments When Due. Failure by the Debtor to pay any of the DIP Obligations, including failure by the Debtor to pay when due principal of, or interest on, the DIP Loans, whether at stated maturity, by acceleration, by mandatory prepayment or otherwise, or any other amount due hereunder and set forth in the Budget, and such failure continues for five (5) days (except that there shall be no grace period in respect of principal or other DIP Obligations due on the Maturity Date);

(b)    Breach of Certain Covenants.  Failure of the Debtor to perform or comply with any material term or condition contained in Section 2.3, Article V or Article VI, including, without limitation, failure to meet or comply with the terms of the Budget (including permitted variances) or to timely achieve the Bankruptcy Milestones, and such default shall not have been remedied by the Debtor or waived by the DIP Lender within seven (7) days after the earlier of (i) the date upon which an Authorized Officer of the Debtor had Knowledge of such default and (ii) the date upon which notice thereof is given to the Debtor by the DIP Lender;

(c)    Breach of Representations, Etc.  Any representation, warranty, certification or other written statement made or deemed made by the Debtor in any DIP Loan Document or in any statement or certificate at any time given by the Debtor in writing, pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made;

(d)    Other Defaults Under DIP Loan Documents.  The Debtor shall default in the performance of or compliance with any term contained in any of the DIP Loan Documents, other than any such term referred to in any other section of this Section 8.1, and such default shall not have been remedied or waived within fifteen (15) days after the earlier of (i) the date upon which an Authorized Officer of the Debtor had Knowledge of such default and (ii) the date upon which notice thereof is given to the Debtor by the DIP Lender;

(e)    Conversion or Dismissal of Case.  (i) The entry of an order dismissing the Chapter 11 Case which does not contain a provision for termination of this Agreement, and payment in full in cash of all Obligations upon entry of such order dismissing the Chapter 11 Case (other than contingent indemnification obligations for which no claim has been made)  or converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the Debtor files a motion or other pleading seeking entry of such an order or supports or fails to timely oppose such dismissal or conversion; or (ii) the entry of an order whereby a trustee, responsible officer or an examiner having expanded powers under Bankruptcy Code Section 1104 (other than (x) a fee examiner or (y) for purposes of an investigation pursuant to Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed or elected in the Chapter 11 Case, or the Debtor

34

applies for, consents to, supports, acquiesces in or fails to promptly oppose, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in the case of each of clauses (i) and (ii), without the prior written consent of the DIP Lender in its sole discretion;

(f)  Challenges.  Debtor takes any action to, or fails to take all reasonable actions necessary to oppose any action by any other Person (including, but not limited to, (a) challenging the standing of such party to bring any such action, (b) filing pleadings, providing evidentiary support, and appearing in court to support and present the same in opposition of such party's action, and (c) timely prosecuting all available appeals of any order or decision authorizing such party's actions or approving relief granted to such party or timely opposing all appeals (or attempts to appeal) decisions denying standing or relief to such party), in each case, except as expressly permitted hereunder and in the Financing Orders, (i) impair any of the material rights and remedies of the DIP Lender under the DIP Loan Documents, (ii) avoid, subordinate, disallow, or require disgorgement by the DIP Lender of any amount received in respect of the DIP Obligations or (iii) challenge the rights or claims of the Prepetition Secured Parties;

(g)  DIP Loan Documents Impaired.  At any time after the execution and delivery thereof, (i) this Agreement or any DIP Loan Document ceases to be in full force and effect (other than by reason of a release of DIP Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the DIP Obligations in accordance with the terms hereof) or shall be declared null and void, or the DIP Lender shall not have or shall cease to have a valid and perfected first priority Lien, subject only to Permitted Liens, in any material portion of DIP Collateral purported to be covered by the DIP Collateral Documents or (ii) the Debtor shall contest the validity or enforceability of any DIP Loan Document in writing or deny in writing that it has any further liability under any DIP Loan Document to which it is a party;

(h)  Liens.  At any time after the execution and delivery thereof, the Liens created by the DIP Collateral Documents shall not constitute a valid and perfected first priority Lien on the DIP Collateral intended to be covered thereby (to the extent perfection by filing, registration, recordation or possession is required herein or therein) in favor of the DIP Lender, free and clear of all other Liens (other than Permitted Liens), or, except for expiration in accordance with its terms, any of the DIP Collateral Documents shall for whatever reason be terminated or cease to be in full force and effect, or the enforceability thereof shall be contested by the Debtor;

(i)  Condemnation or Forfeiture of DIP Collateral.  Any judicial process, condemnation or forfeiture proceedings is brought against any material item or material portion of the DIP Collateral or any rights therein shall be subject to such judicial process, condemnation or forfeiture proceedings, in each case which is not stayed in the Bankruptcy Case by the Bankruptcy Code;

(j)  Trustee.  A trustee, receiver, interim receiver, examiner, or responsible officer (other than the Debtor's current chief restructuring officer) with enlarged powers relating to the operation of the business of the Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), shall be appointed in the Chapter 11 Case;

(k)      Prepetition Payments.  The Debtor makes any Prepetition Payment which is not permitted under the Budget;

(l)      Government Restraint.  Any Governmental Body, by a final, non-appealable order, ruling or other action, shall prevent the Debtor from conducting any material part of the Debtor's business, to the extent such prevention could reasonably be expected to result in a Material Adverse Effect;

(m)      Operating Licenses.  The loss, revocation, or termination of any license, permit, lease or agreement necessary or material to the Debtor's business, or the cessation of any material part of the Debtor's business, to the extent such loss, revocation, or termination could reasonably be expected to result in a Material Adverse Effect;

(n)      Relief from Automatic Stay.  The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the Debtor, or (ii) to permit other actions that the DIP Lender may, in its sole discretion, deem to have a Material Adverse Effect;

(o)      Financing Orders.  The Debtor shall fail to comply with, or there is otherwise any material breach or default of, the Financing Orders or any other order of the Bankruptcy Court or any order shall be entered reversing, amending, supplementing, staying for a period in excess of five (5) Business Days, vacating or otherwise modifying in any material respect the Financing Orders without the prior written consent of the DIP Lender;

(p)      Judgments.  Any uninsured judgments as to any Post-Petition obligation shall be rendered against the Debtor and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants), or there shall be rendered against the Debtor a nonmonetary judgment with respect to a Post-Petition event, in each case which causes or would reasonably be expected to cause a Material Adverse Effect;

(q)      Material Impairment.  The filing of a motion, pleading or proceeding by the Debtor which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lender under the DIP Loan Documents or the Financing Orders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment; or

