## **Exhibit 2**

DIP Credit Agreement

**PRIMING SUPERPRIORITY**

**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**BY AND BETWEEN**

**BUCKINGHAM SENIOR LIVING COMMUNITY, INC.,**

**AS DEBTOR,**

**AND**

**UMB BANK, N.A.,**

**IN ITS CAPACITY AS BOND TRUSTEE,**

**AS DIP LENDER**

**DATED AS OF JUNE 25, 2021**

## <u>TABLE OF CONTENTS</u>

**Page(s)**

ARTICLE I DEFINED TERMS ..................................................................2

 Section 1.1 Definitions..................................................................2

ARTICLE II LOANS ...............................................................................15

 Section 2.1 DIP Loans ..................................................................15
 Section 2.2 Borrowing Mechanics ...............................................15
 Section 2.3 Use of Proceeds..........................................................16
 Section 2.4 Evidence of Debt.........................................................16
 Section 2.5 Interest on Loans........................................................16
 Section 2.6 Repayment ..................................................................16
 Section 2.7 Mandatory Prepayments.............................................16
 Section 2.8 Application of Payments and Proceeds.......................17
 Section 2.9 General Provisions Regarding Payments.....................17
 Section 2.10 Termination of DIP Loan Commitments .....................17

ARTICLE III CONDITIONS PRECEDENT; CONDITIONS SUBSEQUENT ..................18

 Section 3.1 Conditions Precedent; Closing Date .........................18
 Section 3.2 Conditions to Each Borrowing....................................20
 Section 3.3 Conditions Subsequent................................................21

ARTICLE IV REPRESENTATIONS AND WARRANTIES..............................................21

 Section 4.1 Representations and Warranties.................................21

ARTICLE V AFFIRMATIVE COVENANTS .................................................25

 Section 5.1 Affirmative Covenants................................................25

ARTICLE VI NEGATIVE COVENANTS/BUDGET COMPLIANCE..............................29

 Section 6.1 Negative Covenants ....................................................29
 Section 6.2 Budget Compliance.....................................................32

ARTICLE VII INCREASED COSTS; TAXES; SET OFF; ETC. ......................................32

 Section 7.1 Taxes; Withholding, Etc ............................................32
 Section 7.2 Right of Set Off...........................................................33

ARTICLE VIII EVENTS OF DEFAULT ...........................................................34

 Section 8.1 Events of Default .........................................................34
 Section 8.2 Remedies.....................................................................36
 Section 8.3 Remedies Cumulative..................................................37
 Section 8.4 Application of Proceeds...............................................37

ARTICLE IX MISCELLANEOUS .................................................................37

 Section 9.1 Amendments and Waivers; Release of DIP Collateral ............37
 Section 9.2 Notices........................................................................37
 Section 9.3 Expenses.....................................................................38
 Section 9.4 Enforceability; Successors and Assigns......................40

i

Section 9.5      Integration .................................................................................................40
Section 9.6      No Waiver; Remedies ..................................................................................40
Section 9.7      Setoff.........................................................................................................40
Section 9.8      Execution in Counterparts...........................................................................41
Section 9.9      Governing Law; Submission To Jurisdiction; Venue.................................42
Section 9.10     Waiver of Jury Trial ...................................................................................43
Section 9.11     Severability .................................................................................................43
Section 9.12     Survival ......................................................................................................43
Section 9.13     Maximum Lawful Interest ...........................................................................43
Section 9.14     Interpretation...............................................................................................44
Section 9.15     Ambiguities..................................................................................................44
Section 9.16     The PATRIOT Act.......................................................................................44
Section 9.17     Conflicting Provisions in Security Documents.........................................44
Section 9.18     Conflicting Provisions in the Financing Orders.......................................44
Section 9.19     Modifications ..............................................................................................44
Section 9.20     Release ........................................................................................................45


SCHEDULE 2.1     DIP Loan Commitment

EXHIBIT A        Budget

EXHIBIT B        Form of Borrowing Certificate

THIS PRIMING SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT
AGREEMENT is made as of June 25, 2021 by and between Buckingham Senior Living
Community, Inc. (the "Debtor") and UMB Bank, N.A., in its capacity as Bond Trustee (the "DIP
Lender").

## RECITALS

WHEREAS, on June 25, 2021 (the "Petition Date"), the Debtor filed a voluntary petition
for relief (the "Chapter 11 Case") under Chapter 11 of Title 11 of the United States Code (the
"Bankruptcy Code") with the United States Bankruptcy Court for the Southern District of Texas
(the "Bankruptcy Court");

WHEREAS, the Debtor is the owner and operator of a continuing care retirement
community known as The Buckingham (the "Facility");

WHEREAS, the Tarrant County Cultural Education Facilities Finance Corporation (the
"Bond Issuer") issued its (i) Tarrant County Cultural Education Facilities Finance Corporation
Retirement Facility Revenue Bonds (Buckingham Senior Living Community, Inc. Project),
Series 2007 (the "Series 2007 Bonds"), pursuant to that certain Indenture of Trust dated as of
July 1, 2007 (the "2007 Original Indenture") between the  Bond Issuer and UMB Bank, N.A., in
its capacity as successor trustee thereunder (in such capacity, the "Bond Trustee"), (ii) Tarrant
County Cultural Education Facilities Finance Corporation Retirement Facility Revenue Bonds
(Buckingham Senior Living Community, Inc. Project), Series 2014 (the "Series 2014 Bonds"),
pursuant to the 2007 Indenture, as supplemented by Supplement No. 1 to the Indenture of Trust,
dated as of September 1, 2014 (the 2007 Original Indenture, as supplemented, the "2014
Indenture") between the Bond Issuer and the Bond Trustee and (iii) the Tarrant County Cultural
Education Facilities Finance Corporation Retirement Facility Revenue Bonds (Buckingham
Senior Living Community, Inc. Project), Series 2015A Fixed Rate, Series 2015B-1 Tax Exempt
Mandatory Paydown Securities (TEMP- 80) and Series 2015B-2 Tax Exempt Mandatory
Paydown Securities (TEMP- 50) (the "Series 2015 Bonds" and together with the Series 2007
Bonds and Series 2014 Bonds, the "Bonds"), pursuant to that certain Indenture of Trust, dated as
of August 1, 2015 between the Bond Issuer and the Bond Trustee (the "2015 Indenture" and
together with the 2007 Original Indenture and the 2014 Indenture, the "Bond Indentures");

WHEREAS, the Bond Issuer loaned the proceeds of the Bonds to the Debtor pursuant to
the Loan Agreement dated July 1, 2007 between the Debtor and the Bond Issuer (as amended by
the Amendment No. 1 to the Loan Agreement dated September 1, 2014) and the Loan
Agreement dated August 1, 2015, collectively, the "Loan Agreements");

WHEREAS, the Debtor used the proceeds of the Bonds primarily to: (i) finance the
construction, renovation and equipping of the Facility, (ii) fund debt service reserve funds; (iii)
pay a portion of the interest on the Bonds; and (iv) pay certain expenses incurred in connection
with the issuance of the Bonds;

WHEREAS, the rights of the Bond Issuer under the Loan Agreements were assigned to
the Bond Trustee. In addition, as security for its obligations with respect to the Bonds, the Debtor
entered into that certain Master Trust Indenture, Deed of Trust and Security Agreement dated as

July 1, 2007, as supplemented by the Supplemental Indenture Number 1, dated as of July 1, 2007, the Supplemental Indenture Number 2, dated as of September 1, 2014 and the Supplemental Indenture Number 3, dated as of August 1, 2015 (as supplemented, the "Master Indenture") between the Debtor and UMB Bank, N.A., as successor master trustee (the "Master Trustee" and together with the Bond Trustee, the "Trustee") pursuant to which the Debtor granted the Master Trustee a security interest against substantially all of the Debtor's assets as described in the Master Indenture and that certain Deed of Trust and Security Agreement dated October 8, 2014, as modified by the Modification Agreement dated effective August 1, 2015 (as modified, the "Deed of Trust"), between the Debtor and the Master Trustee (all such collateral so granted under the Prepetition Credit Agreements (as defined below), the "Prepetition Collateral");

WHEREAS, the Bond Indentures, the Loan Agreements, the Master Indenture, the Deed of Trust and any other document or agreement delivered as security for, or in respect to, the Bonds or the Debtor's obligations under any of such documents are collectively referred to herein as the "Prepetition Credit Agreements."

WHEREAS, the Debtor has requested, and the DIP Lender has agreed, to provide a working capital facility to support the Debtor's working capital needs during the Chapter 11 Case, pursuant to the terms and conditions hereof; and

WHEREAS, the DIP Lender is only willing to provide the DIP Loans hereunder if the Debtor grants to the DIP Lender a priming, first priority lien and superpriority administrative claim on the DIP Collateral, subject only to the Carve-Out and other Permitted Liens and the Financing Orders.

NOW THEREFORE, in consideration of the premises and the mutual covenants and the agreements herein set forth, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto, intending to be legally bound, hereby agree as follows:

ARTICLE I
DEFINED TERMS

Section 1.1    Definitions.

(a)    As used in this Agreement, including, without limitation, the preamble, recitals, exhibits and schedules hereto, the following terms have the meanings stated:

"Account" has the meaning set forth in the UCC.

"Action" against a Person means an action, suit, litigation, arbitration, investigation, complaint, contest, hearing, inquiry, inquest, audit, examination or other proceeding threatened or pending against or affecting such Person or its property, whether civil, criminal, administrative, investigative or appellate, in law or equity, before any arbitrator or Governmental Body.

2

"<u>Affiliate</u>" means, with respect to a Person, any other Person which directly or indirectly, through one or more intermediaries, controls or is controlled by or is under common control with such Person, and without limiting the generality of the foregoing, includes (i) any Person which beneficially owns or holds ten (10%) percent or more of any class of the Capital Stock of such Person or other equity interests in such Person, (ii) any Person of which such Person beneficially owns or holds ten (10%) percent or more of any class of the Capital Stock or in which such Person beneficially owns or holds ten (10%) percent or more of the equity interests, (iii) any director or executive officer of such Person. For the purposes of this definition, the term "<u>control</u>" (including with correlative meanings, the terms "<u>controlled by</u>" and "<u>under common control with</u>"), as used with respect to any Person, means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of Capital Stock, by agreement or otherwise.

"<u>Agreement</u>" means this Priming Superpriority Debtor-in-Possession Credit Agreement, as it may be amended, restated, supplemented or otherwise modified from time to time.

"<u>Asset Sale</u>" means a sale, lease or sublease (as lessor or sublessor), sale and leaseback, assignment, conveyance, transfer or other disposition to, or any exchange of property with, any Person, in one or more transactions or a series of related transactions, of all or any part of the businesses of the Debtor, and/or of all or any part of the assets or properties of any kind of the Debtor, whether real, personal, or mixed and whether tangible or intangible, whether now owned or hereafter acquired, other than (a) inventory (or other assets) sold or leased in the ordinary course of business, (b) sales or dispositions of obsolete, worn-out or excess furniture, fixtures, equipment or other property in the ordinary course of business and (c) the actual or constructive loss of any property or the use thereof.

 "<u>Assignee</u>" means has the meaning set forth in Section 9.4(b).

"<u>Assignment</u>" has the meaning set forth in Section 9.4(b).

"<u>Authorized Officer</u>" means, as applied to any Person, any individual holding the position of chairman of the board, executive director (or the equivalent thereof), chief executive officer, chief financial officer, any vice president or treasurer or the Person or entity acting in that capacity.

"<u>Bankruptcy Code</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Bankruptcy Court</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Bankruptcy Milestones</u>" has the meaning set forth in the Financing Orders.

"<u>Bond Indentures</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Bond Issuer</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Bond Trustee</u>" has the meaning set forth in the recitals to this Agreement.

"Bonds" has the meaning set forth in the recitals to this Agreement.

"Borrowing" means an advance of a DIP Loan made hereunder on the Interim Order Entry Date or thereafter.

"Borrowing Certificate" has the meaning set forth in Section 2.2(b).

"Borrowing Date" means the date of a Borrowing.

"Budget" means the budget attached as Exhibit A itemizing on a weekly basis all uses, and anticipated uses, of the DIP Loans, revenues projected to be received and all expenditures proposed to be made during such period, which Budget may be amended with the written consent of the DIP Lender.

"Business Day" means a day other than Saturday or Sunday or other day on which commercial banks in Houston, Texas or New York City, New York are authorized or required by law or other governmental action to close.

"CapEx DIP Loan Commitment" means a subset of the DIP Loan Commitment in the amount set forth in Schedule 2.1 or such lesser amount as determined in accordance with the Financing Orders and the Budget.

"CapEx DIP Loans" mean DIP Loans, in an amount not to exceed the CapEx DIP Loan Commitment, to be used to pay capital expenses and storm damage claims as provided herein.

"Capital Improvement Account" means a deposit account held by the Debtor into which the proceeds of the CapEx DIP Loans shall be deposited.

"Capital Lease" means, as applied to any Person, any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is or should be accounted for as a capital lease on the balance sheet of that Person.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation), including, without limitation, partnership interests and membership interests, and any and all warrants, rights or options to purchase or other arrangements or rights to acquire any of the foregoing.

"Carve-Out" has the meaning set forth in the Interim Order (before the entry of the Final Order) and, after the entry of the Final Order, the Final Order.

"Cash" means a credit balance in any Deposit Account, money or currency.

"Change of Control" means any one or more of the following events: (i) the transfer (in one transaction or a series of transactions) of all or substantially all of the assets of the Debtor to any Person or group; (ii) the liquidation or dissolution of the Debtor or the adoption of a plan by the Board of Directors of the Debtor relating to the dissolution or

liquidation of the Debtor; (iii) the conversion of the Debtor from a Texas non-profit corporation to a "for profit" corporation or other entity; (iv) any Person or two or more Persons acting in concert shall have acquired by contract or otherwise, the power to exercise, directly or indirectly, a controlling influence over the management or policies of the Debtor or control the election of members of the board of directors or equivalent governing body of the Debtor; or (v) any change in the composition or membership of the Debtor's board of directors, or day to day management of the Debtor, from that in effect on the date hereof, except for any changes approved in advance by the DIP Lender.

"Chapter 11 Case" has the meaning set forth in the recitals to this Agreement.

"Closing Date" means the date hereof.

"Committee" means any committee of unsecured creditors appointed in the Chapter 11 Case.

"Controlled Account" has the meaning set forth in Section 5.1(f).

"Controlled Account Agreement" has the meaning set forth in Section 5.1(f).

"Consents" means any approval, consent, authorization or order of, notice to or registration or filing with, or any other action by, any Governmental Body or other Person.

"Credit Bid" means the submission by the DIP Lender of a bid at a public or private sale to purchase all or any portion of the DIP Collateral in which any of the DIP Obligations are used and applied as a credit against the purchase price.

"Debtor" has the meaning set forth in the Preamble to this Agreement; provided that "Debtor" shall include any of the Debtor's successors and assigns (including, without limitation, any trustee or other fiduciary hereafter appointed as its legal representative or with respect to the property of the estate of the Debtor, whether under chapter 11 of the Bankruptcy Code or any subsequent chapter 7 case and the Debtor's successor upon conclusion of the Chapter 11 Case).

"Debtor Relief Laws" shall mean the Bankruptcy Code and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, examinership, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

"Default" means a condition or event that, after notice or lapse of time or both, would constitute an Event of Default.

"Deposit Account" means any deposit account (as such term is defined in the UCC), including, without limitation, a demand, time, savings, passbook or like account with a bank, savings and loan association, credit union or like organization, other than an account evidenced by a negotiable certificate of deposit.

"DIP Collateral" means any and all "Property" as defined in the Mortgage and/or the Financing Orders, together with any other collateral granted by the Debtor to the DIP Lender pursuant to any other DIP Collateral Document, as applicable.

"DIP Collateral Documents" means the Mortgage, the Controlled Account Agreements and all other instruments, documents and agreements delivered by the Debtor pursuant to this Agreement or any of the other DIP Loan Documents pursuant to which the Debtor grants a DIP Lien, or any other Lien, mortgage, or encumbrance, to the DIP Lender, as any of the foregoing may be amended, restated, supplemented, modified, or replaced from time to time. For the avoidance of doubt, the DIP Collateral Documents do not include the Financing Orders.

"DIP Commitment Period" means (a) with respect to Initial DIP Loans, the period commencing on Interim Order Entry Date and ending on the Maturity Date and (b) with respect to remaining DIP Loans (exclusive of the Initial DIP Loans), the period commencing on the Final Order Entry Date and ending on the Maturity Date.

"DIP Lender" has the meaning set forth in the Preamble to this Agreement.

"DIP Lien" means any Lien granted under or pursuant to any DIP Collateral Document or the Financing Orders.

"DIP Loan" has the meaning set forth in Section 2.1(a).