Section 8.2      Remedies.  Subject to the Financing Orders, upon the occurrence of an Event of Default then: (i), the DIP Lender may, by written notice to the Debtor (with a copy to counsel for the Committee and to the United States Trustee), take any or all of the following actions, at the same or different times, in each case without further order of or application to the Bankruptcy Court (provided, that with respect to the enforcement of DIP Liens or other remedies with respect to the DIP Collateral under clause (iii) below, the DIP Lender shall provide the Debtor (with a copy to counsel for the Committee and to the United States Trustee) with five (5) Business Days' written notice prior to taking the action contemplated thereby; in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto

being whether, in fact, an Event of Default has occurred and is continuing): (a) declare the DIP Loan Commitment terminated, whereupon the DIP Loan Commitments of the DIP Lender shall forthwith terminate immediately; (b) declare and otherwise accelerate the principal of and any accrued interest in respect of all DIP Loans and any promissory notes evidencing such DIP Loans and all other DIP Obligations owing with respect thereto hereunder and thereunder to be, whereupon the same shall become, forthwith immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Debtor; and (c) enforce all of the DIP Liens and security interests created pursuant to the DIP Collateral Documents securing DIP Obligations owing to the DIP Lender in accordance with applicable Regulations and (ii) in addition to the foregoing, upon the occurrence of an Event of Default, the DIP Lender may, (x) exercise any right of counterclaim, setoff, banker's lien or otherwise which it may have with respect to money or property of the Debtor, (y) bring any lawsuit, action or other proceeding permitted by law for the specific performance of, or injunction against any violation of, any DIP Loan Document and may exercise any power granted under or to recover judgment under any DIP Loan Document, and (iii) exercise any other right or remedy permitted by applicable Regulations or otherwise available to the DIP Lender at law, in equity or otherwise.

Section 8.3    Remedies Cumulative.  No remedy herein conferred upon the DIP Lender is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

Section 8.4    Application of Proceeds.  The DIP Lender shall apply any proceeds from pursuit of any remedy first to costs and expenses provided for herein, then to interest on the DIP Loans which is due and outstanding and then to principal on the DIP Loans which is due and outstanding.

ARTICLE IX
MISCELLANEOUS

Section 9.1    Amendments and Waivers; Release of DIP Collateral.

(a)    General Amendments and Waivers.  No amendment, modification, termination (other than pursuant to the express terms of the DIP Loan Documents) or waiver of any provision of the DIP Loan Documents, or consent to any departure by the Debtor therefrom, shall be effective without the written consent of the DIP Lender and the Debtor.

(b)    Effect of Notices, Waivers or Consents.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on Debtor in any case shall entitle Debtor to any other or further notice (except as otherwise specifically required hereunder or under any of the DIP Loan Documents) or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 9.1 shall be binding upon the DIP Lender and the Debtor, if signed by the Debtor and DIP Lender.

Section 9.2    Notices.  All notices, requests, demands and other communications to any party or given under any DIP Loan Document (collectively, the "Notices") will be in writing and

delivered personally, by overnight courier or by registered mail to the parties at the following address or sent by electronic transmission (with confirmation of transmission), to the address specified below (or at such other address as will be specified by a party by like notice given at least five calendar days prior thereto):

      (a)     If to the Debtor, at:

> BUCKINGHAM SENIOR LIVING COMMUNITY, INC.
> Attn: Chairman
> 8580 Woodway Drive
> Houston, TX 77063
> Email:  mwyse@wyseadvisorsllc.com

with a copy sent contemporaneously by email to (which shall not constitute notice):

> McGUIREWOODS LLP
> Attn: Demetra Liggins
> JPMorgan Chase Tower
> 600 Travis Street, Suite 7500
> Houston, TX 77002-2906
> Email: dliggins@mcguirewoods.com

      (b)     If to the DIP Lender, at:

> UMB BANK, N.A.
> Corporate Trust Services
> Attn: Virginia Housum
> 120 Sixth Street South, Suite 1400
> Minneapolis, MN 55402
> Email: virginia.housum@umb.com

with a copy sent contemporaneously by email to (which shall not constitute notice):

> MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND
> POPEO, P.C.
> Attn: Daniel S. Bleck
> One Financial Center
> Boston, MA 02111
> Email:  dsbleck@mintz.com

All Notices will be deemed delivered when actually received.  Each of the parties will hereafter notify the other in accordance with this Section of any change of address or email address to which notice is required to be mailed.

Section 9.3    Expenses.  Whether or not the transactions contemplated hereby shall be consummated or any DIP Loans shall be made, the Debtor agrees to pay promptly, subject to the Financing Orders (but no later than the Maturity Date), upon written demand from the DIP

Lender (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval in the event the transactions contemplated hereby are consummated:

(i)  all the reasonable, out-of-pocket costs and expenses of preparation of the DIP Loan Documents and any consents, amendments, waivers or other modifications thereto; the reasonable fees, expenses and disbursements of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., as counsel to the DIP Lender, in connection with the negotiation, preparation, execution and administration of the DIP Loan Documents and any consents, amendments, supplements, waivers or other modifications thereto;

(ii)  all the reasonable, out of pocket costs and expenses of creating and perfecting Liens in favor of the DIP Lender pursuant hereto, including, without limitation, filing and recording fees, expenses, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., as counsel to the DIP Lender, and any other counsel of the DIP Lender in any other jurisdiction;

(iii)  upon the occurrence and during the continuance of an Event of Default or as otherwise incurred in connection with visits and inspections permitted by Section 5.1(b) (the expenses for which are required to be paid by the Debtor pursuant to such Section), all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers incurred in connection with the preservation and protection of the DIP Lender's rights under this Agreement and the other DIP Loan Documents;

(iv)  all the actual costs and reasonable expenses, including, without limitation, upon the occurrence and during the continuance of an Event of Default or as otherwise incurred in connection with visits and inspections permitted by Section 5.1(b), the expenses for which are required to be paid by the Debtor pursuant to such Section, the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the DIP Lender and its counsel in connection with the inspection, verification, custody or preservation of any of the DIP Collateral, to the extent required or permitted hereunder;

(v)  after the occurrence and during the continuance of a Default or an Event of Default, all out-of-pocket costs and expenses, including, without limitation, reasonable attorneys' fees and out-of-pocket costs of settlement, incurred by the DIP Lender in enforcing any DIP Obligations of or in collecting any payments due from Debtor hereunder or under the other DIP Loan Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the DIP Collateral) or in connection with any negotiations, reviews, refinancing or restructuring of the credit arrangements provided hereunder, including without

limitation in the nature of a "workout" or pursuant to any insolvency or bankruptcy cases or proceedings; and

(vi)     the foregoing shall not be construed to limit any other provisions of the DIP Loan Documents regarding costs and expenses to be paid by the Debtor.

Section 9.4     Enforceability; Successors and Assigns.

(a)     Enforceability; Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto.  This Agreement may not be assigned by the Debtor hereto without the prior written consent of the DIP Lender.  Any assignment or attempted assignment in contravention of this Section 9.4(a) will be void *ab initio* and will not relieve the assigning party of any obligation under this Agreement.