"DIP Loan Commitment" means the amount set forth in Schedule 2.1 or such lesser amount as determined in accordance with the Financing Orders and the Budget.

"DIP Loan Document" means any of this Agreement, the DIP Collateral Documents and all other documents, instruments or agreements executed and delivered by the Debtor for the benefit of the DIP Lender in connection herewith.

"DIP Obligations" means all indebtedness, obligations, covenants, duties of payment or performance of every kind and all other liabilities of the Debtor from time to time owed to DIP Lender, whether direct or indirect, joint or several, absolute or contingent, matured or unmatured, liquidated or unliquidated, secured or unsecured, arising by contract, operation of law or otherwise, owing, arising, due or incurred under this Agreement, the Financing Orders or any DIP Loan Document or in respect of any of the DIP Loans, or any other instruments at any time evidencing any of the foregoing or otherwise, including, without limitation, all obligations to repay principal of and interest on the DIP Loans, and to pay interest, costs, charges, expenses, professional fees, and all sums chargeable to the Debtor under the DIP Loan Documents and the Financing Orders and Debtor's obligation to provide the DIP Lender with adequate protection of its interests in the DIP Collateral and other property to be used, sold, leased or otherwise disposed of by the Debtor under the terms of the Financing Orders.

"Dollars" and the sign "$" mean the lawful money of the United States of America.

"Employee Benefit Plan" means any "employee benefit plan" as defined in Section 3(3) of ERISA that is sponsored, maintained or contributed to by, or required to be contributed to by, the Debtor.

"Environmental Laws" means all federal, state, local and foreign laws (including without limitation common law), treaties, statutes, regulations and rules whether now or hereinafter in effect relating in any way to the environment, the preservation or reclamation of natural resources, the management, release or threatened release of any Hazardous Material or health and safety matters, including, without limitation, the Resource Conservation and Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act of 1980, the Superfund Amendments and Reauthorization Act of 1986, the Federal Clean Water Act, the Federal Clean Air Act, the Toxic Substances Control Act, in each case as amended, and all rules, regulations, judgments, decrees, orders and licenses arising under all such laws.

"Environmental Liability" means any actual, alleged or contingent liability or obligations of the Debtor directly or indirectly resulting from or based on (i) violations or alleged violations of any Environmental Law, (ii) the generation, use, handling, transportation, management, storage, treatment or disposal of any Hazardous Material, (iii) exposure to any Hazardous Material, (iv) the release or threatened release of any Hazardous Material into the environment or (v) any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with any of the foregoing.

"Environmental Permits" means all permits, licenses, authorizations, registrations and other governmental consents required by applicable Environmental Laws for the use, storage, treatment, transportation, release, emission and disposal of raw materials, by-products, wastes and other substances used or produced by or otherwise relating to the operations of the Debtor.

"Equipment" means, as to the Debtor, all of the Debtor's now owned and hereafter acquired equipment, wherever located, including machinery, data processing and computer equipment (whether owned or licensed and including embedded software), vehicles, tools, furniture, fixtures, all attachments, accessions and property now or hereafter affixed thereto or used in connection therewith, and substitutions and replacements thereof, wherever located.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and any successor thereto.

"ERISA Affiliate" means, as applied to any Person, (i) any corporation that is a member of a controlled group of corporations within the meaning of Section 414(b) of the Internal Revenue Code of which that Person is a member, (ii) any trade or business (whether or not incorporated) that is a member of a group of trades or businesses under common control within the meaning of Section 414(c) of the Internal Revenue Code of which that Person is a member, and (iii) any member of an affiliated service group within the meaning of Section 414(m) or (o) of the Internal Revenue Code of which that Person, any corporation described in clause (i) above or any trade or business described in clause (ii)

above is a member.  Any former ERISA Affiliate of the Debtor, shall continue to be considered an ERISA Affiliate of the Debtor within the meaning of this definition with respect to the period such entity was an ERISA Affiliate of the Debtor and with respect to liabilities arising after such period for which the Debtor could be liable under the Internal Revenue Code or ERISA.

"Event of Default" means each of the conditions or events set forth in Section 8.1.

"Excluded Property" means the Avoidance Actions (as defined in the Financing Orders).

"Excluded Taxes" means any of the following Taxes imposed on or with respect to the DIP Lender or required to be withheld or deducted from a payment to the DIP Lender, (a) Taxes imposed on or measured by net income (however denominated), franchise Taxes, and branch profits Taxes, in each case, (i) imposed as a result of the DIP Lender being organized under the laws of, or having its principal office or, its applicable lending office located in, the jurisdiction imposing such Tax (or any political subdivision thereof) or (ii) that are imposed as a result of a present or former connection between the DIP Lender and the jurisdiction imposing such Tax (other than connections arising from the DIP Lender having executed, delivered, become a party to, performed its obligations under, received payments under, received or perfected a security interest under, engaged in any other transaction pursuant to or enforced this Agreement, or sold or assigned an interest in any DIP Loan or any DIP Loan Document), (b) U.S. federal withholding Taxes imposed on amounts payable to or for the account of the DIP Lender with respect to an applicable interest in a DIP Loan pursuant to a law in effect on the date on which the DIP Lender acquires such interest in the DIP Loan, (c) Taxes attributable to the DIP Lender's failure to comply with Section 7.1(c) and (d) any U.S. federal withholding Taxes imposed under FATCA.

"Facility" has the meaning set forth in the recitals to this Agreement.

"FATCA" means Sections 1471 through 1474 of the Internal Revenue Code, as of the date of this Agreement (or any amended or successor version that is substantively comparable and not materially more onerous to comply with), any current or future regulations or official interpretations thereof and any agreement entered into pursuant to Section 1471(b)(1) of the Internal Revenue Code.

 "Final Order" means a final order (which must be acceptable in form and substance to the DIP Lender in its sole discretion) entered or to be entered by the Bankruptcy Court authorizing the secured financing under the DIP Loan Documents.

"Final Order Entry Date" means the date on which the Bankruptcy Court enters the Final Order.

"Financing Orders" means, collectively, the Interim Order, the Final Order and such other orders relating thereto or authorizing the granting of credit by DIP Lender to the Debtor on an emergency, interim or permanent basis, pursuant to section 364 of the Bankruptcy Code as may be issued or entered by the Bankruptcy Court in the Chapter 11 Case.

"GAAP" means generally accepted accounting principles in the United States as in effect from time to time, consistently applied throughout the periods to which reference is made.

"Governmental Body" means any agency, bureau, commission, court, department, official, political subdivision, tribunal or other instrumentality of any administrative, judicial, legislative, executive, regulatory, police or taxing authority of any government, whether supranational, national, federal, state, regional, provincial, local, domestic or foreign, and includes, without limitation, the European Union and its agencies and instrumentalities.

"Hazardous Materials" means any hazardous or toxic substance, waste, contaminant, pollutant, gas or material, including, without limitation, radioactive materials, oil, petroleum and petroleum products and constituents thereof, which are regulated under any Environmental Law, including, without limitation, any substance, waste or material which is (i) designated a "pollutant", "hazardous substance", "extremely hazardous substance" or "toxic chemical" under any Environmental Law, or (ii) regulated in any way under the Regulations of any state or other jurisdiction where the Debtor conducts its business or owns any real property or has any leasehold or in which any Relevant Property is located.

"Indebtedness" means, with respect to any Person, without duplication, the following: (i) all indebtedness of such Person for borrowed money, (ii) all obligations of such Person for the deferred purchase price of property or services (other than accounts payable and accrued liabilities that would be classified as current liabilities under GAAP if and only for so long as such item of such accounts payable and accrued liabilities is no more than 90 days past due), (iii) all obligations of such Person evidenced by notes, bonds, debentures or similar borrowing or securities instruments, (iv) all obligations of such Person created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person, (v) all obligations of such Person as lessee under Capital Leases, (vi) all obligations of such Person in respect of banker's acceptances and letters of credit, (vii) all obligations of such Person secured by Liens on the assets and property of such Person, (viii) all obligations of such Person to purchase, redeem, retire, defease or otherwise make any payment in respect of any Capital Stock or other ownership or profit interest in such Person or any other Person or any warrants, rights or options to acquire such Capital Stock, (ix) net liabilities in respect of such Person's hedge agreements as determined in accordance with GAAP, (x) all obligations of such Person in respect of any guaranty by such Person of any obligation of another Person of the type described in clauses (i) through (ix) of this definition and (xi) all obligations of another Person of the type described in clauses (i) through (x) secured by a Lien on the property or assets of such Person (whether or not such Person is otherwise liable for such obligations of such other Person).

"Indemnified Taxes" means Taxes, other than Excluded Taxes, imposed on or with respect to any payment made by or on account of any obligation of the Debtor under any DIP Loan Document.

"Initial DIP Loans" means the amount set forth on Schedule 2.1 or such lesser amount as set forth in the Interim Order and the Budget.

"Intellectual Property" means, collectively, all copyrights, all patents and all trademarks, together with: (i) all inventions, processes, production methods, proprietary information, know-how and trade secrets; (ii) all licenses or user or other agreements granted to the Debtor with respect to any of the foregoing, in each case whether now or hereafter owned or used including the licenses or other agreements with respect to any DIP Collateral; (iii) all customer lists, identification of suppliers, data, plans, blueprints, specifications, designs, drawings, recorded knowledge, surveys, engineering reports, test reports, manuals, materials standards, processing standards, performance standards, catalogs, computer and automatic machinery software and programs; (iv) all sales data and other information relating to sales or service of products now or hereafter manufactured; (v) all accounting information and all media in which or on which any information or knowledge or data or records may be recorded or stored and all computer programs used for the compilation or printout of such information, knowledge, records or data; and (vi) all causes of action, claims and warranties, in each case, now or hereafter owned or acquired by the Debtor in respect of any of the items listed above.

"Interim Order" means an interim order (which must be acceptable in form and substance to the DIP Lender in its sole discretion) entered or to be entered by the Bankruptcy Court authorizing the secured financing (including the Initial DIP Loans) under the DIP Loan Documents.

"Interim Order Entry Date" means the date on which the Bankruptcy Court issues the Interim Order.

"Internal Revenue Code" means the Internal Revenue Code of 1986, as amended to the date hereof and from time to time hereafter, and any successor statute.

"Investment" means (i) any direct or indirect purchase or other acquisition by the Debtor of, or of a beneficial interest in, any of any Capital Stock of any other Person, (ii) any direct or indirect redemption, retirement, purchase or other acquisition for value, by the Debtor from any Person, of any Capital Stock of such Person, and (iii) any direct or indirect loan, advance or capital contribution by the Debtor to any other Person, including all indebtedness and accounts receivable from that other Person that are not current assets or did not arise from sales of inventory to that other Person in the ordinary course of business and/or constitute ordinary trade credit extended in the ordinary course of business. The amount of any Investment shall be the original cost of such Investment plus the cost of all additional Investments, without any adjustments for increases or decreases in value, or write-ups, write-downs or write-offs with respect to such Investment.

"Knowledge" means, with respect to the Debtor, the actual knowledge of the Debtor's Authorized Officers.

"<u>Leasehold Property</u>" means any leasehold interest of the Debtor as lessee under any lease of real or personal property, other than any such leasehold interest designated from time to time by the DIP Lender in its sole discretion as not being required to be included in the DIP Collateral or with respect to which the applicable lease includes an enforceable prohibition on the grant of a security interest therein.

"<u>Loan Agreements</u>" has the meaning set forth in the recitals to this Agreement.

"<u>Lien</u>" means any mortgage, deed of trust, security interest, charge, pledge, hypothecation, assignment, attachment, deposit arrangement, encumbrance, lien (statutory, judgment or otherwise, but excluding any right of set off arising by operation of law or pursuant to agreements entered into in the ordinary course of business), or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement, any Capital Lease, any Synthetic Lease, any financing lease involving substantially the same economic effect as any of the foregoing and the filing of any financing statement under the UCC or comparable law of any jurisdiction in respect of the foregoing).

"<u>Margin Stock</u>" means "margin stock" as defined in Regulation U of the Board of Governors of the Federal Reserve System as in effect from time to time.

"<u>Material Adverse Effect</u>" means any material adverse effect on or change in (i) the business or assets of the Debtor, (ii) the ability of the Debtor to perform its obligations hereunder or under of any of the DIP Loan Documents, (iii) the legality, validity or enforceability of any DIP Loan Document, or (iv) the DIP Collateral or the perfection or priority of any DIP Liens granted to the DIP Lender under any of the DIP Collateral Documents.

"<u>Maturity Date</u>" means the earliest to occur of the date that is (a) November 8, 2021, (b) the closing date of any Restructuring, (c) the confirmation of a plan of reorganization or liquidation for the Debtor in the Chapter 11 Case, and (d) the date on which the DIP Lender accelerates the DIP Obligations (or the DIP Obligations automatically and immediately accelerate) or the DIP Obligations otherwise become immediately due and payable, in each case pursuant to the terms hereof.

"<u>Mortgage</u>" means the Mortgage, dated on even date herewith, by the Debtor in favor of the DIP Lender.

"<u>Multiemployer Plan</u>" means any Employee Benefit Plan that is a "multi-employer plan" as defined in Section 3(37) of ERISA.

"<u>Net Asset Sale Proceeds</u>" means, for the Debtor, with respect to any Asset Sale, an amount equal to: (i) Cash payments (including any Cash received by way of deferred payment pursuant to, or by monetization of, a note receivable or otherwise, but only as and when so received) received by the Debtor from such Asset Sale, <u>minus</u> (ii) the sum of (a) reasonable, customary and documented brokerage, consultant and other reasonable customary and documented fees and expenses actually incurred in connection with such

Asset Sale and (b) Taxes paid or reasonably estimated to be payable as a result of such Asset Sale.

"Net Indebtedness Proceeds" means the proceeds of any Indebtedness incurred by the Debtor after the Petition Date (other than pursuant to this Agreement) minus if, at the time of payment thereof and after giving thereto, (i) the Debtor is in pro forma compliance with the provisions of Section 6.2, (ii) any such payment is permitted to be made at such time in accordance with the Budget and (iii) no Default or Event of Default shall have occurred and be continuing or would result therefrom, reasonable, customary and documented out-of-pocket attorneys' fees, accountants' fees, and other reasonable customary and documented fees and expenses actually incurred in connection with the issuance of such Indebtedness.

"Net Insurance/Condemnation Proceeds" means, for the Debtor, an amount equal to: (i) any Cash payments or proceeds received by or owed to the Debtor (A) under any casualty insurance policy in respect of a covered loss thereunder or (B) as a result of the taking of any assets of the Debtor by any Person pursuant to the power of eminent domain, condemnation or otherwise, or pursuant to a sale of any such assets to a purchaser with such power under threat of such a taking minus (ii) the sum of (A) any actual and reasonable documented costs and expenses (including reasonable out-of-pocket attorney's fees) incurred by the Debtor in connection with the adjustment or settlement of any claims of the Debtor in respect thereof, and (B) any bona fide, reasonable, customary and documented costs actually incurred in connection with any sale of such assets as referred to in clause (i)(B) of this definition, including Taxes paid or reasonably estimated to be payable as a result of any gain recognized in connection therewith.

"Net Proceeds" means, as of any time, the aggregate of Net Asset Sale Proceeds, Net Insurance/Condemnation Proceeds and Net Indebtedness Proceeds.

"Notices" has the meaning set forth in Section 9.2.

"Operating Account" means the Debtor's deposit account at Bank of America, N.A., currently used as its operating account, which deposit account may be changed with the written consent of the DIP Lender.

"PATRIOT Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism Act of 2001 (Public Law 107-56).

"PBGC" means the Pension Benefit Guaranty Corporation or any successor thereto.

"Pension Plan" means any Employee Benefit Plan, other than a Multiemployer Plan, that is subject to Section 412 of the Internal Revenue Code or Section 302 of ERISA.

"Permit" means any permit, license, approval, consent, permission, notice, franchise, confirmation, endorsement, waiver, certification, registration, qualification, clearance or other authorization issued, granted, given or otherwise made available by or under the

authority of any Governmental Body or pursuant to any federal, state, local or foreign Regulation.

"Permitted Indebtedness" means the Indebtedness permitted pursuant to Section 6.1(a).

"Permitted Investment" has the meaning set forth in Section 6.1(c).

"Permitted Liens" has the meaning set forth in Section 6.1(b).

"Person" means and includes natural persons, corporations, limited partnerships, general partnerships, limited liability companies, limited liability partnerships, joint stock companies, joint ventures, associations, companies, trusts, banks, trust companies, land trusts, business trusts or other organizations, whether or not legal entities, other legal entities and Governmental Bodies.

"Petition Date" has the meaning set forth in the recitals to this Agreement.

"Post-Petition" means following the Petition Date.

"Prepetition Collateral" has the meaning set forth in the recitals to this Agreement.