(b)     Assignments.  The DIP Lender may assign (an "Assignment") all or a portion of its rights and obligations under the DIP Loan Documents (including all or a portion of the DIP Lender's DIP Loans and DIP Loan Commitment, as the case may be, in a minimum amount of $250,000) to any Assignee.  Such Assignment may be made without the consent of the Debtor.  From and after the date of the Assignment, the Assignee shall be a party hereto and, to the extent of the interest assigned pursuant to the Assignment, have the rights and obligations of the DIP Lender under this Agreement, and the assigning DIP Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement.  No Assignment by the DIP Lender shall release the DIP Lender from its obligations hereunder arising prior to the date of such assignment.  The Debtor hereby consents to the disclosure of any information obtained by DIP Lender in connection with this Agreement to any Person to which DIP Lender sells, or proposes to sell, its DIP Loans or DIP Loan Commitment, provided any such Person shall agree to keep any such information confidential.

Section 9.5     Integration.  This Agreement and the other DIP Loan Documents contain and constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto.

Section 9.6     No Waiver; Remedies.  No failure or delay by any party in exercising any right, power or privilege under this Agreement or any of the other DIP Loan Documents will operate as a waiver of such right, power or privilege.  A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power or privilege.  The rights and remedies provided in the DIP Loan Documents will be cumulative and not exclusive of any rights or remedies provided by law.

Section 9.7     Setoff.  The Debtor hereby, subject to the Financing Orders and the Carve-Out, grants to the DIP Lender a continuing lien, security interest and right of setoff as security for all liabilities and obligations to the DIP Lender, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession,

custody, safekeeping or control of the DIP Lender or any Affiliate and their successors and assigns or in transit to any of them.  Regardless of the adequacy of any collateral, if any of the DIP Obligations are due and payable and have not been paid or any Event of Default shall have occurred, any deposits or other sums credited by or due from the DIP Lender to the Debtor and any securities or other property of the Debtor in the possession of the DIP Lender may be applied to or set off by the DIP Lender against the payment of DIP Obligations and any and all other liabilities, direct, or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Debtor to the DIP Lender.  **ANY AND ALL RIGHTS TO REQUIRE THE DIP LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER DIP COLLATERAL WHICH SECURES THE DIP OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE DEBTOR IS HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.**

Section 9.8    Execution in Counterparts.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.

Section 9.9    Governing Law; Submission To Jurisdiction; Venue.

(a)    SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN CERTAIN OF THE OTHER DIP LOAN DOCUMENTS, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAWS RULES AND PRINCIPLES THEREUNDER) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THEN IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF TEXAS, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, THE DEBTOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  THE DEBTOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACKS PERSONAL JURISDICTION OVER DEBTOR, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT BROUGHT IN THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER DEBTOR.  DEBTOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE DEBTOR AT ITS ADDRESS AS SET FORTH IN SECTION 9.2 HEREOF, SUCH SERVICE, NOTWITHSTANDING THE PERIODS OF TIME PROVIDED FOR IN SECTION 9.2, TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  DEBTOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER DIP LOAN DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE DIP LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST DEBTOR IN ANY OTHER JURISDICTION.

(b)    DEBTOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURTS HAVE BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 9.10   <u>Waiver of Jury Trial</u>.  **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTIES WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION**.

Section 9.11   <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 9.12   <u>Survival</u>.  All representations, warranties, covenants, agreements, and conditions contained in or made pursuant to this Agreement or the other DIP Loan Documents shall survive (a) the making of the Loans and the payment of the DIP Obligations and (b) the performance, observance and compliance with the covenants, terms and conditions, express or implied, of all DIP Loan Documents, until the due and punctual (i) indefeasible payment of the DIP Obligations and (ii) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Loan Documents; <u>provided</u>, <u>however</u>, that the provisions of Article VII and Section 9.3 (other than Section 9.3(a)(iii), except to the extent fees, costs and expenses have been incurred prior to termination hereof but not paid in accordance with such Sections, in which case such Sections shall survive only to require payment of such fees, costs and expenses) shall survive (x) indefeasible payment of the DIP Obligations and (y) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Loan Documents.

Section 9.13   <u>Maximum Lawful Interest</u>.  Notwithstanding anything to the contrary contained herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement or any other DIP Loan Document exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  The Debtor and the DIP Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and other charges for the use of money and manner of payment stated within it; <u>provided</u>, <u>however</u>, that, anything contained herein to

the contrary notwithstanding, if the amount of such interest and other charges for the use of money or manner of payment exceeds the maximum amount allowable under applicable law, then, ipso facto as of the Closing Date, the Debtor is and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Debtor in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Loans to the extent of such excess.

Section 9.14   Interpretation.  As used in this Agreement, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate.  Unless otherwise expressly provided in this Agreement (a) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement and (b) article, section, subsection, and schedule references are references with respect to this Agreement unless otherwise specified.  Unless the context otherwise requires, the term "including" will mean "including, without limitation." The headings in this Agreement and in the Schedules are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.

Section 9.15   Ambiguities.  This Agreement and the other DIP Loan Documents were negotiated between legal counsel for the parties and any ambiguity in this Agreement or the other DIP Loan Documents shall not be construed against the party who drafted this Agreement or such other DIP Loan Documents.

Section 9.16   The PATRIOT Act.  The DIP Lender hereby notifies Debtor, that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies Debtor and other information that will allow the DIP Lender to identify Debtor in accordance with the PATRIOT Act.

Section 9.17   Conflicting Provisions in Security Documents.  In the event that any provisions of this Agreement conflict with any DIP Collateral Document, the provisions of this Agreement shall govern.

Section 9.18   Conflicting Provisions in the Financing Orders.  In the event that any provisions of this Agreement conflict with any provisions in the Financing Orders, the provisions of the Financing Orders shall control.

Section 9.19   Modifications.  Except as specifically contemplated in the Financing Orders, the DIP Liens, lien priority, administrative priorities and other rights and remedies granted to the DIP Lender pursuant to this Agreement and the Financing Orders (specifically, including, but not limited to, the existence, perfection and priority of the DIP Liens provided herein and therein and the administrative priority herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Debtor (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Case, or by any other act or omission whatsoever (other than in connection with any asset disposition permitted hereunder).  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission: (i) except for the Carve-Out having priority over the DIP Obligations, no costs or

expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the DIP Lender against Debtor in respect of any DIP Obligation; (ii) the Liens granted under the DIP Loan Documents shall continue to be valid and perfected and with the specified priority without the necessity that financing statements be filed or that any other action be taken, or document or instrument registered or delivered, under applicable non-bankruptcy law; and (iii) notwithstanding any failure on the part of the Debtor or the DIP Lender to perfect, maintain, protect or enforce the Liens in the DIP Collateral granted under the DIP Loan Documents, the Financing Orders shall automatically, and without further action by any Person, perfect such Liens against the DIP Collateral of the Debtor.