"Prepetition Credit Agreements" has the meaning set forth in the recitals to this Agreement.

"Prepetition Bond Indebtedness" means the Indebtedness issued or loaned and outstanding under a Prepetition Credit Agreement.

"Prepetition Obligations" means all obligations of the Debtor arising prior to the Petition Date.

"Prepetition Payment" means a payment (by way of adequate protection or otherwise) of principal or interest or otherwise on account of Prepetition Obligations or other prepetition claims against the Debtor.

"Prepetition Secured Parties" means each of the Bond Trustee and any other agent, trustee, bondholder, noteholder, lender or other secured party under any Prepetition Credit Agreement.

"Regulation" means each applicable law, rule, regulation, or  order, by any Governmental Body, central bank or comparable agency and any request or directive (if having the force of law) of any of those Persons and each judgment, injunction, order, writ, decree or award of any Governmental Body, arbitrator or other Person.

"Released Parties" shall have the meaning given such term in Section 9.19.

"Relevant Property" means, for the Debtor, all sites, facilities, locations, real property and leaseholds (i) presently or formerly owned, leased, used or operated by the Debtor (whether or not such properties are currently owned, leased, used or operated by the

Debtor) or (ii) at which any Hazardous Material has been transported, disposed, treated, stored or released by the Debtor.

"Restructuring" means a restructuring of Debtor's financial obligations with respect to the Bonds and its other outstanding obligations on the terms and conditions acceptable to the DIP Lender.

"Securities Act" means the Securities Act of 1933, as amended from time to time, and any successor statute.

"Subsidiary" means, with respect to any Person, any corporation, partnership, limited liability company, association, joint venture or other business entity of which more than 50% of the total voting power of shares of stock or other ownership interests entitled (without regard to the occurrence of any contingency) to vote in the election of the Person or Persons (whether directors, managers, trustees or other Persons performing similar functions) having the power to direct or cause the direction of the management and policies thereof is at the time owned or controlled, directly or indirectly, by that Person or one or more of the other Subsidiaries of that Person or a combination thereof.

"Synthetic Lease" means any lease of goods or other property, whether real or personal, which is treated as an operating lease under GAAP and as a loan or financing for U.S. income tax purposes.

"Tax" means any present or future tax, levy, impost, duty, assessment, charge, fee, deduction or withholding of any nature and whatever called, by whomsoever, on whomsoever and wherever imposed, levied, collected, withheld or assessed.

"UCC" means the Uniform Commercial Code (or any similar or equivalent legislation) as in effect in the State of New York; provided that if by reason of mandatory provisions of law, the perfection, the effect of perfection or non-perfection or the priority of the DIP Liens is governed by the Uniform Commercial Code as in effect in a United States jurisdiction other than New York, "UCC" shall mean the Uniform Commercial Code as in effect in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-perfection or priority.

"United States Trustee" means the United States Trustee for the Southern District of Texas.

"Weekly Budget Report" means, a weekly report certified by an Authorized Officer for the Debtor, substantially in the same form as the Budget indicating (i) a comparative reconciliation, on a line-by-line basis, of actual cash receipts and disbursements against the cash receipts and disbursements forecast in the Budget, and the percentage variance thereof, for (A) the weekly period ended on (and including) the immediately preceding Sunday and (B) the cumulative period to date; and (ii) a written explanation of such variances.

(b)     Capitalized terms used but not defined above or elsewhere herein shall have the meanings given to such terms in the Financing Orders, as applicable.

14

## ARTICLE II
## LOANS

Section 2.1    DIP Loans.

(a)    Subject to the terms and conditions set forth herein and in the Financing Orders, upon Debtor's request for a DIP Loan in accordance with Section 2.2(b), the DIP Lender agrees to make term loans pursuant to this Section 2.1(a) (collectively, the "DIP Loans") during the DIP Commitment Period in an amount equal to such requested DIP Loan.  Each such DIP Loan shall be for purposes consistent with the Budget and otherwise consistent with this Agreement; provided that both before and after giving effect to any DIP Loan, the aggregate amount of all DIP Loans, including the CapEx DIP Loans, made shall not exceed the DIP Loan Commitment.  Once repaid, DIP Loans borrowed hereunder may not be reborrowed.

(b)    Any amount borrowed under this Section 2.1 shall, along with all other DIP Obligations (including accrued and unpaid costs, and expenses), be entitled to the DIP Liens on the DIP Collateral and the other rights and benefits provided pursuant to the Financing Orders, this Agreement and the other DIP Loan Documents.

Section 2.2    Borrowing Mechanics.

(a)    The DIP Loans, other than the CapEx DIP Loans, shall be funded by the DIP Lender into the Debtor's Operating Account, and anything herein to the contrary notwithstanding, shall be disbursed solely in accordance with the Budget and the Financing Orders (both as to timing and amount of any such requests), subject to Sections 3.1 and 3.2.  The CapEx DIP Loans shall be funded by the DIP Lender into the Debtor's Capital Improvement Account, and shall be disbursed solely in accordance with the Budget and Financing Orders (both as to timing and amount of any such requests), subject to Sections 3.1 and 3.2.

(b)    Not less than two Business Days prior to any Borrowing Date, the Debtor shall deliver to the DIP Lender a fully executed Borrowing Certificate no later than 10:00 a.m. (New York City time) on such date.  Such Borrowing Certificate, a form of which is attached hereto as Exhibit B (each a "Borrowing Certificate"), shall, except with respect to the CapEx DIP Loans, specify the amount of the proposed DIP Loan and the Borrowing Date thereof, and shall certify that the amount of the proposed DIP Loan, after accounting for other available funds held by the Debtor less five hundred thousand dollars ($500,000), is reasonably expected to be needed to pay amounts coming due in the 15 days immediately following such Borrowing Date, as set forth in the Budget.  With respect to the CapEx DIP Loans, the Debtor may request a CapEx DIP Loan by indicating its request for such CapEx DIP Loan in a Borrowing Certificate, specifying the amount of the proposed CapEx DIP Loan and the Borrowing Date thereof, and certifying that the amount of the proposed CapEx DIP Loan is needed to pay amounts having come due and otherwise incurred with respect to capital improvements or storm damage claims at the Facility as set forth in the Budget.  On the Borrowing Date specified in any Borrowing Certificate, the DIP Lender shall disburse such funds to the Operating Account (or the Capital Improvement Account with respect to the CapEx DIP Loans) and shall use reasonable efforts to make the funds available to the Debtor no later than 2:00 p.m. (New York City time) on the requested Borrowing Date.

15

Section 2.3     Use of Proceeds.  The proceeds of the DIP Loans, other than the CapEx DIP Loans, shall be used by the Debtor, subject to and in accordance with the Budget and the Financing Orders, solely for (i) working capital and general corporate purposes of the Debtor and (ii) bankruptcy-related costs and expenses.  The proceeds of the CapEx DIP Loans shall be used by the Debtor, subject to and in accordance with the Budget and the Financing Orders, solely for payment of capital expenses and storm damage claims. None of the proceeds of the DIP Loans shall be used in connection with the investigation (including discovery proceedings), initiation or prosecution of any claims, causes of action, adversary proceedings or other litigation against the DIP Lender (whether in its capacity as DIP Lender, Prepetition Secured Party, Bond Trustee or in any other capacity), the beneficial owners of the Bonds, or any of their respective advisors, agents and sub-agents, including in connection with the validity of the DIP Liens granted to the DIP Lender, or the Liens granted to the Prepetition Secured Parties in the Prepetition Collateral arising under the Prepetition Credit Agreements.

Section 2.4     Evidence of Debt.  The DIP Lender shall maintain in its internal records an account or accounts evidencing the DIP Obligations owed to the DIP Lender, including the amounts of the DIP Loans owed to it and each repayment and prepayment in respect thereof.  Any such recordation shall be conclusive and binding on the Debtor, absent manifest error; provided, failure to make any such recordation, or any error in such recordation, shall not affect the DIP Loan Commitment, the DIP Loans or any of the DIP Obligations.

Section 2.5     Interest on Loans.

(a)     Applicable Rate; Payment of Interest.  Interest shall accrue on the full amount of the DIP Loan Commitment from the Interim Order Entry Date through the Maturity Date at a simple rate per annum equal to five and six hundred and twenty-five thousandths percent (5.625%).  Accrued interest shall be due and payable on the Maturity Date.

(b)     Calculation of Interest Rates.  Interest payable pursuant to this Section 2.5 shall be computed on the basis of a 360-day year for the actual number of days elapsed in the period during which it accrues.

Section 2.6     Repayment.  Subject to Sections 2.8 and 2.9, the DIP Loans shall be due and payable, and the Debtor shall be required to repay all of the DIP Obligations (including, without limitation, all accrued and unpaid principal, interest, fees, costs, and expenses on the DIP Loans) on the Maturity Date.

Section 2.7     Mandatory Prepayments.

(a)     Net Proceeds.  No later than the first Business Day following the date of receipt by the Debtor of any Net Proceeds, the Debtor shall prepay the DIP Loans (including the applicable portion of the accrued costs and expenses) as set forth in Section 2.9 in an aggregate amount equal to such Net Proceeds.

(b)     Prepayment Certificate.  Concurrently with any prepayment of the DIP Loans pursuant to Section 2.7(a), the Debtor shall deliver to the DIP Lender a certificate of an Authorized Officer demonstrating the calculation in reasonable detail of the amount of the applicable Net Proceeds.  In the event that the Debtor shall subsequently determine that the

actual amount received exceeded the amount set forth in such certificate, the Debtor shall promptly make an additional prepayment of the DIP Loans in accordance with Section 2.9 in an amount equal to such excess, and the Debtor shall concurrently therewith deliver to the DIP Lender a certificate of an Authorized Officer demonstrating the derivation of such excess.

Section 2.8    Application of Payments and Proceeds.  Any amount required to be paid pursuant to Section 2.7(a) or any other provision of this Agreement, and all proceeds of the DIP Collateral (whether before or after an Event of Default) shall be applied (a) first, to pay any amounts (including reasonable and documented attorneys' fees) payable to the DIP Lender under Section 9.3 hereof, (b) second, to pay accrued and unpaid interest, costs, expenses and other outstanding DIP Obligations, and (c) third, to repay any principal amounts outstanding in respect of the DIP Loans.

Section 2.9    General Provisions Regarding Payments.

(a)    Payments.  All payments by the Debtor of principal, interest and other DIP Obligations shall be made by the Debtor to the DIP Lender in Dollars in same day funds, without defense, setoff or counterclaim, free of any restriction or condition, and delivered to the DIP Lender not later than 4:00 p.m. (New York City time) on the date due at the DIP Lender's office for receipt of notices hereunder (or as otherwise instructed by the DIP Lender to the Debtor) without presentment, demand, protest or notice of any kind, all of which are expressly waived by the Debtor.

(b)    Late Payments.  The DIP Lender shall be permitted to consider any payment made by or on behalf of the Debtor that is not made in same day funds prior to 4:00 p.m. (New York City time) as a late payment, and any such late payment shall be deemed received on the next Business Day.  The DIP Lender shall give prompt telephonic notice to the Debtor (confirmed in writing) if any payment is considered late hereunder. To the extent any late payment is received, the DIP Lender shall be permitted to declare by notice to the Debtor (confirmed in writing) a Default or Event of Default to the extent so provided under the terms of Section 8.1.  Interest shall continue to accrue on any late payment until the Business Day following receipt thereof.

(c)    Payments to Include Accrued Interest.  All payments in respect of the principal amount of any DIP Loan shall include payment of accrued interest on the principal amount being repaid or prepaid calculated in accordance with Section 2.5, and all such payments shall be applied to the payment of interest before application to principal.

(d)    Business Days.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, such payment shall be made on the next succeeding Business Day and such extension of time shall be included in the computation of the payment of interest hereunder.

Section 2.10    Termination of DIP Loan Commitments.  Unless previously terminated, the DIP Loan Commitment shall automatically terminate at the end of the DIP Commitment Period.  Upon the making of any DIP Loan, the DIP Loan Commitment shall be permanently reduced by an amount equal to the principal amount of such DIP Loan.

17

## ARTICLE III
## CONDITIONS PRECEDENT; CONDITIONS SUBSEQUENT

Section 3.1    Conditions Precedent; Closing Date.  The obligation of the DIP Lender to make any DIP Loan on any date on which the Debtor requests a Borrowing is subject to the satisfaction, or waiver in accordance with Section 9.1, of the following conditions on or before the Closing Date:

(a)    Certificate.  The DIP Lender shall have received a certificate of an Authorized Officer of the Debtor with respect to (i) the articles of incorporation of the Debtor, (ii) the bylaws of the Debtor, (iii) the resolutions of the board of directors of the Debtor approving each DIP Loan Document and such other agreements, instruments, certificates or other documents required to be delivered by the Debtor under the DIP Loan Documents and the performance of the obligations of the Debtor thereunder, and (iv) the names and true signatures of any officers of the Debtor who the Borrower desires to sign DIP Loan Documents from time to time (all of whom shall be Authorized Officers).

(b)    Good Standing Certificate.  The DIP Lender shall have received a good standing certificate from the applicable Governmental Body of the jurisdiction of incorporation of the Debtor and in each jurisdiction in which it is qualified as a foreign corporation or other entity to do business, each dated within 30 days prior to the Closing Date.

(c)    Financing Orders.  The Financing Orders, and all motions relating thereto, approving and authorizing the DIP Loans, all provisions thereof and the priorities and DIP Liens granted under Bankruptcy Code section 364(c) and (d), as applicable, shall be in form and substance satisfactory to the DIP Lender and its counsel, the Interim Order shall have been entered by the Bankruptcy Court on or before the date hereof and the Final Order shall be scheduled to be issued no later than September 2, 2021, and shall include, without limitation, provisions (a) modifying the automatic stay to permit the creation and perfection of the DIP Liens, (b) providing for the vacation of such stay to permit the enforcement of the DIP Lender's rights and remedies under the DIP Loan Documents upon further Court order, (c) upon entry of the Final Order, prohibiting the assertion of claims arising under sections 506(c) or 552(b) of the Bankruptcy Code against the DIP Lender or, except as expressly permitted therein, the commencement of other actions adverse to the DIP Lender or its respective rights and remedies under the DIP Loan Documents, the Financing Orders, or any other order, (d) prohibiting the incurrence of Indebtedness by Debtor, other than Permitted Indebtedness, with priority equal to or greater than the DIP Loans, (e) prohibiting any granting or imposition of Liens other than DIP Liens and Permitted Liens, and (f) authorizing and approving the Debtor to execute and deliver the DIP Loan Documents to which each shall be a party and the transactions contemplated therein, including, without limitation, the granting of the super priority status, the first-priority and priming security interests and DIP Liens upon the DIP Collateral and the payment of all fees and expenses due to the DIP Lender.  As of the Final Order Entry Date, the Final Order shall further state, among other things, that, upon entry of the Final Order, (a) the DIP Lender, the Prepetition Secured Parties, and all of their respective counsel, advisors and consultants, shall each be entitled to the benefit of a "good faith" finding pursuant to section 364(e) of the Bankruptcy Code, and (b) permit the DIP Lender the right to Credit Bid (pursuant to section

363(k) of the Bankruptcy Code and/or applicable law) the DIP Loans, in whole or in part, in connection with any sale or disposition of assets in the Chapter 11 Case.

(d)  Compliance with Financing Orders.  No Financing Order shall have been reversed, modified, amended, stayed or vacated, in the case of any modification or amendment, in a manner, or relating to a matter, without the consent of the DIP Lender.  The Debtor shall be in compliance in all material respects with the Financing Orders and all other orders of the Bankruptcy Court binding on it.

(e)  Debtor-in-Possession.  No trustee or examiner shall have been appointed with respect to the Debtor or its properties.

(f)  First Day Motions.  All "first day" motions and related orders entered by the Bankruptcy Court in the Chapter 11 Case shall be in form and substance satisfactory to the DIP Lender and its counsel.

(g)  Use of Proceeds and Information.  The proceeds of the DIP Loans shall be used by the Debtor solely in accordance with the Budget and the DIP Lender shall receive such information (financial or otherwise) as may be reasonably requested by the DIP Lender.

(h)  Litigation, etc.  There shall not exist any material action, suit, investigation, litigation or proceeding pending (other than the Chapter 11 Case) or threatened in any court or before any Governmental Body that, in the reasonable opinion of the DIP Lender, materially and adversely affects any of the transactions contemplated hereby, or that has or could be reasonably likely to have a Material Adverse Effect.

(i)  Cash Management.  Cash management arrangements satisfactory to the DIP Lender in form and substance shall be in place.  The DIP Lender or its advisors shall have completed a review of the Debtor's cash management systems and determined that all material amounts of cash and cash equivalents of the Debtor are subject to a DIP Lien in favor of the DIP Lender.