Section 9.20    Release.  THE DEBTOR HEREBY ACKNOWLEDGES AND AGREES THAT AS OF THE DATE HEREOF IT HAS NO DEFENSE, COUNTERCLAIM, OFFSET, CROSS-COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT CAN BE ASSERTED TO REDUCE OR ELIMINATE ALL OR ANY PART OF ITS LIABILITY TO REPAY THE DIP OBLIGATIONS (OR THE PREPETITION OBLIGATIONS OWED TO THE PREPETITION SECURED PARTIES) OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM THE DIP LENDER (IN ITS CAPACITY AS DIP LENDER HEREUNDER AND IN ITS CAPACITY AS A PREPETITION SECURED PARTY) OR OTHER PREPETITION SECURED PARTIES. THE DEBTOR HEREBY VOLUNTARILY AND KNOWINGLY RELEASES AND FOREVER DISCHARGES THE DIP LENDER (IN ITS CAPACITY AS DIP LENDER HEREUNDER AND IN ITS CAPACITY AS A PREPETITION SECURED PARTY), THE OTHER PREPETITION SECURED PARTIES, THEIR RESPECTIVE AFFILIATES, AND EACH OF THEIR RESPECTIVE AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "**RELEASED PARTIES**") FROM ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES, OBLIGATIONS, DEBTS AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT OR CONDITIONAL, OR AT LAW OR IN EQUITY, IN ANY CASE ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE THIS AGREEMENT IS EXECUTED THAT THE DEBTOR MAY NOW OR HEREAFTER HAVE AGAINST THE RELEASED PARTIES, IF ANY, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS, OR OTHERWISE, AND THAT ARISE FROM ANY DIP LOANS OR PREPETITION INDEBTEDNESS, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THE DIP LOAN DOCUMENTS OR THE PREPETITION CREDIT AGREEMENTS AND THEIR RELATED DOCUMENTS, AND/OR NEGOTIATION FOR AND EXECUTION OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE FOREGOING RELEASE SHALL BE SUBJECT TO THE RIGHTS OF THE COMMITTEE OR ANY OTHER PARTY IN INTEREST UNDER THE FINANCING ORDERS.

Section 9.21   <u>Electronic Transactions</u>.  The transaction described herein may be conducted, and related documents may be stored, by electronic means.  Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents will be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

[Remainder of page intentionally left blank; signatures on following pages.]

In witness whereof, the parties hereto have caused this Agreement to be duly executed and delivered by their respective representatives thereunto duly authorized as of the date first written above.

**BUCKINGHAM SENIOR LIVING COMMUNITY, INC.**, as Debtor

By: _____

     Name:  Michael Wyse

     Title:   Chairman

**UMB BANK, N.A.**, as DIP Lender

By: _____

     Name:  Virginia Anne Housum

     Title:   Senior Vice President

[PRIMING SUPERPRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT]

**SCHEDULE 2.1**

**DIP LOAN COMMITMENTS**

| **DIP Loans** | **Commitment Amount** |
|---|---|
| Initial DIP Loans | $1,500,000 |
| DIP Loans (less Initial DIP Loans) | $1,900,000 |
| CapEx DIP Loan | $692,259 |
| DIP Loan Commitment (cumulative) | $3,400,000 |