(j)  Consents.  Holders of a majority in principal amount of the Bonds outstanding shall have consented to the DIP Lender's entry into the DIP Loan Documents.

(k)  No Default.  No Default or Event of Default shall exist at the time of, or after giving effect to, the transactions contemplated on the Closing Date, including the advancing of any DIP Loans.

(l)  Representations and Warranties.  All representations and warranties in the DIP Loan Documents shall be true and correct as of the Closing Date.

(m)  UCC Financing Statements.  The DIP Lender shall have received UCC financing statements duly authorized by the Debtor with respect to all personal property DIP Collateral of the Debtor, for filing in all jurisdictions as may be necessary or, in the opinion of the DIP Lender, desirable, to perfect the security interests created in such DIP Collateral pursuant to the DIP Collateral Documents.

(n)     DIP Loan Documents.  The DIP Lender shall have received duly executed copies of each DIP Loan Document (other than any DIP Loan Document which the DIP Lender has allowed to be executed at a later date), with originals to promptly follow.  The Mortgage, financing statements and other DIP Loan Documents related to perfection of the security interest and Liens of the DIP Lender in the DIP Collateral shall, at the DIP Lender's option, have been filed in all appropriate jurisdictions (or arrangements for such filings acceptable to the DIP Lender shall have been made).

(o)     Other Actions to Perfect Security Interests.  The DIP Lender shall have received evidence that Debtor shall have taken or caused to be taken any other action, executed and delivered or caused to be executed and delivered any other agreement, document and instrument, and made or caused to be made any other filing and recording (other than as set forth herein), reasonably required by the DIP Lender to perfect, and to ensure the perfection of, its security interests in the DIP Collateral with the priority required by the DIP Loan Documents.

(p)     Other Information.  The DIP Lender shall have received any other financial or non-financial information regarding the Debtor that the DIP Lender reasonably requested at least five Business Days prior to the Closing Date.

(q)     DIP Lender's Professional Fees and Costs.  The Financing Orders shall require the Debtor pay, on the Maturity Date, all reasonable out-of-pocket fees and expenses of the DIP Lender incurred in connection with this Agreement and the other DIP Loan Documents, including the fees, costs and expenses of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, PC., as counsel to the DIP Lender, and any other attorneys' fees, costs and expenses of local counsel to the DIP Lender.  The DIP Lender shall be satisfied, in its sole discretion, that all such fees and expenses constitute DIP Obligations under the Financing Orders and are secured by the DIP Liens on the DIP Collateral.

(r)     No Material Adverse Change.  The Debtor, as debtor-in-possession, shall have continued to operate its business in the ordinary course through the Closing Date, and since the Petition Date there shall have been no Material Adverse Effect.

Section 3.2     Conditions to Each Borrowing.  The obligations of the DIP Lender to make any DIP Loan on any Borrowing Date, including the Closing Date, is subject to the satisfaction, or waiver in accordance with Section 9.1, of the following conditions precedent:

(a)     Borrowing Certificate.  The DIP Lender shall have received a fully executed and delivered Borrowing Certificate, in accordance with Section 2.2.  Each Borrowing Certificate shall be executed by an Authorized Officer of the Debtor and delivered to the DIP Lender on a Business Day.

(b)     Representations and Warranties.  As of such Borrowing Date (both before and after giving effect to the advance of the DIP Loans and application of its proceeds), the representations and warranties of the Debtor contained in the DIP Loan Documents shall be true and correct in all material respects on and as of that Borrowing Date, as if made on and as of that Borrowing Date (except to the extent such representations and warranties specifically relate to an

earlier date, such representations and warranties were true and correct on and as of such earlier date).

(c)     No Event of Default.  As of such Borrowing Date, no Default or Event of Default shall have occurred and be continuing or would result from the consummation of the applicable Borrowing (or the application of its proceeds).

(d)     Consents.  The DIP Lender shall have received such Consents and other information, approvals, opinions or documents reasonably requested by the DIP Lender in connection with such Borrowing.

(e)     Available Commitments.  After making the DIP Loans requested on such Borrowing Date, the aggregate outstanding principal amount of the DIP Loans shall not exceed the amount of the DIP Loan Commitment.

(f)     No Material Adverse Effect.  Since the Interim Order Entry Date, no Material Adverse Effect shall have occurred after giving effect to the making of the DIP Loans.

(g)     Other Information.  The DIP Lender shall have received any other financial or non-financial information regarding the Debtor that the DIP Lender reasonably requested.

Section 3.3     Conditions Subsequent.  The Debtor shall timely perform all obligations and commitments in any post-closing agreement between the DIP Lender and the Debtor with respect to any requirement of Sections 3.1 or 3.2 hereof that the DIP Lender has, in the exercise of its sole and absolute discretion, agreed to be satisfied at a later date.

ARTICLE IV
REPRESENTATIONS AND WARRANTIES

Section 4.1     Representations and Warranties.  In order to induce the DIP Lender to enter into this Agreement and to make each DIP Loan to be made hereby, Debtor hereby represents and warrants to the DIP Lender, on the Closing Date and on each Borrowing Date as follows:

(a)     Status; Authorization.  Debtor is duly organized, validly existing, and in good standing under the laws of its jurisdiction of incorporation and is duly qualified and in good standing in every other jurisdiction where it is doing business except where the failure to so qualify could not reasonably be expected to have a Material Adverse Effect, and, subject to the entry by the Bankruptcy Court of the Financing Orders, the execution, delivery and performance by the Debtor of the DIP Loan Documents (i) are within its respective authority, (ii) have been duly authorized, and (iii) do not conflict with or contravene its constitutive documents.  Subject to the entry by the Bankruptcy Court of the Financing Orders, the execution, delivery, performance of its obligations, and exercise of its rights under the DIP Loan Documents by the Debtor, including, without limitation, the making of the DIP Loans under this Agreement, (y) do not require any Consents that have not been obtained or notices to third parties that have not been provided except to the extent such failure would not result in a Material Adverse Effect and (z) are not and will not be in conflict with or be prohibited or prevented by (A) any Regulation,

21

(B) any corporate governance document, corporate minute or resolution of the Debtor or (C) any instrument, agreement or provision thereof, in each case binding on it or affecting any of its property.

(b)  Execution and Binding Effect.  Subject to the entry by the Bankruptcy Court of the Financing Orders, upon execution and delivery thereof, each DIP Loan Document shall constitute the legal, valid and binding obligation of the Debtor, enforceable in accordance with its terms.

(c)  Properties.

(i)  Debtor has good and marketable title to all real property owned or purported to be owned by it, in each case free of all Liens other than the Permitted Liens.

(ii)  Debtor enjoys, and will enjoy, peaceful and undisturbed possession of, or a lease or license to use, all property (subject only to the Permitted Liens) that is necessary for the conduct of its business.

(d)  Litigation.  Except for the Chapter 11 Case, there are no material legal or other proceedings or investigations pending or, to the Knowledge of the Debtor, threatened against the Debtor before any court, tribunal or regulatory authority which could, if adversely determined, alone or together, reasonably be expected to have a Material Adverse Effect.

(e)  Governmental Approvals and Filings.  Other than the Bankruptcy Court's entry of the Financing Orders and the filings and recordings contemplated by the DIP Collateral Documents, no approval, order, consent, authorization, certificate, license, permit or validation of, or exemption or other action by, or filing, recording or registration with, or notice to, any Governmental Body is or will be necessary in connection with the execution and delivery of this Agreement or any other DIP Loan Document, consummation by the Debtor of the transactions herein or therein contemplated, or performance of or compliance with the terms and conditions hereof or thereof.  The Debtor is not an "investment company" or a company "controlled" by an "investment company," with the meaning of the Investment Company Act of 1940, as amended.

(f)  Absence of Conflicts.  Subject to the Bankruptcy Court's entry of the Financing Orders, the execution and delivery by the Debtor of this Agreement and each other DIP Loan Document to which it is a party and performance by it hereunder and thereunder will not violate any law (including, without limitation, Regulations T, U and X of the Federal Reserve Board) and will not conflict with or result in a breach of any order, writ, injunction, resolution, decree or other similar document or instrument of any court or Governmental Body or its certificate of incorporation or by-laws or similar constituent documents or create (with or without the giving of notice or lapse of time, or both) a default under or breach of any material agreement, bond, note or indenture, in each case to which it is a party (by successor in interest or otherwise), or by which it is bound or any material portion of its properties or assets is affected, in each case, the effect of which could reasonably be expected to be, have or reflect in a Material Adverse Effect or, except under the DIP Collateral Documents, result in the imposition of any

Lien (other than Permitted Liens) of any nature whatsoever upon any of the properties or assets owned by or used in connection with the business of the Debtor.

(g)     DIP Collateral.  From and after the Interim Order Entry Date, the DIP Lender shall have first-priority perfected security interests and DIP Liens in and to all of the DIP Collateral, free and clear of any Liens other than the Permitted Liens, and entitled to priority under applicable law, with no financing statements, hypothecations, chattel mortgages, real estate mortgages or similar filings on record with respect to the Debtor or the DIP Collateral anywhere other than such filings in connection with this Agreement, the DIP Collateral Documents or the Permitted Liens.  Each of the representations and warranties made by the Debtor in each DIP Collateral Document to which it is a party is true and correct in all material respects as of each date made or deemed made.

(h)     Subsidiaries.  The Debtor does not own any Subsidiaries.

(i)     Material Misstatements and Omissions.  Any projections and pro forma financial information contained in or delivered pursuant to any DIP Loan Document (including the Budget and each Weekly Budget Report) or any other document, certificate or written statement furnished to the DIP Lender pursuant to any DIP Loan Document are based upon good faith estimates and assumptions believed by the Debtor to be reasonable at the time made.

(j)     Budgets.  All facts in the Budget and each Weekly Budget Report (when delivered) are accurate in all material respects and the Debtor has disclosed to the DIP Lender all material assumptions in the Budget and each Weekly Budget Report.  After giving effect to the DIP Loans projected to be made under the Budget, the Debtor believes, in good faith and in the exercise of its commercially reasonable judgment, that it has or will have sufficient capital and funds to pay and satisfy the expenses, obligations and liabilities of the Debtor as set forth, as and when provided to be paid or satisfied, in the Budget.

(k)     Labor Practices.  To the Knowledge of the Debtor, the Debtor is not engaged in any unfair labor practice that could reasonably be expected to have a Material Adverse Effect.

(l)     Employee Benefits.  Each of the Employee Benefit Plans intended to qualify under Section 401 of the Internal Revenue Code so qualifies, and nothing has occurred with respect to the operation of such plan which would cause the loss of such qualification or the imposition of any material liability, penalty or tax under ERISA or the Internal Revenue Code. All contributions and premiums required by law or by the terms of each Employee Benefit Plan have been timely made.  Neither Debtor nor its ERISA Affiliates bear any liability for any Pension Plan or Multiemployer Plan and have not had any liability under any Pension Plan or Multiemployer Plan for the last 6 years

(m)     Environmental Matters.

(i)     There are no Environmental Liabilities at any Relevant Property, which individually or in the aggregate, could reasonably be expected to have a Material Adverse Effect.

(ii)     The Debtor: (A) has operated its business in compliance with all applicable Environmental Laws; (B) has obtained all Environmental Permits required by applicable Environmental Laws for the ownership and operation of its properties, and all such Environmental Permits are in full force and effect or such Person has made all appropriate filings for issuance or renewal of such Environmental Permits; (C) to its Knowledge, is not aware of any acts, omissions, events or circumstances that may interfere with or prevent continued compliance with the Environmental Laws and Environmental Permits referred to in the preceding clauses (A) and (B); (D) has not received written notice of any asserted or threatened claim, action, suit, proceeding, hearing, investigation or request for information relating to any environmental matter; and (E) has not received notice from any Governmental Body that the Debtor is a potentially responsible party under any Environmental Law at any disposal site containing Hazardous Materials, nor has the Debtor received any notice that any lien under any Environmental Law against any property of the Debtor exists, except for matters in each case of (A) through (E) above, which individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(n)     <u>Insurance</u>.  The policies, binders or self-insurance programs for fire, liability, product liability, workmen's compensation, vehicular and other insurance currently held by or on behalf of the Debtor insure its material properties and business activities against such losses and risks as are reasonably believed to be adequate to protect its properties in accordance with customary industry practice.  As of the date hereof, all such policies, binders and self-insurance programs are in full force and effect.  As of the date hereof, the Debtor has not received notice from any insurer or agent of such insurer that substantial capital improvements or other expenditures are required.  As of the date hereof, the Debtor has not received notice of cancellation of any material insurance policy or binder.

(o)     <u>Absence of Events of Default and Material Adverse Effect</u>.  Since the Interim Order Entry Date, no Default or Event of Default has occurred.  Since the Interim Order Entry Date, no Material Adverse Effect has occurred.

(p)     <u>Compliance with Laws</u>.  Except as otherwise excused by the Bankruptcy Code, the Debtor has complied, and is in compliance in all respects, with all laws, except for such instances of non-compliance that, individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.

(q)     <u>Margin Regulations</u>.  No part of the proceeds of the DIP Loans issued hereunder will be used for the purpose of buying or carrying any Margin Stock or to extend credit to others for the purpose of buying or carrying any Margin Stock, in either case in a manner which would violate or conflict with Regulations T, U or X of the Board Governors of the Federal Reserve System.  The Debtor is not engaged in the business of extending credit to others for the purpose of buying or carrying Margin Stock.  Neither the making of the DIP Loans nor any use of proceeds of any such Loans will violate or conflict with the provisions of Regulations T, U or X of the Board of Governors of the Federal Reserve System, as amended from time to time.

(r)     Taxes.  The Debtor has filed all federal and other material Post-Petition Tax returns required to be filed by it and has not failed to pay any material Post-Petition Taxes, or interest and penalties relating thereto, except for Post-Petition Taxes not yet due and except for those the amount or validity of which is currently being contested in good faith by appropriate proceedings diligently pursued and available to the Debtor and with respect to which adequate reserves have been set aside on its books in accordance with GAAP.

ARTICLE V
AFFIRMATIVE COVENANTS

Section 5.1     Affirmative Covenants.  The Debtor covenants and agrees that until payment in full of all DIP Obligations (other than indemnification obligations for which no claim has been made as of the applicable date of determination), the Debtor shall perform all the covenants in this Article V applicable to it:

(a)     Basic Reporting Requirements.  The Debtor shall furnish to the DIP Lender:

(i)     no later than 12:00 p.m. (prevailing Central time) on Thursday of each week or if such Thursday is not a business day, then the immediate succeeding business day, the Weekly Budget Report;

(ii)     at any time and from time to time that the Debtor receives any material written notice from any Governmental Body, the Debtor shall promptly provide a copy of such notice to the DIP Lender, and the Debtor shall provide to the DIP Lender copies of all material reports, certificates and notices that the Debtor may provide to any Governmental Body;

(iii)     a monthly reporting package, no later than 30 days after the end of each calendar month, including cash flow, income statement and balance sheet for such month, accounts payable and receivable reports with aging information; and

(iv)     as promptly as reasonably practicable from time to time following the DIP Lender's reasonable request therefor, such other information (including historical information) regarding the operations, business affairs and financial condition of the Debtor, the progress of the Chapter 11 Case or compliance with the terms of any DIP Loan Document.

(b)     Verification.  The Debtor shall keep true and accurate (in all material respects) books of account in accordance with past practices and shall permit the DIP Lender, or any of its designated representatives, upon reasonable notice and at the expense of the Debtor, during normal business hours to examine the books of account of the Debtor (and to make copies and/or extracts therefrom) and to discuss the affairs, finances and accounts of the Debtor with, and to be advised as to the same by, the managers, executives and officers of the Debtor and to be advised as to such or other business records upon the reasonable request of the DIP Lender. Management, advisors, consultants and senior personnel of the Debtor shall be available upon reasonable advance notice from the DIP Lender (or its agents or representatives) for meetings

with the DIP Lender and its agents or representatives during normal business hours with reasonable prior notice and at such reasonable locations.

(c)     Existence; Maintenance of Properties; Compliance with Regulations.  The Debtor shall maintain its corporate/legal existence and business, maintain its assets in good operating conditions and repair (subject to ordinary wear and tear and casualty damage and to all provisions of this Agreement permitting sales of certain of the Debtor's assets), keep its business and assets insured in accordance herewith, maintain its chief executive office in the United States, continue to engage in the same or substantially similar lines of business as of the Petition Date, and comply in all respects with all Regulations, including without limitation, ERISA and Environmental Laws, except where a failure to do so could not individually or in the aggregate reasonably be expected to have a Material Adverse Effect.