Schedule 2.1

525295.000011 26440800.12

# EXHIBIT A

**Budget**

Case 21-31553 Document 501 Filed in TXSB on 08/29/21 Page 92 of 100

**The Buckingham: Summary DIP Liquidity Projection**
Weekly Presentation

| Credits: | 6/26/2021 Q2 '21 Actual | 7/3/2021 Q3 '21 Projected 1 | 7/10/2021 Q3 '21 Projected 2 | 7/17/2021 Q3 '21 Projected 3 | 7/24/2021 Q3 '21 Projected 4 | 7/31/2021 Q3 '21 Projected 5 | 8/7/2021 Q3 '21 Projected 6 | 8/14/2021 Q3 '21 Projected 7 | 8/21/2021 Q3 '21 Projected 8 | 8/28/2021 Q3 '21 Projected 9 | 9/4/2021 Q3 '21 Projected 10 | 9/11/2021 Q3 '21 Projected 11 | 9/18/2021 Q3 '21 Projected 12 | 9/25/2021 Q3 '21 Projected 13 | 10/2/2021 Oct-Nov '21 Projected 14 | DIP Total weeks 7/3-10/2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Resident Checks | 279,939 | - | 121,658 | 106,658 | 193,922 | 193,922 | 196,802 | 196,802 | 196,802 | 196,802 | 196,802 | 196,802 | 196,802 | 196,802 | 196,802 | 2,667,315 |
| Resident ACH | - | - | - | - | - | 915,916 | - | - | - | 745,090 | - | - | - | 745,090 | - | 2,406,096 |
| Medicare | 1,380 | 213,143 | - | - | - | 243,757 | - | - | - | - | 304,696 | - | - | - | 243,757 | 1,006,734 |
| Private Insurance | 45,237 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 300,881 |
| Other | 500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 35,500 |
| **Operating Receipts** | 327,055 | 233,904 | 142,419 | 127,419 | 214,682 | 1,374,355 | 217,562 | 217,562 | 217,562 | 962,652 | 522,258 | 217,562 | 217,562 | 962,652 | 461,319 | 6,416,526 |
| Check Reversal Credit | 39,743 | | | | | | | | | | | | | | | 39,743 |
| **Transfer from UMB Operating Reserve Fund (DIP)** | - | - | - | 705,478 | 187,565 | - | 237 | 628,730 | 28,730 | 353,361 | - | 505,263 | 26,230 | - | 526,669 | 2,962,262 |
| Total Transfers In to x6160 | - | - | - | 705,478 | 187,565 | - | 237 | 628,730 | 28,730 | 353,361 | - | 505,263 | 26,230 | - | 526,669 | 2,962,262 |
| **Total Receipts** | 366,798 | 233,904 | 142,419 | 832,897 | 402,247 | 1,374,355 | 217,800 | 846,292 | 246,292 | 1,316,013 | 522,258 | 722,825 | 243,792 | 962,652 | 987,988 | 9,418,531 |
| **Debits:** | | | | | | | | | | | | | | | | |
| Payroll and related expenses (1) | (580,000) | - | - | (632,730) | - | (600,000) | - | (600,000) | - | (600,000) | - | (600,000) | - | (600,000) | - | (4,212,730) |
| Facility Services/Supplies (2) | (20,616) | (39,854) | (39,854) | (39,854) | (39,854) | (39,854) | (39,854) | (39,854) | (39,854) | (34,854) | (34,854) | (34,854) | (34,854) | (34,854) | (34,854) | (548,574) |
| Food/Food Service (3) | (628) | (41,715) | (41,172) | (41,172) | (41,172) | (41,172) | (41,172) | (41,172) | (41,172) | (41,172) | (41,172) | (36,172) | (36,172) | (36,172) | (36,172) | (557,579) |
| Manager Services/Marketing (4) | (141,968) | (32,062) | (204,967) | (34,967) | (34,967) | (34,967) | (204,967) | (34,967) | (34,967) | (34,967) | (204,967) | (29,967) | (29,967) | (29,967) | (29,967) | (1,118,600) |
| IT & Utilities (5) | (57,198) | (69,794) | (65,275) | (64,301) | (45,275) | (45,275) | (45,275) | (45,275) | (45,275) | (45,275) | (45,275) | (42,775) | (42,775) | (42,775) | (42,775) | (744,589) |
| Insurance/Broker (6) | - | (13,684) | - | - | - | - | - | - | - | - | - | - | - | - | - | (13,684) |
| Pharma/Healthcare Services/Hospitality/Administration/Security (7) | (8,044) | (69,760) | (43,392) | (43,392) | (43,392) | (43,392) | (43,392) | (43,392) | (43,392) | (43,392) | (33,392) | (33,392) | (33,392) | (33,392) | (33,392) | (591,900) |
| BOD/Professional Services/Other (8) | (73,381) | (73,148) | (18,632) | (18,632) | (52,588) | (56,632) | (16,632) | (16,632) | (16,632) | (56,632) | (16,632) | (16,632) | (16,632) | (16,632) | (56,632) | (522,700) |
| CAPEX (Storm Repair) (9) | - | (233,120) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | - | - | - | - | - | - | - | - | (408,120) |
| CAPEX (General) (10) | (51,742) | (202,872) | (25,000) | (25,000) | (25,000) | (25,000) | (50,000) | (25,000) | (25,000) | (25,000) | (50,000) | (25,000) | (50,000) | (22,259) | (25,000) | (651,874) |
| **Operating Disbursements** | (933,578) | (776,009) | (473,292) | (935,048) | (317,247) | (921,292) | (476,292) | (846,292) | (246,292) | (881,292) | (426,292) | (818,792) | (243,792) | (816,051) | (258,792) | (9,370,350) |
| Check Error/ACH Return/Return Item | (1,758) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (1,758) |
| Debtor Professional Fees | (286,155) | - | (88,000) | - | - | (169,571) | - | - | - | (348,909) | - | - | - | - | - | (610,798) |
| Indenture Professional Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | - | (1,503,434) | |
| Committee Fees | (74,188) | - | - | - | - | (25,000) | - | - | - | (85,813) | - | - | - | - | (85,000) | (270,000) |
| UST Fees | - | - | - | - | (85,000) | - | - | - | - | - | - | - | - | - | (180,000) | (265,000) |
| Transfer to BOA CAPEX Account | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Transfers Out from x6160 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| **Total Disbursements** | (1,295,680) | (776,009) | (561,292) | (935,048) | (402,247) | (1,115,863) | (476,292) | (846,292) | (246,292) | (1,316,013) | (426,292) | (818,792) | (243,792) | (816,051) | (1,134,590) | (11,410,542) |
| Operating Cash Flow | (606,523) | (542,106) | (330,873) | (807,630) | (102,565) | 453,063 | (258,730) | (628,730) | (28,730) | 81,361 | 95,967 | (601,230) | (26,230) | 146,602 | 202,528 | (2,953,824) |
| Other Activity | (322,358) | - | (88,000) | 705,478 | 102,565 | (194,571) | 237 | 628,730 | 28,730 | (81,361) | - | 505,263 | 26,230 | - | (349,129) | 961,813 |
| Beginning Cash | 2,492,012 | 1,563,130 | 1,021,024 | 602,151 | 500,000 | 500,000 | 758,492 | 500,000 | 500,000 | 500,000 | 500,000 | 595,967 | 500,000 | 500,000 | 646,602 | 2,492,012 |
| Minimum Cash Balance Requirement | | | | | | | | | | | | | | | | |
| Net Credits | 366,798 | 233,904 | 142,419 | 832,897 | 402,247 | 1,374,355 | 217,800 | 846,292 | 246,292 | 1,316,013 | 522,258 | 722,825 | 243,792 | 962,652 | 987,988 | 9,418,531 |
| Net Debits | (1,295,680) | (776,009) | (561,292) | (935,048) | (402,247) | (1,115,863) | (476,292) | (846,292) | (246,292) | (1,316,013) | (426,292) | (818,792) | (243,792) | (816,051) | (1,134,590) | (11,410,542) |
| **Ending Operating Account Cash (Bank)** | 1,563,130 | 1,021,024 | 602,151 | 500,000 | 500,000 | 758,492 | 500,000 | 500,000 | 500,000 | 500,000 | 595,967 | 500,000 | 500,000 | 646,602 | 500,000 | 500,000 |
| Estimated Check Float | | | | | | | | | | | | | | | | |
| Ending Operating Account Cash (Book) | | | | | | | | | | | | | | | | |
| Indenture Trust Accounts (Bank) | | | | | | | | | | | | | | | | |
| **Indenture DIP Loan** | | | | | | | | | | | | | | | | |
| Beginning Balance | | - | - | - | (705,478) | (893,044) | (893,044) | (893,281) | (1,522,010) | (1,550,740) | (1,904,101) | (1,904,101) | (2,409,363) | (2,435,593) | (2,435,593) | - |
| Draw | | - | - | (705,478) | (187,565) | - | (237) | (628,730) | (28,730) | (353,361) | - | (505,263) | (26,230) | - | (526,669) | (2,962,262) |
| Repayment | | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| PIK Interest | | | | | | | | | | | | | | | | - |
| **Ending DIP Balance** | | - | - | (705,478) | (893,044) | (893,044) | (893,281) | (1,522,010) | (1,550,740) | (1,904,101) | (1,904,101) | (2,409,363) | (2,435,593) | (2,435,593) | (2,962,262) | (2,962,262) |
| Resident Occupancy | | | | | | | | | | | | | | | | |
| Healthcare Occupancy | | | | | | | | | | | | | | | | |
| **Incurred Restructuring Fees Projection** | | | | | | | | | | | | | | | | |
| Thompson & Knight (Debtor Restructuring Counsel) | 166,424 | 37,500 | 45,000 | 45,000 | 45,000 | 45,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 12,500 | 12,500 | 12,500 | 12,500 | |
| McCall Parkhurst & Horton (Debtor Bond Counsel) | - | - | - | - | - | - | - | - | - | 255,000 | - | - | - | - | - | |
| B. Riley Advisors (Debtor Financial Advisor) | 31,854 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 18,625 | 18,625 | 18,625 | 18,625 | |
| TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Stretto (Debtor Claims Agent) | 22,065 | 87,071 | 20,227 | 20,227 | 15,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | |
| Healthcare Ombudsman | - | 22,000 | - | - | - | 11,000 | - | - | - | 11,000 | - | - | - | - | 11,000 | |
| UST Trustee | - | - | - | - | 85,000 | - | - | - | - | - | - | - | - | - | 180,000 | |
| Resident/Creditor Committee Professionals | 24,188 | 25,000 | 25,000 | 25,000 | 20,813 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | |
| Mintz Levin (Indenture Trustee Counsel) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| RBC (Indenture Trustee Financial Advisor) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Utility Deposit | - | - | 88,000 | - | - | - | - | - | - | - | - | - | - | - | (88,000) | |