(d)     Notice of Material Events.  The Debtor shall notify the DIP Lender promptly in writing upon an Authorized Officer becoming aware of any of the following: (i) the occurrence of any Default or Event of Default, (ii) any noncompliance with any Environmental Law or proceeding in respect thereof which could reasonably be expected to have a Material Adverse Effect, (iii) any change of chief executive office address of the Debtor, (iv) any pending or, to the Knowledge of the Debtor, threatened litigation or similar proceeding affecting the Debtor involving claims in excess of $100,000 in the aggregate or any material change in any such litigation or proceeding previously reported, (v) claims in excess of $100,000 in the aggregate against any assets or properties of the Debtor encumbered in favor of the DIP Lender, and (vi) any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

(e)     Further Assurances.

(i)     The Debtor shall cooperate with the DIP Lender, take such action, execute such documents, and provide such information as the DIP Lender may from time to time reasonably request in order to effect the transactions contemplated by and the purposes and intent of the DIP Loan Documents.

(ii)     The Debtor shall promptly, upon request by the DIP Lender, correct, and cause each of the other parties to the DIP Loan Documents to promptly correct, any defect or error that may be discovered in any DIP Loan Document or in the execution, acknowledgment or recordation of the DIP Loan Document.  Promptly upon request by the DIP Lender, the Debtor shall execute, authorize, acknowledge, deliver, record, file and register, any and all such further acts, deeds, conveyances, documents, security agreements, pledge agreements, mortgages, deeds of trust, trust deeds, assignments, financing statements and continuations, notices of assignment, transfers, certificates, assurances and other instruments as the DIP Lender may require from time to time in order to carry out more effectively the purposes and intent of each DIP Loan Document.  Without limiting the foregoing, the Debtor shall (A) authorize the filing by the DIP Lender of UCC-1 financing statements for all jurisdictions deemed necessary or desirable by the DIP Lender, and (B) take such action from time to time (including, without limitation, authorizing, filing, executing and/or delivering such assignments,

security agreements and other instruments) as shall be reasonably requested by the DIP Lender to create, in favor of the DIP Lender, to the extent required under the respective DIP Collateral Documents and to the maximum extent permitted under applicable law, a first-priority perfected Lien in all of the DIP Collateral, subject only to Permitted Liens.

(f)     Controlled Account Agreements.

(i)     The Debtor shall use its commercially reasonable efforts to enter into an account control agreement in form and substance acceptable to the DIP Lender (each, a "Controlled Account Agreement") as necessary to provide the DIP Lender, to the extent not prohibited by applicable law, with "control" over, except as set forth below, each Deposit Account of the Debtor (each, a "Controlled Account") as provided for under Section 9-104 of Article 9 of the UCC (or other applicable law) for the purpose of perfecting the security interest which the DIP Lender has in such Deposit Account pursuant to the DIP Collateral Documents.  The Debtor further agrees to promptly enter into Controlled Account Agreements for any new Deposit Accounts opened during the DIP Commitment Period, which new Deposit Accounts shall only be opened following notice to, and written consent from, the DIP Lender.  No arrangement contemplated hereby or by any Controlled Account Agreement in respect of any such Deposit Account of the Debtor, shall be modified by the Debtor without the prior written consent of the DIP Lender. Deposit Accounts excluded from the requirements of this section are as follows:

| Bank Name | Last Four Digits of Account # | Description |
|---|---|---|
| Bank of America, N.A. | xxx0610 | Utility Adequate Assurance Account |
| Bank of America, N.A. | xxx7564 | Scholarship Account |
| Bank of America, N.A. | xxx6160 | Operating Account |
| Bank of America, N.A. | xxx3732 | Capital Expenditure Account |
| Bank of America, N.A. | xxx4705 | Community/Collateral Account (Credit Card) |
| UMB Bank, N.A. | xxx933.3 | |
| UMB Bank, N.A. | xxx933.1 | |
| UMB Bank, N.A. | xxx933.2 | |
| UMB Bank, N.A. | xxx935.3 | |
| UMB Bank, N.A. | xxx935.1 | |
| UMB Bank, N.A. | xxx935.2 | |
| UMB Bank, N.A. | xxx939.3 | Trustee Restricted Accounts |
| UMB Bank, N.A. | xxx939.4 | |
| UMB Bank, N.A. | xxx939.6 | |
| UMB Bank, N.A. | xxx939.5 | |
| UMB Bank, N.A. | xxx939.12 | |
| UMB Bank, N.A. | xxx939.1 | |
| UMB Bank, N.A. | xxx939.2 | |

| UMB Bank, N.A. | xxx939.8 | |
|---|---|---|
| UMB Bank, N.A. | xxx939.10 | |
| UMB Bank, N.A. | xxx939.13 | |
| UMB Bank, N.A. | xxx939.7 | |
| Regions Bank | xxx0407 | Escrow Account (Reservation Deposits) |
| Regions Bank | Pending | Escrow Account (Entrance Fee) |

(ii)     Upon the occurrence and during the continuance of an Event of Default, any disbursements of proceeds in any Controlled Account will only be made at the direction of the DIP Lender; prior to the occurrence of an Event of Default, the Debtor will have access to any funds on deposit in the Controlled Accounts for use solely in accordance with this Agreement and the other DIP Loan Documents.  The DIP Lender assumes no responsibility for the Controlled Accounts, including, without limitation, any claim of accord and satisfaction or release with respect to deposits which any banks accept thereunder.  Upon the occurrence and during the continuance of an Event of Default, all remittances which the Debtor receives in payment of any Accounts, and the proceeds of any other DIP Collateral, shall be (A) kept separate and apart from the Debtor's own funds so that they are capable of identification as the DIP Lender's property; (B) held by the Debtor as trustee of an express trust for the DIP Lender's benefit; and (C) immediately deposited in such accounts designated by the DIP Lender.  Upon the occurrence and during the continuance of an Event of Default, all proceeds received or collected by the DIP Lender with respect to the Controlled Accounts, and reserves and other property of the Debtor in possession of the DIP Lender at any time or times hereafter, may be held by the DIP Lender, as the case may be, without interest to the Debtor until all DIP Obligations are paid in full or applied by the DIP Lender on account of the DIP Obligations.  The DIP Lender may release to the Debtor such portions of such reserves and proceeds as the DIP Lender may determine.  The DIP lender shall not have any duty to protect, insure, collect or realize upon the Controlled Accounts or to preserve rights in them.

(g)     Insurance.  The Debtor shall maintain, at its expense, and keep in effect with responsible insurance companies, such liability insurance for bodily injury and third-party property damage as is customary in the case of companies engaged in the same or similar business or having similar properties, similarly situated.  The Debtor shall keep and maintain, at its expense, its material real and personal property insured against loss or damage by fire, theft, explosion, spoilage and all other risks ordinarily insured against by other owners or users of such properties in similar businesses in an amount equal to the full replacement or cash value thereof, subject to deductible amounts which the Debtor, in its reasonable judgment, deems prudent.

(h)     Information Regarding DIP Collateral.  The Debtor will furnish to the DIP Lender prompt written notice of any change in (i) any the Debtor's corporate name or any trade name used to identify it in the conduct of its business or the Debtor's chief executive office, its principal place of business or its jurisdiction of organization or (ii) the Debtor's federal Taxpayer

Identification Number.  The Debtor will not affect or permit any change referred to in the preceding sentence unless arrangements satisfactory to the DIP Lender have been made to ensure that all filings will be (or have been) made under the UCC and all other actions have been taken that are required so that such change will not at any time adversely affect the validity, perfection or priority of any Lien established under any DIP Loan Document on the DIP Collateral.

(i)     Existence; Conduct of Business.  The Debtor will do or cause to be done all things reasonably necessary to preserve, renew and keep in full force and effect its legal existence and the rights, licenses, permits (including, without limitation, Environmental Permits) privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, except to the extent that failure to so act, which either individually or in the aggregate, could not reasonably be expected to have a Material Adverse Effect.  The Debtor shall maintain its credit and risk policies substantially as in effect on the Petition Date.

(j)     Payment of Obligations.  Proceeds of the DIP Loans shall be used solely as provided in Section 2.3

(k)     Compliance with Laws.  Except as otherwise excused by the Bankruptcy Code, the Debtor will comply with all laws (including, without limitation, all Environmental Laws), rules, licenses, permits, Regulations and orders of any Governmental Body applicable to it or its property, except where failures to do so, in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

(l)     Subsidiaries.  Without limitation of the prohibition against forming Subsidiaries under Section 6.1(f) or waiving any Event of Default arising therefrom, if any Subsidiary is nonetheless formed or acquired by the Debtor after the Closing Date, the Debtor will, prior to the date upon which such Subsidiary is formed or acquired, notify the DIP Lender thereof and promptly following such formation or acquisition, cause any equity interest in, assets owned or leased by, or Indebtedness owned by or on behalf, of such Subsidiary to be added to the DIP Collateral.  The DIP Lender may require that any such Subsidiary be joined to this Agreement or the DIP Collateral Documents as a borrower or debtor hereunder or thereunder pursuant to joinder agreements in form and substance reasonably satisfactory to the DIP Lender.

(m)     Restructuring.  The Debtor shall, in good faith, continue to pursue the Restructuring and take all commercially reasonable steps to obtain approvals for the Restructuring as expeditiously as is reasonably practicable under applicable law.  Any agreements, arrangements, pleadings or other documents relating to a Restructuring which Debtor shall enter into must be acceptable to the DIP Lender.

(n)     Bankruptcy Milestones.  The Debtor shall comply with the Bankruptcy Milestones.

ARTICLE VI
NEGATIVE COVENANTS/BUDGET COMPLIANCE

Section 6.1     Negative Covenants.  The Debtor covenants and agrees that until all of the DIP Obligations (other than indemnification obligations for which no claim has been made as of

the applicable date of determination) have been paid or satisfied in full, the Debtor shall perform all covenants in this Section 6.1 applicable to it:

      (a)   <u>Indebtedness</u>.  The Debtor shall not incur, create, assume, become or be liable in any manner with respect to, or permit to exist, any Indebtedness, or guarantee, assume, endorse, or otherwise become responsible for (directly or indirectly), any Indebtedness, performance, obligations or dividends of any other Person, except:

      (i)   the DIP Obligations;

      (ii)   the Prepetition Bond Indebtedness; and

      (iii)   Indebtedness, including post-petition administrative expenses, incurred in the ordinary course of the Debtor's operations and in compliance with the Budget; provided that such Indebtedness remains at all times unsecured except as provided in Section 6.1(b).

      (b)   <u>Liens</u>.  The Debtor shall not create or incur any Liens on any of the property or assets of the Debtor, except (the Liens described in the following clauses, the "<u>Permitted Liens</u>"):

      (i)   the Liens of the DIP Lender securing the DIP Obligations;

      (ii)   Liens of the Prepetition Secured Parties securing the Prepetition Bond Indebtedness, including the Liens granted pursuant to the Financing Orders and other Liens existing on the date hereof;

      (iii)   Liens securing the payment of taxes, assessments or other governmental charges or levies either not yet overdue or the validity of which are being contested in good faith by appropriate proceedings diligently pursued and available to the Debtor and with respect to which adequate reserves have been set aside on its books;

      (iv)   non-consensual statutory Liens (other than Liens securing the payment of taxes) arising in the ordinary course of the Debtor's business to the extent:  (A) such Liens secure Indebtedness which is not overdue or (B) such Liens secure Indebtedness relating to claims or liabilities which are fully insured and being defended at the sole cost and expense and at the sole risk of the insurer or being contested in good faith by appropriate proceedings diligently pursued by the Debtor, in each case prior to the commencement of foreclosure or other similar proceedings and with respect to which adequate reserves have been set aside on its books;

      (v)   zoning and land use restrictions, easements, encumbrances, licenses, covenants and other restrictions affecting the use of real property which do not interfere in any material respect with the use of such real property or ordinary conduct of the business of the Debtor as presently conducted thereon or materially impair the value of the real property which may be subject thereto;

(vi)     purchase money security interests in Equipment (including Capital Leases) to secure Indebtedness permitted under Section 6.1(a)(ii) hereof;

(vii)    pledges and deposits of cash by the Debtor after the date hereof in the ordinary course of business in connection with workers' compensation, unemployment insurance and other types of social security benefits consistent with the current practices of the Debtor as of the date hereof;

(viii)   pledges and deposits of cash by the Debtor after the date hereof to secure the performance of tenders, bids, leases, trade contracts (other than for the repayment of Indebtedness), statutory obligations and other similar obligations in each case in the ordinary course of business consistent with the current practices of the Debtor as of the date hereof; provided, that, in connection with any performance bonds issued by a surety or other person, the issuer of such bond shall have waived in writing any rights in or to, or other interest in, any of the DIP Collateral in an agreement, in form and substance satisfactory to the DIP Lender;

(ix)     Liens arising from (A) operating leases and the precautionary UCC financing statement filings in respect thereof and (B) Equipment or other materials which are not owned by the Debtor located on the premises of the Debtor (but not in connection with, or as part of, the financing thereof) from time to time in the ordinary course of business and consistent with current practices of the Debtor and the precautionary UCC financing statement filings in respect thereof; and

(x)      judgments and other similar Liens arising in connection with court proceedings that do not constitute an Event of Default; provided, that, (A) the enforcement of such judgments and Liens remain at all times subject to the automatic stay provisions of the Bankruptcy Code, (B) except as otherwise consented to in writing by the DIP Lender, such Liens are being contested in good faith and by appropriate proceedings diligently pursued by the Debtor, as the case may be, and (C) adequate reserves or other appropriate provision, if any, as are required by GAAP have been made therefor.

(c)     Investments.  The Debtor shall not make any Investments other than Investments in: (i) marketable obligations of the United States maturing within one (1) year; (ii) certificates of deposit, bankers' acceptances and time and demand deposits of United States banks having total assets in excess of $1,000,000,000 or other similar cash equivalents; and (iii) existing Investments on the Closing Date shown on the Budget or financial statements (each of (i) through (iii) above, a "Permitted Investment").

(d)     Mergers; Asset Sales.  Other than any disposals of obsolete, worn out or surplus property and the license or sublicense of intellectual property, the Debtor shall not, without the written consent of the DIP Lender, (i) consummate a merger, amalgamation or consolidation, (ii) enter into any Asset Sale or otherwise effect the disposition of any assets, (iii) purchase, sell, lease or otherwise dispose of assets other than inventory in the ordinary course, (iv) make any changes in the corporate structure or identity of the Debtor which could

31

reasonably be expected to have a Material Adverse Effect or (v) enter into any binding agreement to do any of the foregoing.

(e)   Restricted Payments.  The Debtor shall not directly or indirectly, declare, order, pay, make or set apart any sum for any Indebtedness other than the DIP Loans or the Prepetition Bond Indebtedness or any other payments permitted by the Bankruptcy Court subject to the Budget.

(f)   Subsidiaries.  The Debtor shall not form, or cause to be formed, any Subsidiary without the written consent of the DIP Lender.

(g)   Chapter 11 Claims.  Except as provided in the Financing Orders, the Debtor will not incur, create, assume, suffer to exist or permit any other superpriority expense claim under section 364 of the Bankruptcy Code or any or Lien which is senior to or *pari passu* with, the Liens securing the DIP Obligations.

Section 6.2   Budget Compliance.  The Debtor shall comply with the Budget (subject to the permitted variances provided in the next immediate sentence), and shall not make any payments, or incur any obligations or liabilities, that are not projected and provided for in the Budget.  As of the last day of each Measuring Period (as defined in the Financing Orders), (a) aggregate disbursements during such period shall not exceed 110% of the total budgeted disbursement for such period; (b) any single disbursement line item shall not exceed 115% of the such budgeted line item for such period; (c) total receipts shall not be less than 90% of such budgeted receipts for any particular staggered month, with such staggered month being measured from the 6th Business Day of a particular month to the 5th Business Day of the following month, and (d) expenditures for estate professional fees shall not exceed 100% of the amount allocated for such expenditures in the Budget for such period (both in the aggregate and with respect to each professional's respective line on the Budget).  Subject to the prior consent of the DIP Lender, the Variance shall exclude emergency repairs involving manifest danger to the life or safety of the Residents or immediately necessary for the preservation or safety of the Community. Each "Variance" shall be measured on a rolling four week basis, other than as set forth in (c) of this Section, and may include weeks prior to the Petition Date.

ARTICLE VII
INCREASED COSTS; TAXES; SET OFF; ETC.

Section 7.1   Taxes; Withholding, Etc.

(a)   Payments to be Free and Clear.  Except as otherwise required under this Section 7.1, all sums payable by the Debtor hereunder and under the other DIP Loan Documents shall (except to the extent required by law) be paid free and clear of, and without any deduction or withholding on account of, any Tax (other than an Excluded Tax) imposed, levied, collected, withheld or assessed by or within the United States of America or any political subdivision in or of the United States of America or any other jurisdiction from or to which a payment is made by or on behalf of the Debtor or by any federation or organization of which the United States of America or any such jurisdiction is a member at the time of payment.