Note:
-Estimate of Storm Damage Capex may be higher but difference to be reimbursed by insurance ($250k deductible)
-Does not reflect DIP interest/fees

**<u>EXHIBIT B</u>**

**Form of Borrowing Certificate**

## Borrowing Certificate

Reference is hereby made to that certain Priming Superpriority Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement") dated as of June __, 2021, by and between Buckingham Senior Living Community, Inc. (the "Debtor") and UMB Bank, N.A., in its capacity as Bond Trustee (the "DIP Lender"). Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Credit Agreement. The undersigned, in their capacity as an Authorized Officer of the Debtor and not individually, hereby certifies as follows as of _____, 2021 (the "Borrowing Date"):

1.      DIP Loans.  Pursuant to the terms of the DIP Credit Agreement, the Debtor is authorized to borrow DIP Loans in an amount equal to the DIP Loan Commitment during the DIP Commitment Period, solely in compliance with the DIP Credit Agreement. The Debtor hereby requests an advance of DIP Loans[1] in the aggregate amount of $_____ (the "Borrowing") to be transferred to the Debtor within two (2) Business Days of the Borrowing Date.

2.      Representations and Warranties.  On and as of the Borrowing Date (both before and after giving effect to the Borrowing requested hereby and application of such proceeds), the representations and warranties of the Debtor contained in the DIP Loan Documents are true and correct in all material respects (except to the extent such representations and warranties specifically relate to an earlier date, such representations and warranties are true and correct on and as of such earlier date).

3.      No Default or Event of Default.  As of the Borrowing Date, no event has occurred or is continuing or would result from the consummation of the Borrowing requested hereby, or the application of such proceeds, that would constitute a Default or an Event of Default.

4.      Available Commitments. After making the DIP Loans requested by this Borrowing, the aggregate outstanding principal amount of the DIP Loans will not exceed the DIP Loan Commitment.

5.      Use of Proceeds.  The proceeds of the DIP Loans advanced under this Borrowing will be used by the Debtor in accordance with the Budget and the DIP Credit Agreement.

[signature page follows]

---

[1] Indicate if CapEx DIP Loan

IN WITNESS WHEREOF, the undersigned has executed this Borrowing Certificate as of the date first above written.

**BUCKINGHAM SENIOR LIVING COMMUNITY, INC.**, as Debtor

By: _____

    Name:

    Title:

110911187v.6

**Exhibit B**

**The Buckingham: Summary DIP Liquidity Projection**
**Weekly Presentation**

| Credits: | 7/3/2021 Q3 21 Actual | 7/10/2021 Q3 21 Actual | 7/17/2021 Q3 21 Actual | 7/24/2021 Q3 21 Actual | 7/31/2021 Q3 21 Actual | 8/7/2021 Q3 21 Actual | 8/14/2021 Q3 21 Projected 1 | 8/21/2021 Q3 21 Projected 2 | 8/28/2021 Q3 21 Projected 3 | 9/4/2021 Q3 21 Projected 4 | 9/11/2021 Q3 21 Projected 5 | 9/18/2021 Q3 21 Projected 6 | 9/25/2021 Q3 21 Projected 7 | 10/2/2021 Oct-Nov '21 Projected 8 | 10/9/2021 Projected 9 | 10/16/2021 Projected 10 | 10/23/2021 Projected 11 | 10/30/2021 Projected 12 | 11/6/2021 Projected 13 | 11/13/2021 Projected 14 | 11/20/2021 Projected 15 | 11/27/2021 Projected 16 | DIP Total weeks 7/24-11/27 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Resident Checks | 94,055 | - | 495,885 | 298,698 | 139,403 | - | 136,220 | 204,227 | 204,227 | 206,249 | 206,249 | 206,249 | 206,249 | 206,249 | 206,249 | 206,249 | 206,249 | 206,249 | 206,249 | 206,249 | 206,249 | 206,249 | 3,225,912 |
| Resident ACH | - | - | 761,065 | - | 30,898 | - | - | - | 772,549 | - | - | - | 780,198 | - | - | - | - | 975,248 | - | - | - | 780,198 | 3,308,193 |
| Medicare | 282,907 | 13,532 | - | 13,551 | 218,034 | 3,775 | - | - | 389,472 | - | - | - | - | 316,543 | - | - | - | - | 316,543 | - | - | 395,678 | 1,418,236 |
| Private Insurance | 15,722 | 10,355 | 60,421 | 29,461 | 4,349 | 22,612 | - | 22,260 | 22,260 | 22,260 | 22,260 | 22,260 | 22,260 | 22,260 | 22,260 | 22,260 | 22,260 | 22,260 | 22,260 | 22,260 | 22,260 | 22,260 | 333,900 |
| Other | - | - | - | - | 3,790 | 3,529 | - | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 710 | 10,650 |
| Operating Receipts | 392,683 | 23,887 | 1,317,371 | 345,500 | 396,214 | 26,387 | 136,220 | 227,197 | 999,746 | 618,691 | 229,219 | 229,219 | 1,009,417 | 545,762 | 229,219 | 229,219 | 1,204,467 | 545,762 | 229,219 | 229,219 | 1,009,417 | 624,898 | 8,296,890 |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Check Reversal Credit | - | - | 183 | - | - | 36,115 | - | 8,968 | 734 | - | - | - | - | - | - | - | - | - | - | - | - | - | 9,702 |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Transfer from UMB Operating Reserve Fund (DIP) | | | | | - | - | 1,040,559 | 286,953 | 134,355 | 532,724 | 630,616 | 55,616 | - | 997,527 | 932,736 | 29,336 | - | - | 208,896 | 29,336 | - | - | 4,878,653 |
| Total Transfers In to x6160 | - | - | - | - | 750 | - | 1,040,559 | 286,953 | 134,355 | 532,724 | 630,616 | 55,616 | - | 997,527 | 932,736 | 29,336 | - | - | 208,896 | 29,336 | - | - | 4,878,653 |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Total Receipts | 392,683 | 23,887 | 1,317,554 | 345,500 | 396,964 | 62,502 | 1,176,779 | 523,118 | 1,134,835 | 1,151,415 | 859,835 | 284,835 | 1,009,417 | 1,543,289 | 1,161,955 | 258,555 | 1,204,467 | 545,762 | 438,115 | 258,555 | 1,009,417 | 624,898 | 13,185,245 |
| | | | | | | | | | | | | | | | | | | | | | | | |
| **Debits:** | | | | | | | | | | | | | | | | | | | | | | | |
| Payroll and related expenses (1) | - | (345) | (561,632) | - | (496,397) | (5,320) | (660,000) | (98,283) | (600,000) | - | (600,000) | - | (600,000) | - | (600,000) | - | (600,000) | - | (600,000) | - | (600,000) | 60,000 | (4,898,283) |
| Facility Services/Supplies (2) | (2,363) | - | (898) | (51,027) | (5,300) | (15,556) | (172,145) | (34,861) | (34,861) | (34,861) | (34,861) | (34,861) | (34,861) | (34,861) | (34,861) | (34,861) | (34,861) | (34,861) | (34,861) | (34,861) | (34,861) | (34,861) | (695,060) |
| Food/Food Service (3) | - | - | - | (75,557) | (74,980) | (35,841) | (109,084) | (43,410) | (43,410) | (43,410) | (43,410) | (43,410) | (43,410) | (43,410) | (43,410) | (43,410) | (43,410) | (43,410) | (43,410) | (43,410) | (43,410) | (43,410) | (760,234) |
| Manager Services/Marketing (4) | - | - | (157,265) | (410) | - | (29,807) | (401,646) | (44,967) | (44,967) | (214,967) | (34,967) | (34,967) | (34,967) | (34,967) | (204,967) | (34,967) | (34,967) | (34,967) | (204,967) | (34,967) | (34,967) | (34,967) | (1,466,150) |
| IT & Utilities (5) | (6,053) | - | (33,814) | (10,447) | (14,464) | (15,660) | (301,487) | (49,094) | (49,094) | (49,094) | (49,094) | (49,094) | (49,094) | (49,094) | (49,094) | (49,094) | (49,094) | (49,094) | (49,094) | (49,094) | (49,094) | (49,094) | (1,037,893) |
| Insurance/Broker (6) | - | - | - | - | - | - | (13,684) | | | | | | | | | | | | | | | | (13,684) |
| Pharma/Healthcare Services/Hospitality/Administration/Security (7) | - | - | - | (26,649) | (4,603) | (49,232) | (279,645) | (53,397) | (53,397) | (53,397) | (53,397) | (53,397) | (53,397) | (53,397) | (53,397) | (53,397) | (53,397) | (53,397) | (53,397) | (53,397) | (53,397) | (53,397) | (1,080,602) |
| BOD/Professional Services/Other (8) | - | (16,705) | (2,603) | (5,939) | (45,311) | (5,109) | (135,666) | (174,106) | (59,106) | (19,106) | (19,106) | (19,106) | (19,106) | (89,106) | (17,826) | (17,826) | (17,826) | (17,826) | (17,826) | (17,826) | (17,826) | (57,826) | (757,017) |
| CAPEX (Storm Repair) (9) | - | - | - | - | (16,041) | (52,528) | (339,551) | | | | | | | | | | | | | | | | (339,551) |
| CAPEX (General) (10) | - | - | - | (1,200) | (52,122) | (4,255) | (320,295) | (25,000) | (25,000) | (50,000) | (25,000) | (50,000) | (22,259) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (742,554) |
| Operating Disbursements | (8,416) | (17,051) | (756,212) | (171,228) | (709,218) | (213,308) | (2,733,201) | (523,118) | (909,835) | (464,835) | (859,835) | (284,835) | (857,094) | (329,835) | (1,028,555) | (258,555) | (858,555) | (298,555) | (1,028,555) | (258,555) | (858,555) | (238,555) | (11,791,077) |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Check Error/ACH Return/Return Item | - | - | (183) | (7,075) | (734) | (38,009) | | | | | | | | | | | | | | | | | - |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Debtor Professional Fees | (96,806) | | | | | | | (225,000) | (590,580) | | | | (100,000) | (965,777) | (109,400) | - | (100,000) | (322,679) | | | (100,000) | 56,375 | (2,457,061) |
| Indenture Professional Fees | | | | | | | | | | | | | | | | | | | | | | | - |
| Committee Fees | | | | | | | | | (96,000) | | | | | (180,000) | (24,000) | | | (80,000) | | | | (80,000) | (460,000) |
| UST Fees | | | | | | (250) | (19,750) | | | | | | | (120,000) | | | | | | | | (80,000) | (219,750) |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Transfer to BOA CAPEX Account | | | | | | | | | | | | | | | | | | | | | | | - |
| Total Transfers Out from x6160 | - | - | - | - | (750) | (750) | | | | | | | | | | | | | | | | | - |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Total Disbursements | (105,222) | (17,051) | (762,656) | (178,303) | (710,702) | (252,316) | (2,752,951) | (523,118) | (1,134,835) | (1,151,415) | (859,835) | (284,835) | (957,094) | (1,595,612) | (1,161,955) | (258,555) | (958,555) | (701,234) | (1,028,555) | (258,555) | (958,555) | (342,180) | (14,927,838) |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Operating Cash Flow | 384,268 | 6,836 | 561,159 | 174,272 | (313,004) | (186,921) | (2,596,981) | (295,921) | 89,911 | 153,856 | (630,616) | (55,616) | 152,323 | 215,927 | (799,336) | (29,336) | 345,912 | 247,207 | (799,336) | (29,336) | 150,862 | 386,343 | (3,494,136) |
| Other Activity | (96,806) | - | (6,060) | (7,075) | (734) | (2,893) | 1,020,809 | 295,921 | (89,911) | (153,856) | 630,616 | 55,616 | (100,000) | (268,250) | 799,336 | 29,336 | (100,000) | (402,679) | 208,896 | 29,336 | (100,000) | (103,625) | 1,751,544 |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning Cash | 1,563,130 | 1,850,592 | 1,857,428 | 2,412,527 | 2,579,724 | 2,265,986 | 2,076,172 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 552,323 | 500,000 | 500,000 | 500,000 | 745,912 | 590,440 | - | - | 50,862 | 2,076,172 |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Net Credits | 392,683 | 23,887 | 1,317,554 | 345,500 | 396,964 | 62,502 | 1,176,779 | 523,118 | 1,134,835 | 1,151,415 | 859,835 | 284,835 | 1,009,417 | 1,543,289 | 1,161,955 | 258,555 | 1,204,467 | 545,762 | 438,115 | 258,555 | 1,009,417 | 624,898 | 13,185,245 |
| Net Debits | (105,222) | (17,051) | (762,656) | (178,303) | (710,702) | (252,316) | (2,752,951) | (523,118) | (1,134,835) | (1,151,415) | (859,835) | (284,835) | (957,094) | (1,595,612) | (1,161,955) | (258,555) | (958,555) | (701,234) | (1,028,555) | (258,555) | (958,555) | (342,180) | (14,927,838) |
| Ending Operating Account Cash (Bank) | 1,850,592 | 1,857,428 | 2,412,527 | 2,579,724 | 2,265,986 | 2,076,172 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 552,323 | 500,000 | 500,000 | 500,000 | 745,912 | 590,440 | - | - | 50,862 | 333,579 | 333,579 |
| Estimated Check Float | | | (177,170) | (222,796) | (258,070) | (367,531) | | | | | | | | | | | | | | | | | |
| Ending Operating Account Cash (Book) | 1,850,592 | 1,857,428 | 2,235,357 | 2,356,928 | 2,007,916 | 1,808,641 | | | | | | | | | | | | | | | | | |
| Indenture Trust Accounts (Bank) | 5,447,454 | 5,447,454 | 5,447,214 | 5,449,572 | 5,378,146 | 5,378,146 | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | |
| **Indenture DIP Loan** | | | | | | | | | | | | | | | | | | | | | | | |
| Beginning Balance | | | | | | | - | 1,040,559 | 1,327,512 | 1,461,867 | 1,994,591 | 2,625,207 | 2,680,823 | 2,680,823 | | | | | | | | | |
| Draw | | | | | | | 1,040,559 | 286,953 | 134,355 | 532,724 | 630,616 | 55,616 | - | 997,527 | 932,736 | 29,336 | - | - | 208,896 | 29,336 | - | - | 4,878,653 |
| Repayment | | | | | | | | | | | | | | | | | | | | | | | - |
| PIK Interest | | | | | | | | | | | | | | | | | | | | | | | - |
| Ending DIP Balance | - | - | - | - | - | - | 1,040,559 | 1,327,512 | 1,461,867 | 1,994,591 | 2,625,207 | 2,680,823 | 2,680,823 | 3,678,350 | 932,736 | 29,336 | - | - | 208,896 | 29,336 | - | - | 4,878,653 |
| | | | | | | | | | | | | | | | | | | | | | | | |
| Resident Occupancy | 185 | 185 | 185 | 185 | 185 | 185 | | | | | | | | | | | | | | | | | |
| Healthcare Occupancy | 111 | 103 | 104 | 103 | 103 | 95 | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | |
| **Incurred Restructuring Fees Projection** | | | | | | | | | | | | | | | | | | | | | | | |
| Holland & Knight (Debtor Special Counsel) | 107,000 | 15,250 | 15,250 | 15,250 | 15,250 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | 9,231 | |
| McColl Parkhurst & Horton (Debtor Bond Counsel) | | | | | | | | | | | | | | 255,000 | | | | | | | | | |
| B. Riley Advisors (Debtor Financial Advisor) | 35,000 | 35,000 | 35,000 | 35,000 | 35,000 | 30,000 | 30,000 | 30,000 | 30,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | 25,000 | |
| McGuire Woods (Debtor Restructuring Counsel) | - | 50,250 | 50,250 | 50,250 | 50,250 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | 33,462 | |
| Stretto (Debtor Claims Agent) | 87,071 | 20,227 | 20,227 | 15,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | |
| Healthcare Ombudsman | 22,000 | - | - | - | 11,000 | - | - | - | 11,000 | - | - | - | 11,000 | - | - | - | 11,000 | - | - | - | - | 11,000 | |
| UST Trustee | - | - | - | - | - | 20,000 | - | - | - | - | - | - | - | 120,000 | - | - | - | - | - | - | - | 80,000 | |
| Resident/Creditor Committee Professionals | 25,000 | 25,000 | 25,000 | 25,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | 20,000 | |
| Mintz Levin/RBC (Indenture Trustee Professionals paid directly from Indenture Collateral) | | | | | | | | | | | | | | | | | | | | | | | |
| Investment Banker | - | - | - | - | - | - | - | 100,000 | - | - | - | - | 100,000 | - | - | - | 100,000 | - | - | - | - | 100,000 | |
| Utility Deposit | 96,806 | | | | | | | | | | | | | | | | | | | | | (96,806) | |