(b)     <u>Withholding of Taxes</u>.  If the Debtor is required by law to make any deduction or withholding on account of any such Tax from any sum paid or payable by the Debtor to the DIP Lender in the ordinary or general conduct of business: (i) the Debtor shall notify the DIP Lender of any such requirement or any change in any such requirement as soon as the Debtor becomes aware of it, (ii) the Debtor shall pay any such Tax before the date on which penalties attach thereto, such payment to be made (if the liability to pay is imposed on Debtor) for its own account or (if that liability is imposed on the DIP Lender) on behalf of and in the name of the DIP Lender, (iii) if such Tax is an Indemnified Tax, the sum payable by the Debtor in respect of which the relevant deduction, withholding or payment is required shall be increased to the extent necessary to ensure that, after the making of that deduction, withholding or payment, the DIP Lender, as the case may be, receives an amount equal to what it would have received had no such deduction, withholding or payment been required or made, and (iv) within 30 days after paying any sum from which it is required by law to make any deduction or withholding, and within 30 days after the due date of payment of any Tax which it is required by clause (ii) above to pay, the Debtor shall deliver to the DIP Lender evidence satisfactory to the other affected parties of such deduction, withholding or payment and of the remittance thereof to the relevant taxing or other authority.

(c)     <u>Taxpayer Identification</u>.  Upon the reasonable request of the Debtor, the DIP Lender shall deliver to the Debtor two (2) properly completed and duly executed copies of United States Internal Revenue Service Form W-9 (certifying that the DIP Lender is entitled to an exemption from U.S. backup withholding tax) or any successor form on or before the date the DIP Lender becomes a party hereto.  Upon the reasonable request of the Debtor, the DIP Lender also agrees to deliver to the Debtor two (2) further copies of said Form W-9, properly completed and duly executed, on or before the date that any such form expires or becomes obsolete or after the occurrence of any event requiring a change in the most recent form previously delivered by it to the Debtor, and such extensions or renewals thereof as may reasonably be requested by the Debtor, unless in any such case an event (including, without limitation, any change in treaty, law or regulation) has occurred prior to the date on which any such delivery would otherwise be required that renders all such forms inapplicable or that would prevent the DIP Lender from duly completing and delivering any such form with respect to it and the DIP Lender so advises the Debtor.

Section 7.2     <u>Right of Set Off</u>.  In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, upon the occurrence and during the continuance of any Event of Default, the DIP Lender is hereby authorized by the Debtor at any time or from time to time, without notice to the Debtor or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and to apply any and all deposits (general or special, including Indebtedness evidenced by certificates of deposit, whether matured or unmatured, but not including trust accounts) and any other Indebtedness at any time held or owing by the DIP Lender to or for the credit or the account of the Debtor against and on account of the DIP Obligations of the Debtor to the DIP Lender hereunder, irrespective of whether or not (a) the DIP Lender shall have made any demand hereunder or (b) the principal of or the interest on the DIP Loans or any other amounts due hereunder or the other DIP Loan Documents shall have become due and payable and although such obligations and liabilities, or any of them, may be contingent or unmatured; provided that the DIP Lender shall notify the Debtor promptly upon the exercise of any set-off and the appropriation and application made by

33

the DIP Lender, but the failure to give such notice shall not affect the validity of such set-off and application.

ARTICLE VIII
EVENTS OF DEFAULT

Section 8.1    Events of Default.  Any one or more of the following events which shall occur and be continuing shall constitute an "Event of Default":

(a)    Failure to Make Payments When Due. Failure by the Debtor to pay any of the DIP Obligations, including failure by the Debtor to pay when due principal of, or interest on, the DIP Loans, whether at stated maturity, by acceleration, by mandatory prepayment or otherwise, or any other amount due hereunder and set forth in the Budget, and such failure continues for five (5) days (except that there shall be no grace period in respect of principal or other DIP Obligations due on the Maturity Date);

(b)    Breach of Certain Covenants.  Failure of the Debtor to perform or comply with any material term or condition contained in Section 2.3, Article V or Article VI, including, without limitation, failure to meet or comply with the terms of the Budget (including permitted variances) or to timely achieve the Bankruptcy Milestones, and such default shall not have been remedied by the Debtor or waived by the DIP Lender within seven (7) days after the earlier of (i) the date upon which an Authorized Officer of the Debtor had Knowledge of such default and (ii) the date upon which notice thereof is given to the Debtor by the DIP Lender;

(c)    Breach of Representations, Etc.  Any representation, warranty, certification or other written statement made or deemed made by the Debtor in any DIP Loan Document or in any statement or certificate at any time given by the Debtor in writing, pursuant hereto or thereto or in connection herewith or therewith shall be false in any material respect as of the date made or deemed made;

(d)    Other Defaults Under DIP Loan Documents.  The Debtor shall default in the performance of or compliance with any term contained in any of the DIP Loan Documents, other than any such term referred to in any other section of this Section 8.1, and such default shall not have been remedied or waived within fifteen (15) days after the earlier of (i) the date upon which an Authorized Officer of the Debtor had Knowledge of such default and (ii) the date upon which notice thereof is given to the Debtor by the DIP Lender;

(e)    Conversion or Dismissal of Case.  (i) The entry of an order dismissing the Chapter 11 Case which does not contain a provision for termination of this Agreement, and payment in full in cash of all Obligations upon entry of such order dismissing the Chapter 11 Case (other than contingent indemnification obligations for which no claim has been made)  or converting the Chapter 11 Case to a case under chapter 7 of the Bankruptcy Code, or the Debtor files a motion or other pleading seeking entry of such an order or supports or fails to timely oppose such dismissal or conversion; or (ii) the entry of an order whereby a trustee, responsible officer or an examiner having expanded powers under Bankruptcy Code Section 1104 (other than (x) a fee examiner or (y) for purposes of an investigation pursuant to Sections 1106(a)(3) and (4) of the Bankruptcy Code) is appointed or elected in the Chapter 11 Case, or the Debtor

34

applies for, consents to, supports, acquiesces in or fails to promptly oppose, any such appointment, or the Bankruptcy Court shall have entered an order providing for such appointment, in the case of each of clauses (i) and (ii), without the prior written consent of the DIP Lender in its sole discretion;

(f)  <u>Challenges</u>.  Debtor takes any action to, or fails to take all reasonable actions necessary to oppose any action by any other Person (including, but not limited to, (a) challenging the standing of such party to bring any such action, (b) filing pleadings, providing evidentiary support, and appearing in court to support and present the same in opposition of such party's action, and (c) timely prosecuting all available appeals of any order or decision authorizing such party's actions or approving relief granted to such party or timely opposing all appeals (or attempts to appeal) decisions denying standing or relief to such party), in each case, except as expressly permitted hereunder and in the Financing Orders, (i) impair any of the material rights and remedies of the DIP Lender under the DIP Loan Documents, (ii) avoid, subordinate, disallow, or require disgorgement by the DIP Lender of any amount received in respect of the DIP Obligations or (iii) challenge the rights or claims of the Prepetition Secured Parties;

(g)  <u>DIP Loan Documents Impaired</u>.  At any time after the execution and delivery thereof, (i) this Agreement or any DIP Loan Document ceases to be in full force and effect (other than by reason of a release of DIP Collateral in accordance with the terms hereof or thereof or the satisfaction in full of the DIP Obligations in accordance with the terms hereof) or shall be declared null and void, or the DIP Lender shall not have or shall cease to have a valid and perfected first priority Lien, subject only to Permitted Liens, in any material portion of DIP Collateral purported to be covered by the DIP Collateral Documents or (ii) the Debtor shall contest the validity or enforceability of any DIP Loan Document in writing or deny in writing that it has any further liability under any DIP Loan Document to which it is a party;

(h)  <u>Liens</u>.  At any time after the execution and delivery thereof, the Liens created by the DIP Collateral Documents shall not constitute a valid and perfected first priority Lien on the DIP Collateral intended to be covered thereby (to the extent perfection by filing, registration, recordation or possession is required herein or therein) in favor of the DIP Lender, free and clear of all other Liens (other than Permitted Liens), or, except for expiration in accordance with its terms, any of the DIP Collateral Documents shall for whatever reason be terminated or cease to be in full force and effect, or the enforceability thereof shall be contested by the Debtor;

(i)  <u>Condemnation or Forfeiture of DIP Collateral</u>.  Any judicial process, condemnation or forfeiture proceedings is brought against any material item or material portion of the DIP Collateral or any rights therein shall be subject to such judicial process, condemnation or forfeiture proceedings, in each case which is not stayed in the Bankruptcy Case by the Bankruptcy Code;

(j)  <u>Trustee</u>.  A trustee, receiver, interim receiver, examiner, or responsible officer (other than the Debtor's current chief restructuring officer) with enlarged powers relating to the operation of the business of the Debtor (powers beyond those set forth in sections 1106(a)(3) and (a)(4) of the Bankruptcy Code), shall be appointed in the Chapter 11 Case;

(k) <u>Prepetition Payments</u>. The Debtor makes any Prepetition Payment which is not permitted under the Budget;

(l) <u>Government Restraint</u>. Any Governmental Body, by a final, non-appealable order, ruling or other action, shall prevent the Debtor from conducting any material part of the Debtor's business, to the extent such prevention could reasonably be expected to result in a Material Adverse Effect;

(m) <u>Operating Licenses</u>. The loss, revocation, or termination of any license, permit, lease or agreement necessary or material to the Debtor's business, or the cessation of any material part of the Debtor's business, to the extent such loss, revocation, or termination could reasonably be expected to result in a Material Adverse Effect;

(n) <u>Relief from Automatic Stay</u>. The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor or party in interest (i) to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any material assets of the Debtor, or (ii) to permit other actions that the DIP Lender may, in its sole discretion, deem to have a Material Adverse Effect;

(o) <u>Financing Orders</u>. The Debtor shall fail to comply with, or there is otherwise any material breach or default of, the Financing Orders or any other order of the Bankruptcy Court or any order shall be entered reversing, amending, supplementing, staying for a period in excess of five (5) Business Days, vacating or otherwise modifying in any material respect the Financing Orders without the prior written consent of the DIP Lender;

(p) <u>Judgments</u>. Any uninsured judgments as to any Post-Petition obligation shall be rendered against the Debtor and the enforcement thereof shall not be stayed (by operation of law, the rules or orders of a court with jurisdiction over the matter or by consent of the party litigants), or there shall be rendered against the Debtor a nonmonetary judgment with respect to a Post-Petition event, in each case which causes or would reasonably be expected to cause a Material Adverse Effect;

(q) <u>Material Impairment</u>. The filing of a motion, pleading or proceeding by the Debtor which could reasonably be expected to result in a material impairment of the rights or interests of the DIP Lender under the DIP Loan Documents or the Financing Orders or a determination by a court with respect to a motion, pleading or proceeding brought by another party which results in such a material impairment; or

Section 8.2 <u>Remedies</u>. Subject to the Financing Orders, upon the occurrence of an Event of Default then: (i), the DIP Lender may, by written notice to the Debtor (with a copy to counsel for the Committee and to the United States Trustee), take any or all of the following actions, at the same or different times, in each case without further order of or application to the Bankruptcy Court (provided, that with respect to the enforcement of DIP Liens or other remedies with respect to the DIP Collateral under clause (iii) below, the DIP Lender shall provide the Debtor (with a copy to counsel for the Committee and to the United States Trustee) with five (5) Business Days' written notice prior to taking the action contemplated thereby; in any hearing after the giving of the aforementioned notice, the only issue that may be raised by any party in opposition thereto

36

being whether, in fact, an Event of Default has occurred and is continuing):  (a) declare the DIP Loan Commitment terminated, whereupon the DIP Loan Commitments of the DIP Lender shall forthwith terminate immediately; (b) declare and otherwise accelerate the principal of and any accrued interest in respect of all DIP Loans and any promissory notes evidencing such DIP Loans and all other DIP Obligations owing with respect thereto hereunder and thereunder to be, whereupon the same shall become, forthwith immediately due and payable without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Debtor; and (c) enforce all of the DIP Liens and security interests created pursuant to the DIP Collateral Documents securing DIP Obligations owing to the DIP Lender in accordance with applicable Regulations and (ii) in addition to the foregoing, upon the occurrence of an Event of Default, the DIP Lender may, (x) exercise any right of counterclaim, setoff, banker's lien or otherwise which it may have with respect to money or property of the Debtor, (y) bring any lawsuit, action or other proceeding permitted by law for the specific performance of, or injunction against any violation of, any DIP Loan Document and may exercise any power granted under or to recover judgment under any DIP Loan Document, and (iii) exercise any other right or remedy permitted by applicable Regulations or otherwise available to the DIP Lender at law, in equity or otherwise.

Section 8.3    <u>Remedies Cumulative</u>.  No remedy herein conferred upon the DIP Lender is intended to be exclusive of any other remedy and each and every remedy shall be cumulative and shall be in addition to every other remedy given hereunder or now or hereafter existing at law or in equity or by statute or any other provision of law.

Section 8.4    <u>Application of Proceeds</u>.  The DIP Lender shall apply any proceeds from pursuit of any remedy first to costs and expenses provided for herein, then to interest on the DIP Loans which is due and outstanding and then to principal on the DIP Loans which is due and outstanding.

ARTICLE IX<br/>MISCELLANEOUS

Section 9.1    <u>Amendments and Waivers; Release of DIP Collateral</u>.

(a)    <u>General Amendments and Waivers</u>.  No amendment, modification, termination (other than pursuant to the express terms of the DIP Loan Documents) or waiver of any provision of the DIP Loan Documents, or consent to any departure by the Debtor therefrom, shall be effective without the written consent of the DIP Lender and the Debtor.

(b)    <u>Effect of Notices, Waivers or Consents</u>.  Any waiver or consent shall be effective only in the specific instance and for the specific purpose for which it was given.  No notice to or demand on Debtor in any case shall entitle Debtor to any other or further notice (except as otherwise specifically required hereunder or under any of the DIP Loan Documents) or demand in similar or other circumstances.  Any amendment, modification, termination, waiver or consent effected in accordance with this Section 9.1 shall be binding upon the DIP Lender and the Debtor, if signed by the Debtor and DIP Lender.

Section 9.2    <u>Notices</u>.  All notices, requests, demands and other communications to any party or given under any DIP Loan Document (collectively, the "<u>Notices</u>") will be in writing and

37

delivered personally, by overnight courier or by registered mail to the parties at the following address or sent by electronic transmission (with confirmation of transmission), to the address specified below (or at such other address as will be specified by a party by like notice given at least five calendar days prior thereto):

      (a)     If to the Debtor, at:

          BUCKINGHAM SENIOR LIVING COMMUNITY, INC.
          Attn: Chairman
          8580 Woodway Drive
          Houston, TX 77063
          Email: mwyse@wyseadvisorsllc.com

with a copy sent contemporaneously by email to (which shall not constitute notice):

          McGUIREWOODS LLP
          Attn: Demetra Liggins
          JPMorgan Chase Tower
          600 Travis Street, Suite 7500
          Houston, TX 77002-2906
          Email: dliggins@mcguirewoods.com

      (b)     If to the DIP Lender, at:

          UMB BANK, N.A.
          Corporate Trust Services
          Attn: Virginia Housum
          120 Sixth Street South, Suite 1400
          Minneapolis, MN 55402
          Email: virginia.housum@umb.com

with a copy sent contemporaneously by email to (which shall not constitute notice):

          MINTZ, LEVIN, COHN, FERRIS, GLOVSKY AND
          POPEO, P.C.
          Attn: Daniel S. Bleck
          One Financial Center
          Boston, MA 02111
          Email: dsbleck@mintz.com

All Notices will be deemed delivered when actually received. Each of the parties will hereafter notify the other in accordance with this Section of any change of address or email address to which notice is required to be mailed.