*Note:*
*-Estimate of Storm Damage Capex may be higher but difference to be reimbursed by insurance ($250k deductible)*
*-Does not reflect DIP interest/fees*
*-To the extent that a sales process results in greater cash needs than Indenture Collateral Funds, it is anticipated that non-essential capital expenditures would be deferred as necessary*

Draft Subject to Change

**<u>Exhibit C</u>**

# SUMMARY OF LIEN SEARCHES

---

**A. DEBTOR:**      **BUCKINGHAM SENIOR LIVING COMMUNITY, INC. (the "Debtor")**

     1.   Jurisdiction of Search:     Texas Secretary of State – **UCC Liens**

         Date of Search:         June 3, 2021

         Summary:          UCC-1 File No. 07-0028187477, filed 08/17/2007 naming The Bank of New York Trust Company, National Association, as Master Trustee, as secured party (collateral: the Trust Estate as described and defined in the Master Trust Indenture dated as of July 1, 2007 between the Debtor and the secured party)

           (i)     UCC-3 Continuation File No. 12-00257717, filed 08/14/2012

           (ii)     UCC-3 Continuation File No. 17-00181249, filed 05/26/2017

           (iii)     UCC-3 Amendment File No. 18-00234230, filed 06/29/2018 (restatement of collateral: the Trust Estate as defined in that certain Master Trust, Deed of Trust and Security Agreement dated as of July 1, 2007 between the Debtor and the secured party)

           (iv)     UCC-3 Assignment File No. 18-00253454, filed 07/17/2018 (assigning to UMB Bank, N.A. as Master Trustee)

         UCC-1 File No. 16-0030736177, filed 09/16/2016 naming Hewlett-Packard Financial Services Company, as secured party (collateral: equipment and software leased to or financed for Debtor) (will lapse on 09/16/2021 if not continued)

         UCC-1 File No. 19-0028160744, filed 07/25/2019 naming Texas Star Bank, as secured party (collateral: any and all lease contracts now or hereafter existing between IPRO Media, Inc. and the Debtor, with contract # C-2021249 including but not limited to equipment/inventory)

     2.   Jurisdiction of Search:    Harris County, District Court, Texas Open & Closed Litigation by Defendant & Plaintiff – **Open Litigation**

         Date of Search:          June 2, 2021

Summary:        Case No. 2018-21464, filed 03/29/2018, type: Other Injury or Damage, **Defendant**: Anding, Roberta ET AL v. the Debtor

Case No. 2019-02894, filed 01/14/2019, type: Other Civil, **Defendant**: Hurst-Washington, A. v. the Debtor

Case No. 2019-02894A, filed 01/14/2019, type: Other Severance, **Defendant**: Washington, Angela Hurt v. the Debtor

Case No. 2021-01640, filed 01/12/2021, type: Debt/Contract – Consumer/DTPA, **Defendant**: Dunn, Eva Lynn v. the Debtor

Summary:        Case No. 2021-01640, filed 01/12/2021, type: Debt/Contract – Consumer/DTPA, **Plaintiff**: Dunn, Eva Lynn v. the Debtor