     Section 9.3     <u>Expenses</u>. Whether or not the transactions contemplated hereby shall be consummated or any DIP Loans shall be made, the Debtor agrees to pay promptly, subject to the Financing Orders (but no later than the Maturity Date), upon written demand from the DIP

Lender (together with summary backup documentation supporting such reimbursement request) and without the requirement for Bankruptcy Court approval in the event the transactions contemplated hereby are consummated:

(i)     all the reasonable, out-of-pocket costs and expenses of preparation of the DIP Loan Documents and any consents, amendments, waivers or other modifications thereto; the reasonable fees, expenses and disbursements of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., as counsel to the DIP Lender, in connection with the negotiation, preparation, execution and administration of the DIP Loan Documents and any consents, amendments, supplements, waivers or other modifications thereto;

(ii)     all the reasonable, out of pocket costs and expenses of creating and perfecting Liens in favor of the DIP Lender pursuant hereto, including, without limitation, filing and recording fees, expenses, stamp or documentary taxes, search fees, title insurance premiums and reasonable fees, expenses and disbursements of Mintz, Levin, Cohn, Ferris, Glovsky and Popeo, P.C., as counsel to the DIP Lender, and any other counsel of the DIP Lender in any other jurisdiction;

(iii)     upon the occurrence and during the continuance of an Event of Default or as otherwise incurred in connection with visits and inspections permitted by Section 5.1(b) (the expenses for which are required to be paid by the Debtor pursuant to such Section), all the actual costs and reasonable fees, expenses and disbursements of any auditors, accountants, consultants or appraisers incurred in connection with the preservation and protection of the DIP Lender's rights under this Agreement and the other DIP Loan Documents;

(iv)     all the actual costs and reasonable expenses, including, without limitation, upon the occurrence and during the continuance of an Event of Default or as otherwise incurred in connection with visits and inspections permitted by Section 5.1(b), the expenses for which are required to be paid by the Debtor pursuant to such Section, the reasonable fees, expenses and disbursements of any appraisers, consultants, advisors and agents employed or retained by the DIP Lender and its counsel in connection with the inspection, verification, custody or preservation of any of the DIP Collateral, to the extent required or permitted hereunder;

(v)     after the occurrence and during the continuance of a Default or an Event of Default, all out-of-pocket costs and expenses, including, without limitation, reasonable attorneys' fees and out-of-pocket costs of settlement, incurred by the DIP Lender in enforcing any DIP Obligations of or in collecting any payments due from Debtor hereunder or under the other DIP Loan Documents by reason of such Default or Event of Default (including in connection with the sale of, collection from, or other realization upon any of the DIP Collateral) or in connection with any negotiations, reviews, refinancing or restructuring of the credit arrangements provided hereunder, including without

limitation in the nature of a "workout" or pursuant to any insolvency or bankruptcy cases or proceedings; and

(vi)    the foregoing shall not be construed to limit any other provisions of the DIP Loan Documents regarding costs and expenses to be paid by the Debtor.

Section 9.4    Enforceability; Successors and Assigns.

(a)    Enforceability; Successors and Assigns.  This Agreement will be binding upon and inure to the benefit of and is enforceable by the respective successors and permitted assigns of the parties hereto.  This Agreement may not be assigned by the Debtor hereto without the prior written consent of the DIP Lender.  Any assignment or attempted assignment in contravention of this Section 9.4(a) will be void *ab initio* and will not relieve the assigning party of any obligation under this Agreement.

(b)    Assignments.  The DIP Lender may assign (an "Assignment") all or a portion of its rights and obligations under the DIP Loan Documents (including all or a portion of the DIP Lender's DIP Loans and DIP Loan Commitment, as the case may be, in a minimum amount of $250,000) to any Assignee.  Such Assignment may be made without the consent of the Debtor.  From and after the date of the Assignment, the Assignee shall be a party hereto and, to the extent of the interest assigned pursuant to the Assignment, have the rights and obligations of the DIP Lender under this Agreement, and the assigning DIP Lender shall, to the extent of the interest assigned, be released from its obligations under this Agreement.  No Assignment by the DIP Lender shall release the DIP Lender from its obligations hereunder arising prior to the date of such assignment.  The Debtor hereby consents to the disclosure of any information obtained by DIP Lender in connection with this Agreement to any Person to which DIP Lender sells, or proposes to sell, its DIP Loans or DIP Loan Commitment, provided any such Person shall agree to keep any such information confidential.

Section 9.5    Integration.  This Agreement and the other DIP Loan Documents contain and constitute the entire agreement of the parties with respect to the subject matter hereof and supersede all prior negotiations, agreements and understandings, whether written or oral, of the parties hereto.

Section 9.6    No Waiver; Remedies.  No failure or delay by any party in exercising any right, power or privilege under this Agreement or any of the other DIP Loan Documents will operate as a waiver of such right, power or privilege.  A single or partial exercise of any right, power or privilege will not preclude any other or further exercise of the right, power or privilege or the exercise of any other right, power or privilege.  The rights and remedies provided in the DIP Loan Documents will be cumulative and not exclusive of any rights or remedies provided by law.

Section 9.7    Setoff.  The Debtor hereby, subject to the Financing Orders and the Carve-Out, grants to the DIP Lender a continuing lien, security interest and right of setoff as security for all liabilities and obligations to the DIP Lender, whether now existing or hereafter arising, upon and against all deposits, credits, collateral and property, now or hereafter in the possession,

custody, safekeeping or control of the DIP Lender or any Affiliate and their successors and assigns or in transit to any of them.  Regardless of the adequacy of any collateral, if any of the DIP Obligations are due and payable and have not been paid or any Event of Default shall have occurred, any deposits or other sums credited by or due from the DIP Lender to the Debtor and any securities or other property of the Debtor in the possession of the DIP Lender may be applied to or set off by the DIP Lender against the payment of DIP Obligations and any and all other liabilities, direct, or indirect, absolute or contingent, due or to become due, now existing or hereafter arising, of the Debtor to the DIP Lender.  **ANY AND ALL RIGHTS TO REQUIRE THE DIP LENDER TO EXERCISE ITS RIGHTS OR REMEDIES WITH RESPECT TO ANY OTHER DIP COLLATERAL WHICH SECURES THE DIP OBLIGATIONS, PRIOR TO EXERCISING ITS RIGHT OF SETOFF WITH RESPECT TO SUCH DEPOSITS, CREDITS OR OTHER PROPERTY OF THE DEBTOR IS HEREBY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVED.**

Section 9.8    <u>Execution in Counterparts</u>.  This Agreement may be executed in any number of counterparts and by different parties on separate counterparts, each of which, when executed and delivered, shall be deemed to be an original, and all of which, when taken together, shall constitute but one and the same Agreement.  Delivery of an executed counterpart of this Agreement by facsimile or other electronic transmission shall be equally as effective as delivery of an original executed counterpart of this Agreement.

Section 9.9      Governing Law; Submission To Jurisdiction; Venue.

(a)      SUBJECT TO THE JURISDICTION OF THE BANKRUPTCY COURT, THIS AGREEMENT AND THE OTHER DIP LOAN DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL, EXCEPT AS OTHERWISE PROVIDED IN CERTAIN OF THE OTHER DIP LOAN DOCUMENTS, BE CONSTRUED IN ACCORDANCE WITH AND BE GOVERNED BY THE INTERNAL LAW OF THE STATE OF NEW YORK (WITHOUT REGARD TO CONFLICTS OF LAWS RULES AND PRINCIPLES THEREUNDER) AND, TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.  ANY LEGAL ACTION OR PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT SHALL BE BROUGHT IN THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE OR DOES NOT EXERCISE JURISDICTION, THEN IN ANY STATE OR FEDERAL COURT OF COMPETENT JURISDICTION IN THE STATE OF TEXAS, AND, BY EXECUTION AND DELIVERY OF THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT, THE DEBTOR HEREBY IRREVOCABLY ACCEPTS FOR ITSELF AND IN RESPECT OF ITS PROPERTY, GENERALLY AND UNCONDITIONALLY, THE JURISDICTION OF THE AFORESAID COURTS.  THE DEBTOR HEREBY FURTHER IRREVOCABLY WAIVES ANY CLAIM THAT ANY SUCH COURTS LACKS PERSONAL JURISDICTION OVER DEBTOR, AND AGREES NOT TO PLEAD OR CLAIM, IN ANY LEGAL ACTION PROCEEDING WITH RESPECT TO THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT BROUGHT IN THE AFOREMENTIONED COURTS, THAT SUCH COURTS LACK PERSONAL JURISDICTION OVER DEBTOR.  DEBTOR FURTHER IRREVOCABLY CONSENTS TO THE SERVICE OF PROCESS OUT OF THE AFOREMENTIONED COURTS IN ANY SUCH ACTION OR PROCEEDING BY THE MAILING OF COPIES THEREOF BY REGISTERED OR CERTIFIED MAIL, POSTAGE PREPAID, TO THE DEBTOR AT ITS ADDRESS AS SET FORTH IN SECTION 9.2 HEREOF, SUCH SERVICE, NOTWITHSTANDING THE PERIODS OF TIME PROVIDED FOR IN SECTION 9.2, TO BECOME EFFECTIVE 30 DAYS AFTER SUCH MAILING.  DEBTOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION TO SUCH SERVICE OF PROCESS AND FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY ACTION OR PROCEEDING COMMENCED HEREUNDER OR UNDER ANY OTHER DIP LOAN DOCUMENT THAT SERVICE OF PROCESS WAS IN ANY WAY INVALID OR INEFFECTIVE.  NOTHING HEREIN SHALL AFFECT THE RIGHT OF THE DIP LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY LAW OR TO COMMENCE LEGAL PROCEEDINGS OR OTHERWISE PROCEED AGAINST DEBTOR IN ANY OTHER JURISDICTION.

(b)      DEBTOR HEREBY IRREVOCABLY WAIVES ANY OBJECTION WHICH IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY OF THE AFORESAID ACTIONS OR PROCEEDINGS ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT OR ANY OTHER DIP LOAN DOCUMENT BROUGHT IN THE COURTS REFERRED TO IN CLAUSE (a) ABOVE AND HEREBY FURTHER IRREVOCABLY WAIVES AND AGREES NOT TO PLEAD OR CLAIM IN ANY SUCH COURT THAT ANY SUCH ACTION OR PROCEEDING BROUGHT IN ANY SUCH COURTS HAVE BEEN BROUGHT IN AN INCONVENIENT FORUM.

Section 9.10   <u>Waiver of Jury Trial</u>.  **THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY RIGHT THAT THEY MAY HAVE TO TRIAL BY JURY OF ANY CLAIM OR CAUSE OF ACTION, OR IN ANY LEGAL PROCEEDING, DIRECTLY OR INDIRECTLY BASED UPON OR ARISING OUT OF THIS AGREEMENT OR THE TRANSACTIONS CONTEMPLATED BY THIS AGREEMENT (WHETHER BASED ON CONTRACT, TORT, OR ANY OTHER THEORY).  EACH PARTY (A) CERTIFIES THAT NO REPRESENTATIVE OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTIES WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION**.

Section 9.11   <u>Severability</u>.  If any term or other provision of this Agreement is invalid, illegal or incapable of being enforced by any rule of law, or public policy, all other conditions and provisions of this Agreement will nevertheless remain in full force and effect so long as the economic or legal substance of the transactions contemplated hereby is not affected in any manner adverse to any party.  Upon such determination that any term or other provision is invalid, illegal or incapable of being enforced, the parties hereto will negotiate in good faith to modify this Agreement so as to effect the original intent of the parties as closely as possible in an acceptable manner to the end that the transactions contemplated hereby are fulfilled to the extent possible.

Section 9.12   <u>Survival</u>.  All representations, warranties, covenants, agreements, and conditions contained in or made pursuant to this Agreement or the other DIP Loan Documents shall survive (a) the making of the Loans and the payment of the DIP Obligations and (b) the performance, observance and compliance with the covenants, terms and conditions, express or implied, of all DIP Loan Documents, until the due and punctual (i) indefeasible payment of the DIP Obligations and (ii) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Loan Documents; <u>provided</u>, <u>however</u>, that the provisions of Article VII and Section 9.3 (other than Section 9.3(a)(iii), except to the extent fees, costs and expenses have been incurred prior to termination hereof but not paid in accordance with such Sections, in which case such Sections shall survive only to require payment of such fees, costs and expenses) shall survive (x) indefeasible payment of the DIP Obligations and (y) performance, observance and compliance with the covenants, terms and conditions, express or implied, of this Agreement and all of the other DIP Loan Documents.

Section 9.13   <u>Maximum Lawful Interest</u>.  Notwithstanding anything to the contrary contained herein, in no event shall the amount of interest and other charges for the use of money payable under this Agreement or any other DIP Loan Document exceed the maximum amounts permissible under any law that a court of competent jurisdiction shall, in a final determination, deem applicable.  The Debtor and the DIP Lender, in executing and delivering this Agreement, intend legally to agree upon the rate or rates of interest and other charges for the use of money and manner of payment stated within it; <u>provided</u>, <u>however</u>, that, anything contained herein to

43

the contrary notwithstanding, if the amount of such interest and other charges for the use of money or manner of payment exceeds the maximum amount allowable under applicable law, then, ipso facto as of the Closing Date, the Debtor is and shall be liable only for the payment of such maximum as allowed by law, and payment received from the Debtor in excess of such legal maximum, whenever received, shall be applied to reduce the principal balance of the Loans to the extent of such excess.

Section 9.14    Interpretation.  As used in this Agreement, references to the singular will include the plural and vice versa and references to the masculine gender will include the feminine and neuter genders and vice versa, as appropriate.  Unless otherwise expressly provided in this Agreement (a) the words "hereof", "herein" and "hereunder" and words of similar import when used in this Agreement will refer to this Agreement as a whole and not to any particular provision of this Agreement and (b) article, section, subsection, and schedule references are references with respect to this Agreement unless otherwise specified.  Unless the context otherwise requires, the term "including" will mean "including, without limitation." The headings in this Agreement and in the Schedules are included for convenience of reference only and will not affect in any way the meaning or interpretation of this Agreement.

Section 9.15    Ambiguities.  This Agreement and the other DIP Loan Documents were negotiated between legal counsel for the parties and any ambiguity in this Agreement or the other DIP Loan Documents shall not be construed against the party who drafted this Agreement or such other DIP Loan Documents.

Section 9.16    The PATRIOT Act.  The DIP Lender hereby notifies Debtor, that pursuant to the requirements of the PATRIOT Act, it is required to obtain, verify and record information that identifies Debtor and other information that will allow the DIP Lender to identify Debtor in accordance with the PATRIOT Act.

Section 9.17    Conflicting Provisions in Security Documents.  In the event that any provisions of this Agreement conflict with any DIP Collateral Document, the provisions of this Agreement shall govern.

Section 9.18    Conflicting Provisions in the Financing Orders.  In the event that any provisions of this Agreement conflict with any provisions in the Financing Orders, the provisions of the Financing Orders shall control.

Section 9.19    Modifications.  Except as specifically contemplated in the Financing Orders, the DIP Liens, lien priority, administrative priorities and other rights and remedies granted to the DIP Lender pursuant to this Agreement and the Financing Orders (specifically, including, but not limited to, the existence, perfection and priority of the DIP Liens provided herein and therein and the administrative priority herein and therein) shall not be modified, altered or impaired in any manner by any other financing or extension of credit or incurrence of Indebtedness by the Debtor (pursuant to section 364 of the Bankruptcy Code or otherwise), or by any dismissal or conversion of the Chapter 11 Case, or by any other act or omission whatsoever (other than in connection with any asset disposition permitted hereunder).  Without limitation, notwithstanding any such order, financing, extension, incurrence, dismissal, conversion, act or omission: (i) except for the Carve-Out having priority over the DIP Obligations, no costs or

expenses of administration which have been or may be incurred in the Chapter 11 Case or any conversion of the same or in any other proceedings related thereto, and no priority claims, are or will be prior to or on a parity with any claim of the DIP Lender against Debtor in respect of any DIP Obligation; (ii) the Liens granted under the DIP Loan Documents shall continue to be valid and perfected and with the specified priority without the necessity that financing statements be filed or that any other action be taken, or document or instrument registered or delivered, under applicable non-bankruptcy law; and (iii) notwithstanding any failure on the part of the Debtor or the DIP Lender to perfect, maintain, protect or enforce the Liens in the DIP Collateral granted under the DIP Loan Documents, the Financing Orders shall automatically, and without further action by any Person, perfect such Liens against the DIP Collateral of the Debtor.

Section 9.20   Release.  THE DEBTOR HEREBY ACKNOWLEDGES AND AGREES THAT AS OF THE DATE HEREOF IT HAS NO DEFENSE, COUNTERCLAIM, OFFSET, CROSS-COMPLAINT, CLAIM OR DEMAND OF ANY KIND OR NATURE WHATSOEVER THAT CAN BE ASSERTED TO REDUCE OR ELIMINATE ALL OR ANY PART OF ITS LIABILITY TO REPAY THE DIP OBLIGATIONS (OR THE PREPETITION OBLIGATIONS OWED TO THE PREPETITION SECURED PARTIES) OR TO SEEK AFFIRMATIVE RELIEF OR DAMAGES OF ANY KIND OR NATURE FROM THE DIP LENDER (IN ITS CAPACITY AS DIP LENDER HEREUNDER AND IN ITS CAPACITY AS A PREPETITION SECURED PARTY) OR OTHER PREPETITION SECURED PARTIES. THE DEBTOR HEREBY VOLUNTARILY AND KNOWINGLY RELEASES AND FOREVER DISCHARGES THE DIP LENDER (IN ITS CAPACITY AS DIP LENDER HEREUNDER AND IN ITS CAPACITY AS A PREPETITION SECURED PARTY), THE OTHER PREPETITION SECURED PARTIES, THEIR RESPECTIVE AFFILIATES, AND EACH OF THEIR RESPECTIVE AGENTS, EMPLOYEES, SUCCESSORS AND ASSIGNS (COLLECTIVELY, THE "**RELEASED PARTIES**") FROM ALL POSSIBLE CLAIMS, DEMANDS, ACTIONS, CAUSES OF ACTION, DAMAGES, COSTS, EXPENSES, OBLIGATIONS, DEBTS AND LIABILITIES WHATSOEVER, WHETHER KNOWN OR UNKNOWN, ANTICIPATED OR UNANTICIPATED, SUSPECTED OR UNSUSPECTED, FIXED, CONTINGENT OR CONDITIONAL, OR AT LAW OR IN EQUITY, IN ANY CASE ORIGINATING IN WHOLE OR IN PART ON OR BEFORE THE DATE THIS AGREEMENT IS EXECUTED THAT THE DEBTOR MAY NOW OR HEREAFTER HAVE AGAINST THE RELEASED PARTIES, IF ANY, IRRESPECTIVE OF WHETHER ANY SUCH CLAIMS ARISE OUT OF CONTRACT, TORT, VIOLATION OF LAW OR REGULATIONS, OR OTHERWISE, AND THAT ARISE FROM ANY DIP LOANS OR PREPETITION INDEBTEDNESS, THE EXERCISE OF ANY RIGHTS AND REMEDIES UNDER THE DIP LOAN DOCUMENTS OR THE PREPETITION CREDIT AGREEMENTS AND THEIR RELATED DOCUMENTS, AND/OR NEGOTIATION FOR AND EXECUTION OF THIS AGREEMENT, INCLUDING, WITHOUT LIMITATION, ANY CONTRACTING FOR, CHARGING, TAKING, RESERVING, COLLECTING OR RECEIVING INTEREST IN EXCESS OF THE HIGHEST LAWFUL RATE APPLICABLE.  NOTWITHSTANDING ANYTHING TO THE CONTRARY SET FORTH HEREIN, THE FOREGOING RELEASE SHALL BE SUBJECT TO THE RIGHTS OF THE COMMITTEE OR ANY OTHER PARTY IN INTEREST UNDER THE FINANCING ORDERS.

Section 9.21 <u>Electronic Transactions</u>.  The transaction described herein may be conducted, and related documents may be stored, by electronic means.  Copies, telecopies, facsimiles, electronic files and other reproductions of original executed documents will be deemed to be authentic and valid counterparts of such original documents for all purposes, including the filing of any claim, action or suit in the appropriate court of law.

[Remainder of page intentionally left blank; signatures on following pages.]

In witness whereof, the parties hereto have caused this Agreement to be duly executed and delivered by their respective representatives thereunto duly authorized as of the date first written above.

**BUCKINGHAM SENIOR LIVING
COMMUNITY, INC.**, as Debtor

By: _____

    Name:  Michael Wyse
    Title:   Chairman

**UMB BANK, N.A.**, as DIP Lender

By: _____

    Name:  Virginia Anne Housum
    Title:   Senior Vice President

## SCHEDULE 2.1

## DIP LOAN COMMITMENTS

| **DIP Loans** | **Commitment Amount** |
|---|---|
| Initial DIP Loans | $1,500,000 |
| DIP Loans (less Initial DIP Loans) | $1,900,000 |
| CapEx DIP Loan | $692,259 |
| DIP Loan Commitment (cumulative) | $3,400,000 |

Schedule 2.1

# EXHIBIT A

## Budget

525295.000011 26440800.12

**The Buckingham: Summary DIP Liquidity Projection**

| Weekly Presentation | 6/26/2021 Q2'21 Actual | 7/3/2021 Q3'21 Proj 1 | 7/10/2021 Q3'21 Proj 2 | 7/17/2021 Q3'21 Proj 3 | 7/24/2021 Q3'21 Proj 4 | 7/31/2021 Q3'21 Proj 5 | 8/7/2021 Q3'21 Proj 6 | 8/14/2021 Q3'21 Proj 7 | 8/21/2021 Q3'21 Proj 8 | 8/28/2021 Q3'21 Proj 9 | 9/4/2021 Q3'21 Proj 10 | 9/11/2021 Q3'21 Proj 11 | 9/18/2021 Q3'21 Proj 12 | 9/25/2021 Q3'21 Proj 13 | 10/2/2021 Oct-Nov'21 Proj 14 | DIP Total weeks 7/3-10/2 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **Credits:** | | | | | | | | | | | | | | | | |
| Resident Checks | 279,939 | - | 121,658 | 106,658 | 193,922 | 193,922 | 196,802 | 196,802 | 196,802 | 196,802 | 196,802 | 196,802 | 196,802 | 196,802 | 196,802 | 2,667,315 |
| Resident ACH | - | - | - | - | - | 915,916 | - | - | - | 745,090 | - | - | - | 745,090 | - | 2,406,096 |
| Medicare | 1,380 | 213,143 | - | - | - | 243,757 | - | - | - | - | 304,696 | - | - | - | 243,757 | 1,006,734 |
| Private Insurance | 45,237 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 18,260 | 300,881 |
| Other | 500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 2,500 | 35,500 |
| Operating Receipts | 327,055 | 233,904 | 142,419 | 127,419 | 214,682 | 1,374,355 | 217,562 | 217,562 | 217,562 | 962,652 | 522,258 | 217,562 | 217,562 | 962,652 | 461,319 | 6,416,526 |
| Check Reversal Credit | 39,743 | | | | | | | | | | | | | | | 39,743 |
| Transfer from UMB Operating Reserve Fund (DIP) | - | - | 705,478 | 187,565 | - | 237 | 628,730 | 28,730 | 353,361 | - | 505,263 | 26,230 | - | 526,669 | | 2,962,262 |
| Total Transfers In to x6160 | - | - | 705,478 | 187,565 | - | 237 | 628,730 | 28,730 | 353,361 | - | 505,263 | 26,230 | - | 526,669 | | 2,962,262 |
| Total Receipts | 366,798 | 233,904 | 142,419 | 832,897 | 402,247 | 1,374,355 | 217,800 | 846,292 | 246,292 | 1,316,013 | 522,258 | 722,825 | 243,792 | 962,652 | 987,988 | 9,418,531 |
| **Debits:** | | | | | | | | | | | | | | | | |
| Payroll and related expenses (1) | (580,000) | - | - | (632,730) | - | (600,000) | - | (600,000) | - | (600,000) | - | (600,000) | - | (600,000) | - | (4,212,730) |
| Facility Services/Supplies (2) | (20,616) | (39,854) | (39,854) | (39,854) | (39,854) | (39,854) | (39,854) | (39,854) | (39,854) | (34,854) | (34,854) | (34,854) | (34,854) | (34,854) | (34,854) | (548,574) |
| Food/Food Service (3) | (628) | (41,715) | (41,172) | (41,172) | (41,172) | (41,172) | (41,172) | (41,172) | (41,172) | (41,172) | (41,172) | (36,172) | (36,172) | (36,172) | (36,172) | (557,579) |
| Manager Services/Marketing (4) | (141,968) | (32,062) | (204,967) | (34,967) | (34,967) | (34,967) | (204,967) | (34,967) | (34,967) | (34,967) | (204,967) | (29,967) | (29,967) | (29,967) | (29,967) | (1,118,600) |
| IT & Utilities (5) | (57,198) | (69,794) | (65,275) | (64,301) | (45,275) | (45,275) | (45,275) | (45,275) | (45,275) | (45,275) | (45,275) | (42,775) | (42,775) | (42,775) | (42,775) | (744,589) |
| Insurance/Broker (6) | - | (13,684) | | | | | | | | | | | | | | (13,684) |
| Pharma/Healthcare Services/Hospitality/Administration/Security (7) | (8,044) | (69,760) | (43,392) | (43,392) | (43,392) | (43,392) | (43,392) | (43,392) | (43,392) | (43,392) | (33,392) | (33,392) | (33,392) | (33,392) | (33,392) | (591,900) |
| BOD/Professional Services/Other (8) | (73,381) | (73,148) | (18,632) | (18,632) | (52,588) | (56,632) | (16,632) | (16,632) | (16,632) | (56,632) | (16,632) | (16,632) | (16,632) | (16,632) | (56,632) | (522,700) |
| CAPEX (Storm Repair) (9) | - | (233,120) | (35,000) | (35,000) | (35,000) | (35,000) | (35,000) | | | | | | | | | (408,120) |
| CAPEX (General) (10) | (51,742) | (202,872) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (25,000) | (50,000) | (25,000) | (50,000) | - | (22,259) | (25,000) | (651,874) |
| Operating Disbursements | (933,578) | (776,009) | (473,292) | (935,048) | (317,247) | (921,292) | (476,292) | (846,292) | (246,292) | (881,292) | (426,292) | (818,792) | (243,792) | (816,051) | (258,792) | (9,370,350) |
| Check Error/ACH Return/Return Item | (1,758) | - | - | | | | | | | - | | | | | | (1,758) |
| Debtor Professional Fees | (286,155) | - | (88,000) | - | - | (169,571) | - | - | - | (348,000) | - | - | - | - | (610,798) | (1,503,434) |
| Indenture Professional Fees | | | | | | | | | | | | | | | | |
| Committee Fees | (74,188) | - | - | - | - | (25,000) | - | - | - | (85,813) | - | - | - | - | (85,000) | (270,000) |
| UST Fees | - | - | - | - | (85,000) | - | - | - | - | - | - | - | - | - | (180,000) | (265,000) |
| Transfer to BOA CAPEX Account | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Transfers Out from x6160 | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - |
| Total Disbursements | (1,295,680) | (776,009) | (561,292) | (935,048) | (402,247) | (1,115,863) | (476,292) | (846,292) | (246,292) | (1,316,013) | (426,292) | (818,792) | (243,792) | (816,051) | (1,134,590) | (11,410,542) |
| Operating Cash Flow | (606,523) | (542,106) | (330,873) | (807,630) | (102,565) | 453,063 | (258,730) | (628,730) | (28,730) | 81,361 | 95,967 | (601,230) | (26,230) | 146,602 | 202,528 | (2,953,824) |
| Other Activity | (322,358) | - | (88,000) | 705,478 | 102,565 | (194,571) | 237 | 628,730 | 28,730 | (81,361) | - | 505,263 | 26,230 | - | (349,129) | 961,813 |
| Beginning Cash | 2,492,012 | 1,563,130 | 1,021,024 | 602,151 | 500,000 | 500,000 | 758,492 | 500,000 | 500,000 | 500,000 | 500,000 | 500,000 | 595,967 | 500,000 | 646,602 | 2,492,012 |
| Minimum Cash Balance Requirement | | | | | | | | | | | | | | | | |
| Net Credits | 366,798 | 233,904 | 142,419 | 832,897 | 402,247 | 1,374,355 | 217,800 | 846,292 | 246,292 | 1,316,013 | 522,258 | 722,825 | 243,792 | 962,652 | 987,988 | 9,418,531 |
| Net Debits | (1,295,680) | (776,009) | (561,292) | (935,048) | (402,247) | (1,115,863) | (476,292) | (846,292) | (246,292) | (1,316,013) | (426,292) | (818,792) | (243,792) | (816,051) | (1,134,590) | (11,410,542) |
| **Ending Operating Account Cash (Bank)** | **1,563,130** | **1,021,024** | **602,151** | **500,000** | **500,000** | **758,492** | **500,000** | **500,000** | **500,000** | **500,000** | **595,967** | **500,000** | **500,000** | **646,602** | **500,000** | **500,000** |
| Estimated Check Float | | | | | | | | | | | | | | | | |
| Ending Operating Account Cash (Book) | | | | | | | | | | | | | | | | |
| Indenture Trust Accounts (Bank) | | | | | | | | | | | | | | | | |
| **Indenture DIP Loan** | | | | | | | | | | | | | | | | |
| Beginning Balance | | - | - | - | (705,478) | (893,044) | (893,044) | (893,281) | (1,522,010) | (1,550,740) | (1,904,101) | (1,904,101) | (2,409,363) | (2,435,593) | (2,435,593) | - |
| Draw | | | | (705,478) | (187,565) | - | (237) | (628,730) | (28,730) | (353,361) | - | (505,263) | (26,230) | - | (526,669) | (2,962,262) |
| Repayment | | | | | | | | | | | | | | | | |
| PIK Interest | | | | | | | | | | | | | | | | |
| **Ending DIP Balance** | | - | - | (705,478) | (893,044) | (893,044) | (893,281) | (1,522,010) | (1,550,740) | (1,904,101) | (1,904,101) | (2,409,363) | (2,435,593) | (2,435,593) | (2,962,262) | (2,962,262) |
| **Resident Occupancy** | | | | | | | | | | | | | | | | |
| **Healthcare Occupancy** | | | | | | | | | | | | | | | | |
| **Incurred Restructuring Fees Projection** | | | | | | | | | | | | | | | | |
| Thompson & Knight (Debtor Restructuring Counsel) | 166,428 | 37,500 | 45,000 | 45,000 | 45,000 | 45,000 | 55,000 | 55,000 | 55,000 | 55,000 | 55,000 | 12,500 | 12,500 | 12,500 | 12,500 | |
| McCall Parkhurst & Horton (Debtor Bond Counsel) | - | - | - | - | - | - | - | - | - | 255,000 | | | | | | |
| B. Riley Advisors (Debtor Financial Advisor) | 31,854 | 23,000 | 23,000 | 23,000 | 23,000 | 23,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 18,625 | 18,625 | 18,625 | 18,625 | |
| TBD | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Stretto (Debtor Claims Agent) | 22,065 | 87,071 | 20,227 | 20,227 | 15,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | 10,227 | |
| Healthcare Ombudsman | - | 22,000 | - | - | - | 11,000 | - | - | - | 11,000 | - | - | - | - | 11,000 | |
| UST Trustee | - | - | - | - | 85,000 | - | - | - | - | - | - | - | - | - | 180,000 | |
| Resident/Creditor Committee Professionals | 24,188 | 25,000 | 25,000 | 25,000 | 20,813 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | 15,000 | |
| Mintz Levin (Indenture Trustee Counsel) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| RBC (Indenture Trustee Financial Advisor) | - | - | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Utility Deposit | - | - | 88,000 | - | - | - | - | - | - | - | - | - | - | - | (88,000) | |

Note:
-Estimate of Storm Damage Capex may be higher but difference to be reimbursed by insurance ($250k deductible)
-Does not reflect DIP interest/fees

# EXHIBIT B

**Form of Borrowing Certificate**

**Borrowing Certificate**

Reference is hereby made to that certain Priming Superpriority Debtor-In-Possession Credit Agreement (the "DIP Credit Agreement") dated as of June __, 2021, by and between Buckingham Senior Living Community, Inc. (the "Debtor") and UMB Bank, N.A., in its capacity as Bond Trustee (the "DIP Lender"). Capitalized terms used but not defined herein shall have the meanings given to them in the DIP Credit Agreement. The undersigned, in their capacity as an Authorized Officer of the Debtor and not individually, hereby certifies as follows as of _____, 2021 (the "Borrowing Date"):

1.      DIP Loans.  Pursuant to the terms of the DIP Credit Agreement, the Debtor is authorized to borrow DIP Loans in an amount equal to the DIP Loan Commitment during the DIP Commitment Period, solely in compliance with the DIP Credit Agreement. The Debtor hereby requests an advance of DIP Loans[1] in the aggregate amount of $_____ (the "Borrowing") to be transferred to the Debtor within two (2) Business Days of the Borrowing Date.

2.      Representations and Warranties.  On and as of the Borrowing Date (both before and after giving effect to the Borrowing requested hereby and application of such proceeds), the representations and warranties of the Debtor contained in the DIP Loan Documents are true and correct in all material respects (except to the extent such representations and warranties specifically relate to an earlier date, such representations and warranties are true and correct on and as of such earlier date).

3.      No Default or Event of Default.  As of the Borrowing Date, no event has occurred or is continuing or would result from the consummation of the Borrowing requested hereby, or the application of such proceeds, that would constitute a Default or an Event of Default.

4.      Available Commitments. After making the DIP Loans requested by this Borrowing, the aggregate outstanding principal amount of the DIP Loans will not exceed the DIP Loan Commitment.

5.      Use of Proceeds.  The proceeds of the DIP Loans advanced under this Borrowing will be used by the Debtor in accordance with the Budget and the DIP Credit Agreement.

[signature page follows]

---

[1] Indicate if CapEx DIP Loan

IN WITNESS WHEREOF, the undersigned has executed this Borrowing Certificate as of the date first above written.

**BUCKINGHAM SENIOR LIVING COMMUNITY, INC.**, as Debtor

By: _____
    Name:
    Title:

110911187v.6